The Honorable Richard A. Jones

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| R.W. and R.J.T., husband and wife, and the marital community composed thereof,<br><br>Plaintiffs,<br><br>v.<br><br>LIBERTY MUTUAL FIRE INSURANCE COMPANY, dba Liberty Mutual<br><br>Defendant. | NO.  C16-465 RAJ<br><br>**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT RE COVERAGES**<br><br>Note on Motion Calendar: February 3, 2017 |

## I. RELIEF REQUESTED

Plaintiffs respectfully request that the Court make the following rulings, as a matter of law:

1.  That the damage caused by the March 2014 water leak, and the mitigation of that damage, was covered. (This does not appear to be disputed.)

2.  That there is no evidence that Plaintiffs intentionally caused the May 2015 fire. (This does not appear to be disputed.)

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT RE COVERAGES — 1

NO.  C16-465 RAJ

JOEL B. HANSON
ATTORNEY AT LAW, PLLC
6100 219 STREET SW, SUITE 480
SEATTLE, WA 98043
425.582.5636

3. That the damage resulting from the fire, and the mitigation of that damage, was covered. (This does not appear to be disputed.)

4. That Plaintiffs' mortgage company was also covered for the fire damage, and mitigation of that damage, even if Liberty Mutual had determined that Plaintiffs had intentionally caused the fire. (This does not appear to be disputed.)

5. That neither insurance contracts were limited to a maximum of 12 months of Additional Living Expenses (ALE) or, in the alternative, that Liberty Mutual breached the Consumer Protection Act by deceptively charging Plaintiffs an additional premium for an amendment (an "endorsement") to their contract to "increase" the ALE limit that actually placed a 12-month limit on ALE when no such limit existed in the original contract. (This issue is disputed.)

## II. INTRODUCTION

This matter is scheduled for a jury trial. The interpretation of an insurance contract is a question of law that, in general, is not an issue of fact for the jury. Plaintiffs ask that the Court confirm four coverage conclusions to erase the possibility of any dispute over these issues at trial. Defendant's testifying representative has agreed with these coverage conclusions but Defendant's counsel has disagreed and objected to the language used by Plaintiffs.

The fifth issue is disputed. Liberty Mutual sold Plaintiffs an amendment (known as an "endorsement") to their insurance contract that purported to increase their ALE limit.

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT RE COVERAGES — 2

NO. C16-465 RAJ

JOEL B. HANSON
ATTORNEY AT LAW, PLLC
6100 219 STREET SW, SUITE 480
SEATTLE, WA 98043
425.582.5636

But Liberty Mutual interpreted the endorsement to reduce their ALE limit, which was open-ended, in order to justify placing a cap of 12 months on that benefit. Plaintiffs ask the Court to find that the intent of the contract was not to cap the open-ended ALE benefit. Alternatively, if the 12-month cap was properly applied, then Plaintiffs ask the Court to find that Liberty Mutual violated the Consumer Protection Act (CPA) as a matter of law by charging Plaintiffs for an "increase" that actually reduced the ALE benefit.

## III. FACTS

### A. The Subject Insurance Contracts Covered All Risks, Unless Explicitly Excluded

There are two relevant insurance contracts in this matter, but they are essentially identical in their provisions. One contract was for the period of 2013 to 2014. The other was for 2014 to 2015. The subject insurance contracts covered all forms of physical damage, unless the damage was explicitly excluded by the contract. The contracts provided:

> COVERAGE A - DWELLING and
> COVERAGE B - OTHER STRUCTURES
> We insure against risks of direct loss to property described in
> Coverages A and B only if that loss is a physical loss to property[.]

(Declaration of Joel Hanson, Exhibit F at 6 of 20, and Exhibit G at 6 of 20.) This form of insurance contract is commonly referred to as an 'all risk' policy. "'All Risk' insurance is a promise to pay upon the fortuitous and extraneous happening of loss or damage from any cause whatsoever unless that cause is specifically excluded. Under an all risk policy,

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT RE COVERAGES — 3

NO. C16-465 RAJ

JOEL B. HANSON
ATTORNEY AT LAW, PLLC
6100 219 STREET SW, SUITE 480
SEATTLE, WA 98043
425.582.5636

any risk that is not specifically excluded is an insured peril." *Frank Coluccio Const. Co. v. King Cty.*, 136 Wn. App. 751, 767, 150 P.3d 1147, 1155 (2007) (citations omitted). Accordingly, all the sources of damage in this matter were covered unless the contract specifically excluded that peril.

**B.    The March 2014 Water Leak Was Covered**

As the parties have explained in a prior motion for partial summary judgment (Dkt. No. 11), Plaintiffs suffered a water leak from a hole in a dishwasher in March 2014. (Dkt. No. 11-1 at 1.) Liberty Mutual's adjuster, Jackline Oyugi, determined that the water leak was covered and did not conduct an investigation into what caused the hole in the dishwasher. (Declaration of Joel Hanson, Exhibit A at 11, 37-39, 44-46.) Liberty Mutual has argued to this Court that the water leak was caused by "rust". (*E.g.*, Dkt. No. 24 at 3, lines 15-16 and at 4, line 20; Dkt. No. 32 at 1, lines 17-26.) However, there is evidence that the water leak was actually caused by a small fire on the heating element. (Hanson Decl. Ex. B; *see also* Ex. A at 46.)

Regardless of the cause, Liberty Mutual's testifying representative, Brian Cahill, agreed that the water leak was a covered loss. (Hanson Decl. Ex. C. at 58.) Liberty Mutual also agreed Plaintiffs were covered for the cost of mitigating that water leak damage. (*Id.*)

**C.    A Fire Occurred in May 2015, Which Was Apparently the Result of Transients Living in the House**

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT RE COVERAGES — 4

NO. C16-465 RAJ

JOEL B. HANSON
ATTORNEY AT LAW, PLLC
6100 219 STREET SW, SUITE 480
SEATTLE, WA 98043
425.582.5636

As a result of the water leak and the dispute with Liberty Mutual concerning the coverage limits on the related mold damage, Plaintiffs were unable to complete repairs and move back into their home. They retained counsel and sought to resolve the dispute. On May 19, 2015, a substantial fire occurred at the house. (Dkt. No. 11-1 at 5, lines 11-12, Declaration of R.W.) Plaintiffs later learned that transients had been living in the house, stealing property, and leaving behind drug paraphernalia. (*Id.*; *see also* Hanson Decl. Ex. D at 24-26.) Counsel for Plaintiffs immediately contacted Liberty Mutual and communicated Plaintiffs' belief that the burglars and/or transients had caused the fire. (*See* Hanson Decl. Ex. E.)

### D.   Liberty Mutual Agrees There Is No Evidence Plaintiffs Intentionally Set the Fire

After learning of the fire, Liberty Mutual assigned Roberta Schultz to investigate Plaintiffs for the possibility that they had committed arson. (Hanson Decl. Ex. D at 12-13, 17.) The reason for this investigation is that Plaintiffs had told Liberty Mutual they believed it was an arson and because Plaintiffs had filed insurance claims in the past, such as the unresolved water leak claim. (*Id.*)

Liberty Mutual viewed the fact that Plaintiffs had previously filed insurance claims as a "red flag". (*Id.*) There were no other red flags indicating Plaintiffs might have committed the arson. (*Id.*)

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT RE COVERAGES — 5

NO. C16-465 RAJ

JOEL B. HANSON
ATTORNEY AT LAW, PLLC
6100 219 STREET SW, SUITE 480
SEATTLE, WA 98043
425.582.5636

Schultz concluded there was no evidence that Plaintiffs committed arson. (Hanson Decl. Ex. D at 18-19.) Nor did she find any evidence of dishonesty by Plaintiffs. (*Id.* at 51.) Schultz concluded her investigation into Plaintiffs on around October 7, 2015. (*Id.* at 52.) That was almost five months after Liberty Mutual was alerted of the May 19 fire.

Liberty Mutual's testifying representative agreed that there was no evidence that Plaintiffs committed arson. (Hanson Decl. Ex. C at 129-130.) He also agreed that they were covered for the damage arising from the fire, including the cost of mitigating that damage. (Hanson Decl. Ex. C at 58-59.)

### E.   Plaintiffs' Mortgage Company Was Covered Regardless of Who Set the Fire

The insurance contract in effect at the time of the fire contained a provision granting a coverage interest to Plaintiffs' mortgage company. (Hanson Decl. Ex. F at Policy Declarations page and LM003133 - "Lender's Loss Payable Endorsement" page.) Liberty Mutual's testifying representative agreed that Plaintiffs' mortgage company was covered for the damage arising from the fire, including the cost of mitigating that damage, regardless of whether Plaintiffs were found to have committed arson. (Hanson Decl. Ex. C at 59-60.)

### F.   Plaintiffs Required More Than 12 Months to Repair their House

Plaintiffs lost the use of their house due to the March 2014 dishwasher leak. On April 14, 2014, Plaintiffs requested the additional living expense ("ALE" or "Loss of

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT RE COVERAGES — 6

NO. C16-465 RAJ

JOEL B. HANSON
ATTORNEY AT LAW, PLLC
6100 219 STREET SW, SUITE 480
SEATTLE, WA 98043
425.582.5636

Use") benefits due to the house being uninhabitable. (Hanson Decl. Ex. H.) Liberty Mutual agreed and, initially, placed them in a hotel. (*Id.*) Liberty Mutual later placed them in a rental house. As the parties have discussed in prior briefing, a dispute arose over payment for repairing the mold damage and Plaintiffs were unable to move back into their house. (*See, e.g.,* Dkt. No. 11-1 at 5, lines 6-13.) More than a year after the leak, while Plaintiffs were still unable to live in the house, the May 2015 fire occurred. (*See id.*) To date, Plaintiffs still have not been able to repair their house and cannot yet move back into their home. (*See* Hanson Decl. Ex. I.) On June 24, 2016, Plaintiffs communicated that they were so frustrated with Liberty Mutual's delays that they were turning to their bank to finance the rebuilding of the house. (Hanson Decl. Ex. J.) That process is now underway, though the permits for the rebuild have not yet been finalized. (*See* Hanson Decl. Ex. I.)

### G.     The Insurance Contract Placed No Maximum Time Limit on the ALE Benefit

The insurance contracts in effect at the time of the water leak and at the time of the fire both provided coverage for the Loss of Use of the property, including ALE. Both of the contracts provided:

> COVERAGE D - Loss of Use
> The limit of liability for Coverage D is the total limit for all the coverages that follow.
>
> 1. If a loss covered under this Section makes that part of the residence premises where you reside not fit to live in, we cover, at your choice, either of the following.  However, if the residence

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT RE COVERAGES — 7

NO. C16-465 RAJ

JOEL B. HANSON
ATTORNEY AT LAW, PLLC
6100 219 STREET SW, SUITE 480
SEATTLE, WA 98043
425.582.5636

premises is not your principal place of residence, we will not provide the option under paragraph b. below.

> a. Additional Living Expense, meaning any necessary increase in living expenses incurred by you so that your household can maintain its normal standard of living; or

> b. Fair Rental Value, meaning the fair rental value of that part of the residence premises where you reside less any expenses that do not continue while the premises is not fit to live in.

Payment under a. or b. will be for the shortest time required to repair or replace the damage or, if you permanently relocate, the shortest time required for your household to settle elsewhere.

2. If a loss covered under this Section makes that part of the residence premises rented to others or held for rental by you not fit to live in, we cover the: Fair Rental Value, meaning the fair rental value of that part of the residence premises rented to others or held for rental by you less any expenses that do not continue while the premises is not fit to live in.
Payment will be for the shortest time required to repair or replace that part of the premises rented or held for rental.

3. If a civil authority prohibits you from use of the residence premises as a result of direct damage to neighboring premises by a Peril Insured Against in this policy, we cover the Additional Living Expense or Fair Rental Value loss as provided under 1 and 2 above for no more than two weeks.

The periods of time under 1, 2 and 3 above are not limited by expiration of this policy.

We do not cover loss or expense due to cancellation of a lease or agreement.

(Hanson Decl. Ex. G on page 4 of 20, and Ex. H on page 4 of 20.) The Policy Declarations page of both contracts provided the following limits on the ALE coverage:

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT RE COVERAGES — 8

NO.  C16-465 RAJ

JOEL B. HANSON
ATTORNEY AT LAW, PLLC
6100 219 STREET SW, SUITE 480
SEATTLE, WA 98043
425.582.5636

Section I Coverages                                      LIMITS

. . .

D. Loss of Use of Insured Location                  Actual Loss Sustained

(Hanson Decl. Ex. G at Policy Declarations pages, and Ex. H at Policy Declarations pages.) While the Dwelling and Personal Property coverages had limits, the Loss of Use coverage did not. (*Id.*)

**H.   Liberty Mutual Sold an Endorsement Which Purported to Increase the ALE and Other Benefits**

Liberty Mutual sold Plaintiffs the following "Additional Coverages":

| Additional Coverages | | | |
|---|---|---|---|
| | DEDUCTIBLE | LIMITS | PREMIUM |
| Credit Card, Fund Transfer Card, Forgery | $ 1,000 | | $ 0 |
| Home Protector Plus | | | $ 163 |
| Coverage E & F increased limit | | | $ 26 |
| Total Additional Coverages | | | $ 189 |

(Hanson Decl. Ex. G at Policy Declarations pages, and Ex. H at Policy Declarations pages.) In 2013 to 2014, Plaintiffs paid slightly less, $154, for the Home Protector Plus additional coverage. (*Id.*)

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT RE COVERAGES — 9

NO. C16-465 RAJ

JOEL B. HANSON
ATTORNEY AT LAW, PLLC
6100 219 STREET SW, SUITE 480
SEATTLE, WA 98043
425.582.5636

The "Home Protector Plus Endorsement" in both contracts contained the following provision:

> C. INCREASED LIMIT - COVERAGE D We will pay the amount of loss covered by Coverage D which is actually sustained by you during the 12 consecutive months following the date of loss, subject to the periods of time under paragraphs 1, 2 and 3 of Coverage D - Loss of Use

(Hanson Decl. Ex. G at "Home Protector Plus Endorsement" page 2 of 2, and Ex. H at "Home Protector Plus Endorsement" page 2 of 2.) While this endorsement may have constituted an "increased limit" for many insurance contracts, it was a lesser limit than what already existed in Plaintiffs' contract. As a result, the 12-month limit was not reflected on the Policy Declarations pages, which kept the "Actual Loss Sustained" language. (Hanson Decl. Ex. G at Policy Declarations pages, and Ex. H at Policy Declarations pages.)

## I.     Liberty Mutual Interpreted the "Increased" ALE Benefit to Place a 12-Month Cap on the Benefit That Did Not Previously Exist

Liberty Mutual ended the ALE benefit on March 9, 2015, which was 12 months after the water leak. (Hanson Decl. Ex. K.) After the fire, Plaintiffs reminded Liberty Mutual that they were still living in a rental house and needed the ALE benefit. (*See, e.g.*, Hanson Decl. Ex. L.) On June 25, 2015, Liberty Mutual decided to pay ALE benefits

JOEL B. HANSON
ATTORNEY AT LAW, PLLC
6100 219 STREET SW, SUITE 480
SEATTLE, WA 98043
425.582.5636

while it investigated coverage for the May 19, 2015 fire claim.[1] (Hanson Decl. Ex. M.) Liberty Mutual communicated it would cancel the ALE benefit again at exactly 12 months from the date of the fire. (Hanson Decl. Ex. N.)  However, Plaintiffs argued that Liberty Mutual should not cancel the ALE benefit because the 12-month limit should not overcome the "Actual Loss Sustained" language. (Hanson Decl. Ex. O.) Plaintiffs threatened to bring a motion on that issue. (*Id.*) Eventually, Liberty Mutual agreed to extend the ALE benefit for two more months, and then cancelled those benefits after a total of 14 months from the date of the fire. (Hanson Decl. Ex. P.)

James Wolterman, Liberty Mutual's adjuster currently in charge of the claim, testified that Liberty Mutual ended the ALE benefit to Plaintiffs based on its position that there was a 12-month cap on that benefit. (Hanson Decl. Ex. Q at 145-147.) Wolterman sent a March 16, 2016 email where he appeared to express criticism of the speed at which Plaintiffs had undertaken the repair process. (Hanson Decl. Ex. R.) However, Wolterman clarified during his deposition that he did not actually mean to criticize Plaintiffs' efforts to repair their house. (Hanson Decl. Ex. Q at 180-183.) His only criticism concerning the fire claim is that he feels the engineer, Ryan Barrett of Pacific Engineering Technologies, should have done things differently for the claim process to move forward. (*Id.* at 183, 185, 193.) Liberty Mutual's testifying representative confirmed that Liberty Mutual's only

---

[1] Liberty Mutual declined to pay any money for the structure damage, mitigation, or personal property damage arising from the fire until it completed its arson investigation in October 2015.

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT RE COVERAGES — 11

NO. C16-465 RAJ

JOEL B. HANSON
ATTORNEY AT LAW, PLLC
6100 219 STREET SW, SUITE 480
SEATTLE, WA 98043
425.582.5636

criticism of Plaintiffs was that it wished that the process of submitting engineering plans and requesting permits had started sooner. (Hanson Decl. Ex. C at 164-165.) Plaintiffs have sent correspondence explaining why they feel Liberty Mutual made it impossible for them to move forward with the repair process. (*See, e.g.*, Hanson Decl. Ex. J.) Among other things, Plaintiffs allege that Liberty Mutual did not make a good faith effort to reach an agreement with their contractor on the scope and cost of repairs, which made it impossible for the repairs to begin.

## IV. ARGUMENT

### A.    Standard for summary judgment

The interpretation of an insurance contract is a question of law. *Overton v. Consol. Ins. Co.,* 145 Wn.2d 417, 424, 38 P.3d 322 (2002). A party is entitled to summary judgment if "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether an issue of fact exists, the Court must view the evidence and draw reasonable inferences from the evidence in the light most favorable to nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248-50 (1986); *United States v. Johnson Controls, Inc.,* 457 F.3d 1009, 1013 (9th Cir. 2006). To avoid summary judgment, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT RE COVERAGES — 12

NO. C16-465 RAJ

JOEL B. HANSON
ATTORNEY AT LAW, PLLC
6100 219 STREET SW, SUITE 480
SEATTLE, WA 98043
425.582.5636

The facts that are material to this motion are not genuinely in dispute and the only questions raised in this motion turn on the interpretation of the subject insurance contract. These contractual issues can, and should, be resolved by the Court on summary judgment.

**B.    The damage caused by the March 2014 water leak, and the mitigation of that damage, was covered**

There is no genuine issue of fact. As matter of law, it should be found that the March 2014 water leak, and the mitigation of that damage, was covered.

**C.    There is no evidence that Plaintiffs intentionally caused the May 2015 fire**

There is no genuine issue of fact. As matter of law, it should be found that there is no evidence that Plaintiffs intentionally caused the May 2015 fire.

**D.    The damage resulting from the fire, and the mitigation of that damage, was covered**

There is no genuine issue of fact. As matter of law, it should be found that the damage resulting from the May 2015 fire, and the mitigation of that damage, was covered.

**E.    Plaintiffs' mortgage company was also covered for the fire damage and the mitigation of that damage, even if Liberty Mutual had determined that Plaintiffs had intentionally caused the fire**

There is no genuine issue of fact. As matter of law, it should be found that Plaintiffs' mortgage company was covered for the fire damage, and the mitigation of that damage, even if Liberty Mutual had determined that Plaintiffs had intentionally caused the fire.

JOEL B. HANSON
ATTORNEY AT LAW, PLLC
6100 219 STREET SW, SUITE 480
SEATTLE, WA 98043
425.582.5636

This issue is relevant to Plaintiffs' allegation that Liberty Mutual acted in bad faith during its 5-month delay in paying the claim while it conducted its arson investigation. Liberty Mutual declined to pay for the repairs or for the cost of mitigating the fire damage during that arson investigation. Similarly, Liberty Mutual did little to evaluate the cost of repairs during that time and ignored the estimate it received from Plaintiffs' contractor.

**F.    The contract was not limited to 12 months of ALE**

The Policy Declarations page stated that the maximum "limit" for Loss of Use benefits, including ALE, was the "Actual Loss Sustained". The Loss of Use provision stated that benefits would continue for "the shortest time required to repair or replace the damage". Together, these provisions communicated that the ALE was limited to the shortest time required to repair or replace the damage, without a specific monetary or time limit. If more than 12 months were required for repairs, then the Plaintiffs would be compensated for that time.

However, the Home Protector Plus endorsement contained an "Increased Limit" provision the "increased" the limits to a maximum of 12 months. It may be that, for other insurance contracts, the Increased Limit was an actual increase. But the subject contract already had a limit that exceeded 12 months.

The Policy Declarations pages of the contract reconciled this issue. The Policy Declarations pages explicitly acknowledged that the Home Protector Plus endorsement had been added, yet the Policy Declarations also explicitly stated that the Loss of Use

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT RE COVERAGES — 14

NO. C16-465 RAJ

JOEL B. HANSON
ATTORNEY AT LAW, PLLC
6100 219 STREET SW, SUITE 480
SEATTLE, WA 98043
425.582.5636

limit was the "Actual Loss Sustained". In other words, the Policy Declarations limits were written with the Home Protector Plus endorsement in mind yet did not include a 12-month limit.

The provisions of the contract must be read together. If the parties had intended that the Loss of Use benefit be limited to 12 months, the Policy Declarations page would have reflected that lower limit. Liberty Mutual's application of a 12-month limit ignored the explicit language contained in the Policy Declarations.

The rules of interpreting insurance contracts are highly favorable for insurance customers. "Because they are generally contracts of adhesion, courts look at insurance contracts in a light most favorable to the insured." *Averill v. Farmers Ins. Co. of Washington*, 155 Wn. App. 106, 118, 229 P.3d 830, 836 (2010). As the Washington Supreme Court has explained:

> Policies of insurance are invariably complex and are understood by laymen with difficulty, and as a result the insured generally makes a request for the kind of insurance he desires and then signs 'on the dotted line' upon a formidable appearing printed form with the provisions of which the average assured has slight, if any, acquaintance. The policies are prepared by skilled lawyers retained by the insurance companies, who through years of study and practice have become expert upon insurance law, and are fully capable of drawing a contract which will restrict the scope of the liability of the company with such clearness that the policy will be free from ambiguity, require no construction, but construe itself. Because of reasons such as these, whenever the contract of insurance is so drawn as to be ambiguous, uncertain, and to require construction, the courts of this country resolve the doubt in favor of the insured and against the insurer, in accordance with the rule contra proferentem.

JOEL B. HANSON
ATTORNEY AT LAW, PLLC
6100 219 STREET SW, SUITE 480
SEATTLE, WA 98043
425.582.5636

> Exclusionary clauses in insurance contracts, consequently, are very strictly construed against the insurer.

*Labberton v. General Cas. Co. of America*, 53 Wash.2d 180, 182-83, 332 P.2d 250 (1958) (internal quotation marks omitted). Insurance policies must be "liberally construed in favor of a policyholder or beneficiary thereof, whenever possible, and strictly construed against the insurer in order to afford the protection which the insured was endeavoring to secure when he applied for the insurance." *Queen City Farms, Inc. v. Central Nat'l Ins. Co.*, 64 Wn. App. 838, 855, 827 P.2d 1024 (1992), aff'd, 126 Wn.2d 50, 882 P.2d 703 (1994). "It must not be forgotten that the purpose of insurance is to insure, and that construction should be taken which will render the contract operative, rather than inoperative." *Phil Schroeder, Inc. v. Royal Globe Ins. Co.*, 99 Wn. 2d 65, 68, 659 P.2d 509, 511 (1983). "A construction which contradicts the general purpose of the contract or results in a hardship or absurdity is presumed to be unintended by the parties." *Id.*

"The terms of a policy should be given a fair, reasonable, and sensible construction as would be given to the contract by the average person purchasing insurance." *Overton*, 145 Wn.2d at 424. The terms of an insurance policy should be construed as a whole. *Panorama Vill. Condo. Owners Bd. of Dirs. v. Allstate Ins. Co.*, 144 Wn.2d 130, 137, 26 P.3d 910 (2001). Extrinsic evidence of the intent of the parties may be considered. *Id.*

Where a policy is ambiguous on an issue, that ambiguity must be construed in favor of the insured. *Id.* "The rule strictly construing ambiguities in favor of the insured applies

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT RE COVERAGES — 16

NO. C16-465 RAJ

JOEL B. HANSON
ATTORNEY AT LAW, PLLC
6100 219 STREET SW, SUITE 480
SEATTLE, WA 98043
425.582.5636

with added force to exclusionary clauses which seek to limit policy coverage." *Findlay v. United Pacific Ins. Co.*, 129 Wn.2d 368, 374, 917 P.2d 116 (1996). "Where a provision of a policy of insurance is capable of two meanings, or is fairly susceptible of two constructions, the meaning and construction most favorable to the insured must be employed, even though the insurer may have intended otherwise." *Shotwell v. Transamerica Title Ins. Co.*, 91 Wn. 2d 161, 167, 588 P.2d 208, 212 (1978).

Plaintiffs agree that, in a vacuum, the 12-month increased limit provision would control. The Sixth Circuit Court of Appeals confirmed that a similar provision was enforceable under Michigan law. *Hayes v. Liberty Ins. Corp.*, 526 Fed. Appx. 564, 566 (6th Cir. 2013) (unpublished) (applying Michigan law). But that case is distinguishable. The *Hayes* case did not contain a Policy Declarations page that that stated the Loss of Use limit was for the "Actual Loss Sustained" rather than the 12-month limit. If the 12-month limit was intended to apply, it should have been reflected in the Policy Declarations page, which explicitly acknowledged the Home Protector Plus endorsement.

There is no reason to disregard the "Actual Loss Sustained" limit expressed in the Policy Declarations. A 12-month limit should not have been applied to Plaintiffs' insurance claims. As a matter of law, it should be found that the ALE benefits did not have a 12-month limit.

G.      **In the alternative, Liberty Mutual violated the CPA by charging Plaintiffs for an "increase" in coverage that actually reduced the ALE limit**

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT RE COVERAGES — 17

NO. C16-465 RAJ

JOEL B. HANSON
ATTORNEY AT LAW, PLLC
6100 219 STREET SW, SUITE 480
SEATTLE, WA 98043
425.582.5636

In the alternative, if the Court finds that Liberty Mutual correctly interpreted the contract to limit Loss of Use to 12 months despite the "Actual Loss Sustained" language, then Liberty Mutual violated the CPA by charging Plaintiffs for an amendment (or "endorsement") to the contract that actually reduced the Loss of Use limit.

Liberty Mutual sold Plaintiffs the "Home Protectors Plus" endorsement, which included the "Increased Limit" provision limiting ALE to 12-months, for an additional $163 per year. No such 12-month limit existed in the contract prior to the charge for the endorsement. It is an unfair or deceptive trade practice for an insurance company to sell modifications to insurance contracts that purport to "increase" the insurance limits but that actually reduce the limits.

To prevail in a private CPA action, the plaintiff must show that the defendant's conduct met the elements of the *Hangman Ridge* five-part test: (1) an unfair or deceptive act or practice, (2) occurring in trade or commerce, (3) impacting the public interest, (4) injuring plaintiff in his or her business or property, and (5) causation. *Hangman Ridge v. Safeco Title*, 105 Wn.2d 778, 780, 719 P.2d 531 (1986). The first element is met here because Liberty Mutual charged Plaintiffs for an "Increased Limit" that actually decreased the Loss of Use limits. Where an or practice is unambiguously deceptive or unfair, courts may rule on it as a matter of law. State v. Kaiser, 161 Wn. App. 705, 722-

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT RE COVERAGES — 18

NO. C16-465 RAJ

JOEL B. HANSON
ATTORNEY AT LAW, PLLC
6100 219 STREET SW, SUITE 480
SEATTLE, WA 98043
425.582.5636

23, 254 P.3d 850, 860 (2011) (finding that investing firm violated CPA as a matter of law by taking proceeds from tax foreclosure sales).

The second and third elements of *Hangman Ridge* are automatically met in the context of insurance because it is a business which affects the public interest. *See* RCW 48.01.030; *see also Am. Mfrs. Mut. Ins. Co. v. Osborn*, 104 Wn. App. 686, 697-98, 17 P.3d 1229 (2001) (holding that, to prove a CPA violation, the insured only has to show that the insurer breached one of more of the WAC regulations and that the insured was injured by that breach). The fourth and fifth elements are met because the unfair or deceptive act led to the premature expiration of Plaintiffs' Loss of Use benefit. Therefore, all five elements have been met as a matter of law.

As discussed above, it is Plaintiffs' position that the contract should be interpreted to allow more than 12 months ALE if that is the Actual Loss Sustained. If so, charging Plaintiffs for the Home Protector Plus endorsement and Increased Limit provision did not violate the CPA. However, if the 12-month limit somehow overcomes the Actual Loss Sustained language, then Liberty Mutual should be found to have violated the CPA as a matter of law.

JOEL B. HANSON
ATTORNEY AT LAW, PLLC
6100 219 STREET SW, SUITE 480
SEATTLE, WA 98043
425.582.5636

DATED this 10th day of January, 2017.

JOEL B. HANSON, ATTORNEY AT LAW, PLLC

 /s/ Joel Hanson
Joel B. Hanson, WSBA #40814
Attorney for Plaintiffs

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT RE COVERAGES — 20

NO.  C16-465 RAJ

JOEL B. HANSON
ATTORNEY AT LAW, PLLC
6100 219 STREET SW, SUITE 480
SEATTLE, WA 98043
425.582.5636

The Honorable Richard A. Jones

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| R.W. and R.J.T., husband and wife, and the marital community composed thereof,<br><br>Plaintiffs,<br><br>v.<br><br>LIBERTY MUTUAL FIRE INSURANCE COMPANY, dba Liberty Mutual<br><br>Defendant. | NO.  C16-465 RAJ<br><br>**DECLARATION OF JOEL HANSON IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT RE COVERAGES** |

I, Joel Hanson, declare as follows:

1.     I am over 18 years of age and otherwise competent to make this Declaration, which is based on my personal knowledge and the documents contained herein.

2.     I am the attorney who represents the Plaintiffs in this matter.

3.     Attached as Exhibit A is a true and correct copy of pages 11, 37-39, 44-46 of the deposition transcript of Jackline Oyugi, who was the original adjuster who handled Plaintiffs' water loss claim.

4.     Attached as Exhibit B is a true and correct copy of page LM 00130 of Liberty Mutual's internal log entries, along with pages LM 1323 and LM 1324, which were part of Liberty Mutual's claim file.

DECLARATION OF JOEL HANSON — 1

NO. C16-465 RAJ

JOEL B. HANSON
ATTORNEY AT LAW, PLLC
6100 219 STREET SW, SUITE 480
MOUNTLAKE TERRACE, WA 98043
425.582.5636

5.      Attached as Exhibit C is a true and correct copy pages 58-60, 129-130, 164-165 of the deposition transcript of Brian Cahill, who served as Liberty Mutual's testifying representative concerning the events of the insurance claims and Liberty Mutual's interpretation of the insurance contract.

6.      Attached as Exhibit D is a true and correct copy of pages 12-13, 17, 18-19, 24-26, 51-52 from the deposition transcript of Roberta Schultz.

7.      Attached as Exhibit E is a true and correct copy of an email I sent on May 19, 2015.

8.      Attached as Exhibit F is a true and correct copy of the insurance contract in effect during the May 19, 2015 fire.

9.      Attached as Exhibit G is a true and correct copy of the insurance contract that was in effect during the March 2014 water leak.

10.     Attached as Exhibit H is a true and correct copy of a page from Liberty Mutual's internal log notes labelled LM 00144.

11.     Attached as Exhibit I is a true and correct copy of a November 23, 2016 email from Plaintiff Rani Thykkuttathil.

12.     Attached as Exhibit J is a true and correct copy of a letter sent by Ms. Thykkuttathil on June 24, 2016.

13.     Attached as Exhibit K is a true and correct copy of pages from Liberty Mutual's internal log notes labelled LM0034 and LM0044-45.

14.     Attached as Exhibit L is a true and correct copy of a June 17, 2015, 5:00pm email from me.

DECLARATION OF JOEL HANSON — 2

NO. C16-465 RAJ

15.     Attached as Exhibit M is a true and correct copy of a June 25, 2015 letter from Charles Blackburn.

16.     Attached as Exhibit N is a true and correct copy of an email from Ryan Wellman dated February 4, 2016.

17.     Attached as Exhibit O is a true and correct copy of an email from me dated February 12, 2016.

18.     Attached as Exhibit P is a true and correct copy of an email from James Wolterman dated March 29, 2016.

19.     Attached as Exhibit Q is a true and correct copy of pages 145-147, 180-183, 185, 193 from the deposition transcript of James Wolterman.

20.     Attached as Exhibit R is a true and correct copy of an email from James Wolterman dated March 16, 2016.


I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.


Signed at Mountlake Terrace Washington, this 10th day of January, 2017.


_____/s Joel Hanson_____

Joel B. Hanson, WSBA #40814
Attorney for Plaintiffs


DECLARATION OF JOEL HANSON — 3

NO. C16-465 RAJ

JOEL B. HANSON
ATTORNEY AT LAW, PLLC
6100 219 STREET SW, SUITE 480
MOUNTLAKE TERRACE, WA 98043
425.582.5636

# EXHIBIT A

Atkinson-Baker Court Reporters
www.depo.com

1        IN THE UNITED STATES DISTRICT COURT

2       WESTERN DISTRICT OF WASHINGTON AT SEATTLE

3

4

5  R. W. and R. J. T., husband and

6  wife, and the marital community

7  composed thereof,

8           Plaintiffs,

9  vs.               Case No. CV 16-465 RAJ

10  LIBERTY MUTUAL FIRE INSURANCE

11  COMPANY, d/b/a LIBERTY MUTUAL,

12           Defendant.

13

14

15

16      DEPOSITION OF JACKLINE OYUGI, a witness,

17  taken on behalf of the Plaintiffs, pursuant to

18  Notice, on December 6, 2016, at the offices of

19  REGUS BUSINESS CENTER, 9393 West 110th Street,

20  Suite 500, Overland Park, Kansas, before

21

22         JUSTINA M. WROTEN

23

24  Registered Professional Reporter, Certified in

25  Kansas and Missouri.

1

Atkinson-Baker Court Reporters
www.depo.com

1    Q.    Okay.  And is it correct to say that

2    you've now been with Liberty Mutual for about three

3    or four years?

4        A.    I have been with Liberty for

5    three-and-a-half years now.

6        Q.    And can you say what your role was in Ryan

7    and Rani's claim?

8        A.    I was the adjuster who was assigned to

9    visit with the insureds and determine the cause of

10   loss and afford or deny coverage if it's not

11   available.

12       Q.    Okay.  I'm going to ask you some questions

13   about the standard of care for handling insurance

14   claims, and I'm going to ask whether you agree or

15   disagree with certain statements.

16            Do you agree that an insurance company

17   owes a duty of good faith to its customers?

18       A.    By -- could you rephrase that question

19   again?

20       Q.    Sure.  During an insurance claim, do you

21   agree that an insurance company owes a duty of good

22   faith to its customers?

23       A.    We have a duty of good faith -- it's a

24   mutual duty, both on the insurance side and the

25   homeowner's side.

Atkinson-Baker Court Reporters
www.depo.com

1      Q.    Okay.  So the Seattle area the employees

2   may have needed some additional help from

3   catastrophe adjusters like you; is that right?

4      A.    That is correct.

5      Q.    Okay.  Do you know if there was a -- are

6   you speculating or are you sure that that was an

7   issue at the time that you got involved in the

8   claim?

9      A.    This is typically the kind of situations

10   that I handle.  That's -- I'm a catastrophe

11   adjuster, so I come in during catastrophes, yes.

12      Q.    Okay.  So typically they wouldn't send you

13   to somewhere like Seattle to handle a claim unless

14   the local employees needed some help; is that right?

15      A.    Typically, correct.

16      Q.    Okay.  Can you tell me what you did to

17   investigate the claim?

18      A.    Okay.  What I remember -- and, once again,

19   this is a claim that I handled in 2012.  I can't

20   remember the exact -- you know, every single detail

21   of what happened.  But what I remember off of the

22   top of my head is I called the homeowners, and we

23   agreed to meet on a stated date and time to do the

24   inspection.  And I arrived on site at the stated

25   time, and I did the inspection, whereby there was

Jackline Oyugi
December 6, 2016

1    a -- a dishwasher which had a hole on the base of

2    it, and that hole had caused a water leak into the

3    kitchen, damaging the sides of the cabinet and the

4    floor.  And there's a basement right underneath the

5    kitchen, and there was damage to the drywall on the

6    basement below as well.

7         Q.   Okay.  Do you remember what -- you said

8    there was a hole in the base of the dishwasher; is

9    that right?

10        A.   That is correct.

11        Q.   Do you remember what caused that hole in

12   the base of the dishwasher?

13        A.   Off of the top of my head, I don't.  I

14   just -- I just remember that she showed me a

15   dishwasher which was about to be disposed and there

16   was a hole on it.  And --

17        Q.   Okay.

18        A.   -- it looked like a mechanical failure,

19   you know.

20        Q.   Okay.  How did it look like a mechanical

21   failure to you?

22        A.   Just a hole that's just popped up on --

23   you know, it looked like something that had just

24   happened.  Water just broke through that hole and

25   oozed out.

Atkinson-Baker Court Reporters
www.depo.com

```
1        Q.    Okay.  And you said the water seeped into
2   the floor under the dishwasher and into the walls in
3   the -- the laundry room below; correct?
4        A.    I -- I don't know exactly what you mean by
5   seep because seeping is drip, drip, drip, you
6   know --
7        Q.    Oh.
8        A.    -- little drips.  It -- you know, the
9   amount of water --
10       Q.    Okay.
11       A.    -- that had been cleaned up, it looked
12  like a hole had just -- it seemed like something
13  that was just sudden, you know, like it just busted
14  out --
15       Q.    Okay.
16       A.    -- and water came oozing.
17       Q.    Okay.  And do you -- do you have a -- some
18  kind of estimate as to how many gallons of water
19  seemed to have come out of the dishwasher and into
20  the floor and in the laundry room?
21       A.    I couldn't answer that question, because
22  by the time I got there, the restoration people had
23  done the cleanup.
24       Q.    Okay.
25       A.    Uh-huh.
```

```
 1    water loss and noted that a dishwasher appears to
 2    have leaked due to a fire.  Do you see that?
 3         A.   Yes.
 4         Q.   Do you remember that, that there was a
 5    dishwasher leak as a result of a fire?
 6         A.   No, I don't remember that.  Not -- I mean,
 7    this -- this was a long time ago, so I don't ...
 8         Q.   Yeah.  Okay.  Do you remember doing any
 9    kind of investigation into what caused the hole in
10    the dishwasher?
11         A.   If your question is, how did I determine
12    whether there is coverage for this particular loss,
13    the homeowner's policy indicated that we cover for
14    insuring, the insuring water damage.  So I didn't
15    get into the fine details of -- you know, I didn't
16    flip the dishwasher around to see what was happening
17    on the bottom of it because it was about to be
18    disposed anyway.
19         Q.   Okay.  So based on the information you had
20    that there was a water leak, that was sufficient for
21    you to decide there was coverage; is that correct?
22         A.   I afforded --
23              MS. EVERSOLE:  I'm going to object on --
24         A.   -- coverage based --
25              (Reporter clarification.)
```

44

Atkinson-Baker Court Reporters
www.depo.com

1          MS. EVERSOLE:   That mischaracterized her

2    testimony.

3          You can answer.

4     Q.   (By Mr. Hanson)  Go ahead.  I didn't hear

5    your answer, Ms. Oyugi.

6     A.   I afforded them coverage based on there

7    being a hole that was evident on the dishwasher

8    causing insuring water damage.   Insuring water

9    damage is a covered loss.

10    Q.   Okay.

11    A.   And I explained to --

12    Q.   And there being a hole -- and all you

13   needed to know was that there was a hole in the

14   dishwasher that caused the water damage, and that

15   was sufficient for you to decide that there was

16   coverage; is that correct?

17    A.   I needed to determine -- I determined that

18   there was a hole in the dishwasher that caused a

19   sudden leak.  Water came oozing out.  The insuring

20   water damage is covered, and there is no coverage

21   for the dishwasher that caused the leak itself.

22    Q.   Okay.  Okay.  And then you didn't need to

23   do any more investigation after that into the cause

24   of the loss; is that correct?

25    A.   I believe that the evidence that I had

                                                         45

```
 1    with, you know, looking at a hole on a dishwasher
 2    that caused oozing water was sufficient enough for
 3    me to afford them coverage.  And I knew --
 4         Q.   Okay.
 5         A.   -- from the policy language that the
 6    dishwasher itself is not covered.  If the dishwasher
 7    itself --
 8         Q.   Okay.
 9         A.   -- was covered, it may have been necessary
10    to go further and determine if the actual cause of
11    loss on the particular dishwasher afforded them
12    coverage for the dishwasher replacement.
13         Q.   Okay.  Okay.  Do you remember whether rust
14    was a cause of the dishwasher leak?
15         A.   No, I don't remember that part.
16         Q.   Okay.  Do you remember if the dishwasher
17    was rusty?
18         A.   It appeared old.
19         Q.   Okay.  But do you remember -- do you
20    remember rust?
21         A.   I didn't -- I did not flip the dishwasher
22    around.  It was very heavy, and the homeowner was
23    expecting.  I didn't expect her to help me flip the
24    dishwasher around.
25         Q.   Okay.  I think you said that the leak
```

46

Atkinson-Baker Court Reporters
www.depo.com

```
 1              CERTIFICATE OF REPORTER

 2

 3        I, Justina M. Wroten, a Certified Court

 4   Reporter of the State of Kansas, do hereby certify:

 5        That prior to being examined, the witness

 6   was first duly sworn;

 7        That said testimony was taken down by me in

 8   shorthand at the time and place hereinbefore stated

 9   and was thereafter reduced to typewriting under my

10   direction;

11        That the foregoing transcript is a true

12   record of the testimony given by said witness;

13        That I am not a relative or employee or

14   attorney or counsel of any of the parties or a

15   relative or employee of such attorney or counsel or

16   financially interested in the action.

17        Witness my hand and seal this 21st day of

18   December, 2016.

19

20

21

22

23              Justina M. Wroten

24              Certified Court Reporter

25              State of Kansas
```

Jackline Oyugi
December 6, 2016

# EXHIBIT B

 Pol: H3226803084640 | Ins: RANI THYKKUTTATHIL | DoL: 03/09/2014 | St: Open

| Create Date | Author | Topic | Related To | Subject | Text (2,500) |
|---|---|---|---|---|---|
| | | | - RANI THYKKUTT | | ont he loss, he believes. He is not sure if they were called out or not by the insured. I thanked him for the update and current status. |
| 06/17/2014 03:27 PM | CHARLES BLACKBUR | Claim Status | none (Claim-level) | Servpro | Original 06/17/2014 03:27 PM Received mssg. from Emily at Servpro. Explained that PPS will contact her to provide some direction and to call me back if she is unable to make contact by tomorrow afternoon. She agreed. |
| 06/17/2014 03:26 PM | JON GOFFINET | Policyholde | (3) 1st Party Content - RANI THYKKUTT | Initial PPUN Contact Attempt | Original 06/17/2014 03:26 PM I attempted to contact Rani on her cellphone of (206)255-9969. I left a detailed message and introduced myself and my role in the process. I asked for a retun call and provided my direct cellphone number |
| 06/17/2014 03:23 PM | JON GOFFINET | Policyholde | (3) 1st Party Content - RANI THYKKUTT | Initial PPUN Contact | Original 06/17/2014 03:23 PM I attempted to contact the insureds at their home number of (206)226-9404. I reached Mr. Thykkuttathil. I introduced myself and my role in the process. He asked me to call his wife to discuss the loss in more detail (Rani). I advised him I would do so. He provided the conatct number for her (Rani) of (206)255-9969. |
| 06/17/2014 02:33 PM | JON GOFFINET | Claim Status | none (Claim-level) | Initial Personal Property Review | Original 06/17/2014 02:33 PM I reveiwied this NEW WATER LOSS and noted that a dishwasher appears to have leaked due to a fire. I reviewed the facts of the loss and file notes and noted there may be no unsalvagable items. There will be a packout and cleaning of the PPUN items, possibly. I reviewed the available coverages and apllicable endorsements. I will contact the insured and discuss in more detail to get a game plan to resolve the claim. |
| 06/17/2014 02:31 PM | JON GOFFINET | Loss History | (3) 1st Party Content - RANI THYKKUTT | Prior Losses | Original 06/17/2014 02:31 PM I reveiwied the loss history of the insured in ISO. They had a few auto claims, but no visible Homeowners claims with other carries. The insureds had a prior loss (021692518) but that loss is unrelated to this loss. This old loss was due to a frozen pipe int he basement and current loss is for a leak from a dishwasher. No relation. |
| 06/17/2014 02:24 PM | TIMOTHY O'BRIEN | Investigatio | RAINBOW INTERNATI LLC | Mitigation | Original 06/17/2014 02:24 PM OBC to Mike @ RBW 800-708-6787. Discussed the loss. Mold was pre-existing and pictures in file document that. Discussed in detail. Will need to discuss with the PLS. Requested that he make the requested changes for a payment. |
| 06/17/2014 02:20 PM | EDGARDO GARCIA-HOSOKAW | Investigatio | (1) 1st Party Dwelling | Mitigation | Original 06/17/2014 02:20 PM IBC from Emily with SP 425-251-0310 adv that she concerns with original dry out performed by RBW. MS adv wil reach |

LM000130



## ISO CLAIMSEARCH MATCH REPORT SUMMARY

A claim report identified by ClaimSearch identification number 7G003592623 was received by ISO ClaimSearch on 03/13/2014 as a Replacement of a previously submitted claim. Submission of this replacement claim initiated a search of the ClaimSearch database. The claim(s) listed below appear(s) to be similar to the claim submitted. Reasonable procedures have been adopted to maximize the accuracy of this report. Independent investigations should be performed to evaluate the relevant data provided.

If you have any questions concerning your report, please contact Customer Support at (800) 888-4476.

### INITIATING CLAIM INFORMATION

| | | | |
|---|---|---|---|
| **Claim Number:** | 029279274 | **Date of Loss:** | 03/09/2014 |
| **Policy Number:** | H3226803084640 | **ISO File Number:** | 7G003592623 |

### SUMMARY FOR EACH SEARCHABLE PARTY

**RANI  J  THYKKUTTATHIL,  BOTH CLAIMANT & INSURED**

| | SAME LOSS TYPE | SIU INVOLVEMENT | NAME | ADDRESS | SSN | PHONE | DRIVER'S LICENSE | VIN | LICENSE PLATE | KEY INDICATORS FOR THIS PARTY |
|---|---|---|---|---|---|---|---|---|---|---|
| **# of Matches** | 1 | | 7 | | 2 | 3 | | | | • Prior Claims History |
| **ISO File Number** | | | | | | | | | | |
| 0C002557199 | | | X | | | | | | | |
| 1S002560093 | | | X | | | | | | | |
| 2N003156315 | | | X | | | X | | | | |
| 4J003511143 | | | X | | | | | | | |
| 5N003114868 | X | | X | | X | X | | | | |
| 6H002563814 | | | X | | X | X | | | | |
| 7D003540627 | | | X | | | | | | | |

## ISO CLAIMSEARCH REPLACEMENT CLAIM DETAILS

**Initiating Claim**                                   **File Number:** 7G003592623
  **Company:**                 L00521633

| | |
|---|---|
| RRE Code: | 000020247 |
| TIN: | XX-XXX3681 |
| Site Id: | 000520001 |
| Claim Number: | 029279274 |
| Date/Time of Loss: | 03/09/2014  12:00 |
| Policy Number: | H3226803084640 |
| Policy Type: | PERSONAL PROPERTY HOMEOWNERS |
| Self Insured: | NO |
| Inception Date: | 11/12/2013      Expiration Date: 11/12/2014 |
| Company Received Date: | 03/13/2014 |
| ISO Received Date: | 03/13/2014 |
| Loss Description: | HEATING ELEMENT ON DISHWASHER BURNED A HOLE IN THE |
| CAT Related?: | NO |
| Mold Involvement: | NO |
| Location of Loss: | 10403 67TH AVE S |
| | SEATTLE, WA 98178-2518 |
| | US |

| Involved Party: | **BOTH CLAIMANT & INSURED** |
|---|---|
| Name: | RANI J  THYKKUTTATHIL |
| Address: | 10403 67TH AVE S |
| | SEATTLE, WA 98178-2518 |
| | US |
| DOB: | 09/30/1977 |
| Gender: | FEMALE |
| Home Phone: | (206) 255-9969 |
| SSN: | XXX-XX-0009 WAS ISSUED between 1983 and 1984  in WA |
| Loss Type: | WATER |
| Adjuster Company: | LIBERTY MUTUAL INSURANCE COMPANY |
| Adjuster: | OYUGI , JACKLINE |
| Adjuster Phone: | (407) 516-0447 |
| Property Type: | DWELLING |

back

back
## Matching Claim                              File Number: 0C002557199

| Reason(s) for match: | **NAME** |
|---|---|
| Insuring Company: | STATE FARM (R) AFFILIATE |
| Claim Number: | 467210533 |

# EXHIBIT C

Transcript of the Testimony of

**Brian Cahill**
December 8, 2016

**R.W. and R.J.T. v. Liberty Mutual**
No. CV 16-465 RAJ



**Byers &
Anderson**

**Court Reporters/Video/Videoconferencing
Seattle/Tacoma, Washington**

scheduling@byersanderson.com
www.byersanderson.com

One Union Square: 600 University Street, Suite 2300 Seattle, WA 98101-4128
Seattle: **206 340-1316**  Toll Free: **800 649-2034**
Old Town District: 2208 North 30th Street, Suite 202 Tacoma, WA 98403-3360
Tacoma: **253 627-6401**  Fax: **253 383-4884**

| | | |
|---|---|---|
| 1 | A | Not -- I'm not aware of any dispute. |
| 2 | Q | Do you agree that Ryan and Rani were covered for the |
| 3 | | damage arising from the water leak that occurred around |
| 4 | | March 9th, 2014? |
| 5 | A | Yes, they were covered for that water damage. |
| 6 | Q | And do you agree that they were also covered for the |
| 7 | | cost of mitigating that damage? |
| 8 | A | To the extent provided by the policy, yes, they would |
| 9 | | have been covered. |
| 10 | Q | Can you say for the record what "mitigation" is? |
| 11 | A | It would be -- my understanding, when I hear that word, |
| 12 | | emergency service work that was performed at the onset. |
| 13 | Q | And that would be work to -- just drying out moisture |
| 14 | | and making efforts to prevent additional damage from |
| 15 | | occurring; is that correct? |
| 16 | A | Yes, that's correct. |
| 17 | Q | Do you agree that Ryan and Rani were covered for the |
| 18 | | cost of mitigating the fire damage that occurred around |
| 19 | | May 19th. |
| 20 | | 2015? |
| 21 | A | They have coverage for that based on reasonable cost |
| 22 | | incurred. |
| 23 | Q | Do you agree that Ryan and Rani were covered for the |
| 24 | | fire damage that occurred on May 19th, 2015? |
| 25 | A | Yes.  Fire is a covered peril, so they would have |

```
 1        coverage other than parts of the policy that may not

 2        provide coverage.

 3   Q    Do you agree that the mortgage company for Ryan and

 4        Rani's house was also covered for damage arising from

 5        the fire that occurred on May 19th, 2015?

 6   A    The mortgage company would be covered, based on the

 7        financial interest they had in the property.

 8   Q    Do you agree that the mortgage company for Ryan and

 9        Rani's house was covered for the damage arising from the

10        fire that occurred on May 19th, 2015, regardless of

11        whether Ryan and Rani caused that fire?

12   A    To the extent provided in the letter of loss payable

13        endorsement and their financial interest.

14   Q    To your knowledge, if the homeowner commits arson, does

15        that take away the mortgage company's rights under the

16        policy?

17   A    It does not take away -- if the homeowner -- if there's

18        no coverage or the claim is denied for intentional act,

19        the mortgagee could make a claim for damages.

20   Q    Do you agree that the mortgage company for Ryan and

21        Rani's house was also covered for the mitigation of the

22        damage arising from the fire that occurred on May 19th,

23        2015?

24   A    They would have -- yeah, covered in the sense that if

25        the claim was denied, they would have an interest in
```

1      making a claim for that mitigation effort.

2   Q   And were Ryan and Rani covered for any damage caused by

3       the negligence of Rainbow International employees during

4       their mitigation work of the water damage around March

5       of 2014?

6   A   Well, that's -- the way I would understand that is they

7       have -- they are covered for the work that Rainbow did.

8       But to the extent that there was any liability involved,

9       you know, they wouldn't have coverage for any liability

10      that was created by Rainbow.

11  Q   Does Liberty Mutual guarantee the work of Rainbow

12      International if it refers them to a policyholder?

13  A   No, they do not.

14  Q   Does Rainbow International ever guarantee any of the

15      work that -- of vendors that it refers to homeowners?

16  A   Can you rephrase that?

17  Q   Does Liberty Mutual ever guarantee the work of vendors

18      that it has referred to homeowners?

19  A   No.

20  Q   I'm going to ask you about employees involved in the

21      claim.  Mainly I want to know -- I want to confirm their

22      role and identify where they are located.

23          I understand Jackie Oyugi was the initial adjuster

24      who was responsible for handling the dishwasher leak

25      claim; correct?

```
 1        arson, third-party arson.  But this was reported as

 2        arson, so that's what prompted it to go to SIU.

 3   Q    So it's standard.  Any time you hear that there might be

 4        arson --

 5   A    Right.

 6   Q    Okay.  Are you aware of sort of inconsistent statements

 7        by Ryan or Rani that would be a red flag for her

 8        investigation?

 9   A    No, because it gets referred very quickly probably

10        before any information is obtained, other than the first

11        notice of loss.

12   Q    Are you aware of any inconsistent statements that they

13        made in regards to the fire, the arson?

14   A    No.  I am not aware of any inconsistent statements.  I

15        know there was a lot of things that were going on at the

16        time it started.  And, you know, ultimately the decision

17        was in order to get a complete picture of everything

18        that was happening, let's utilize the examination under

19        oath in one setting to gather all of the facts.

20   Q    Was Ms. Schultz supposed to be investigating anything

21        besides the arson?

22   A    Just investigating -- no.  From what I know, it's

23        basically let's determine the origin and cause of the

24        fire, and, you know, in conjunction with the

25        origin/cause expert.
```

1   Q   And do you agree that Liberty Mutual's arson

2       investigation found no evidence that Ryan and Rani had

3       committed arson?

4   A   **Right.  I think ultimately the decision was it was**

5       **nothing involving the policyholder.**

6   Q   Are you aware of any evidence at all that Ryan or Rani

7       committed arson?

8   A   **No.  The summary was that they were not involved in this**

9       **fire.**

10  Q   Do you agree that there was some evidence that

11      transients were living in the house who may have

12      committed the arson?

13  A   **I didn't go through the details of the whole**

14      **investigation, other than the policyholders were ruled**

15      **out and we proceeded with coverage.**

16  Q   Would you agree that Liberty Mutual's arson

17      investigation lasts between May and October of 2015?

18  A   **The fire happened towards the end of May.  And from what**

19      **I recall, right, the coverage was afforded at the end of**

20      **October of 2015.**

21  Q   Okay.  Did Liberty Mutual authorize any payment for the

22      cost of mitigating the fire damage during that

23      investigation?

24  A   **We had not authorized any money because of the ongoing**

25      **investigation.**

1          And I think there was a history that even with the

2      water claim, there was the initial estimate and it was

3      built upon.  Ultimately we worked off the contractor

4      that the policyholder had assigned to do the repairs.

5    Q   And who was that?

6    A   Mooney Construction.

7    Q   Okay.  So I think you had mentioned one criticism you

8        have for Ryan and Rani for not moving faster with

9        repairs is that they could have initiated the permitting

10       process soon after they received payment for the -- for

11       the dwelling damage; is that correct?

12   A   I'm not stating that's a criticism.  I would think if

13       they are being advised by you or BELFOR as a general

14       contractor, you know, BELFOR certainly would know

15       that -- let's get a permit.  Let's get a contractor of

16       record on this.  And it might just be the policyholder's

17       name.  It currently could be in the name of the

18       policyholder.

19          But, you know, BELFOR, I expect, in their

20       experience, would know that.

21   Q   Okay.  Is there anything else besides getting a permit

22       at this -- once Ryan and Rani got some money from

23       Liberty Mutual, is there anything else besides the

24       permit that they could have done to move the repair

25       process faster?

```
 1   A    Certainly plans.  Having a -- plans would be another

 2        next step.  The plan approval process.  Sometimes that

 3        can take some time.

 4             And then also they could -- permits, plans, and

 5        then, you know, city inspector is what I'm getting at.

 6        City inspector could come out and inspect the property.

 7        And, you know, out of all of the coverage -- out of all

 8        of the ordinance and law requirements that I guess the

 9        city or King County would have, it's ultimately upon the

10        city inspector to deem what they are going to require.

11   Q    Okay.  Aside from that, is there any other criticism you

12        have of Ryan, Rani, or their contractor or anybody else

13        working for them to -- as far as moving the repair

14        process forward as fast as possible?

15   A    Yeah.  Well, again, I'm not presenting these as

16        criticisms.  I'm just presenting them as in my

17        experience of handling large-loss claims, that's

18        normally the process that I see.

19   Q    Okay.  Is that the permit process can start right away;

20        is that correct?

21   A    The permit process would help.  But sometimes that's not

22        a fast process.

23   Q    Okay.  And it's your experience the permit process would

24        get started even if the homeowner's contractor doesn't

25        agree with Liberty Mutual's estimate?
```

Byers & Anderson Court Reporters/Video/Videoconferencing
Seattle/Tacoma, Washington

```
 1    STATE OF WASHINGTON  )     I, Michelle D. Elam, CCR,
                           )ss   a certified court reporter in
 2    County of Pierce     )     the State of Washington, do
                                 hereby certify:
 3

 4

 5                 That the foregoing deposition of Brian Cahill
      was taken before me and completed on December 8, 2016,
 6    and thereafter was transcribed under my direction; that
      the deposition is a full, true and complete transcript
 7    of the testimony of said witness, including all
      questions, answers, objections, motions and exceptions;
 8

 9                 That the witness, before examination, was by
      me duly sworn to testify the truth, the whole truth, and
10    nothing but the truth, and that the witness reserved the
      right of signature;
11

12                 That I am not a relative, employee, attorney
      or counsel of any party to this action or relative or
13    employee of any such attorney or counsel and that I am
      not financially interested in the said action or the
14    outcome thereof;

15

16                 That I am herewith securely sealing the said
      deposition and promptly delivering the same to Attorney
16    Joel B. Hanson.

17

18                 IN WITNESS WHEREOF, I have hereunto set my
      signature on the 15th day of December, 2016.
19

20

21                         Michelle D. Elam, RPR, CCR
                           Certified Court Reporter 3335
22

23

24

25
```

Brian Cahill
December 8, 2016

# EXHIBIT D

Transcript of the Testimony of

**Roberta S. Schultz**
October 25, 2016

**R.W. and R.J.T. v. Liberty Mutual Fire Insurance Company**
No. CV 16-465 RAJ



**Byers &
Anderson**

**Court Reporters/Video/Videoconferencing
Seattle/Tacoma, Washington**

scheduling@byersanderson.com
www.byersanderson.com

One Union Square: 600 University Street, Suite 2300 Seattle, WA 98101-4128
Seattle: **206 340-1316**  Toll Free: **800 649-2034**
Old Town District: 2208 North 30th Street, Suite 202 Tacoma, WA 98403-3360
Tacoma: **253 627-6401**  Fax: **253 383-4884**

1   Q   Do you have any background in law enforcement?

2   A   **No.**

3   Q   Do you have any background in construction?

4   A   **No.**

5   Q   Can you say how you became involved in Ryan and Rani's

6      claim?

7   A   **The claims department had some concerns, and they did a**

8      **referral to the SIU, and I was assigned the case.**

9   Q   I also noticed in the log notes a referral to FIU, which

10     is -- is that fraud investigation unit?

11   A   **That's the fire.**

12   Q   Oh, fire investigation unit.

13   A   **Right.**

14   Q   Okay.  And what is your -- is -- are you connected to the

15     FIU in any way?

16   A   **Only in discussing --**

17   Q   Okay.

18   A   **-- any information if they've been on the scene.**

19   Q   Okay.  Can you say why there was some concerns about the

20     fire that led to you being asked to do your

21     investigation?

22   A   **Because there was some indication whether or not the fire**

23     **was intentionally set.**

24   Q   Okay.  Because there was evidence that the fire was

25     intentionally set, correct?

```
 1   A    I would have to review the file to see if there's

 2        anything saying that, but there was an indication that it

 3        was an intentionally set file.

 4   Q    Okay.  Was there any other reasons that you were asked to

 5        do an investigation besides the fact that there was an

 6        indication that the fire was intentionally set?

 7   A    I think that another red flag that came about was there

 8        was a prior claim history.

 9   Q    Okay.  Meaning that Rani and Ryan had submitted insurance

10        claims prior to this?

11   A    Yes.

12   Q    Any other red flags?

13   A    Not that I can think of right now.

14   Q    Do you recall somebody at Liberty Mutual being concerned

15        about some inconsistent statements by Rani and Ryan?

16   A    I don't recall that at this time, no.

17   Q    Okay.

18                                    (Exhibit No. 1 marked

19                                       for identification.)

20

21   Q    (By Mr. Hanson)  You've been handed Exhibit No. 1 --

22   A    Uh-huh.

23   Q    -- which are a series of log notes.

24            Do you see that in the lower right corner, they are

25        labeled LM002016 through 2037?
```

1   A   I don't.

2   Q   Okay.  And who is Ms. Sutton?

3   A   **Sandra is a -- she was filling in for our TM who probably**

4       **was out of the office just assigning claims.**

5   Q   What does TM stand for?

6   A   **Team manager.**

7   Q   Got you.

8           So that would be -- would that be your manager?

9   A   **Yes.**

10  Q   I see.  So Ms. Sutton was filling in for your manager and

11      would have been the person assigning --

12  A   **Correct.**

13  Q   -- you to this claim?  Okay.

14          Did your investigation include anything else besides

15      the arson or potential arson?

16  A   **I -- that's what my investigation was about, to**

17      **determine.**

18  Q   Okay.  So there was nothing else you were investigating

19      besides the potential arson, correct?

20  A   **Correct.**

21  Q   And was your investigation mainly aimed at determining

22      whether the arson was done by Ryan and Rani?

23  A   **Trying to determine who would have done it.**

24  Q   Okay.  So who did it, whether it was them or somebody

25      else?

**Byers & Anderson Court Reporters/Video/Videoconferencing**
**Seattle/Tacoma, Washington**

1   A   Right.

2   Q   And the red flags that caused you to look into whether

3       they might have committed arson was the fact that there

4       was evidence of arson and that they had filed prior

5       insurance claims, correct?

6   A   Reword that, please.

7   Q   Sure.

8           Would you agree that the red flags that caused you

9       to initiate your investigation was the fact that there

10      appeared to be a potential arson and that they had filed

11      some prior insurance claims?

12  A   Well, that was listed as indicators, but I was there to

13      determine the causation.

14  Q   Okay.  Did your investigation ever expand to include

15      other things besides the arson?

16  A   No.

17  Q   Was there somebody else who was assisting you with your

18      investigation or directing your investigation?

19  A   Assisting in what I was doing, no.

20  Q   Can you say what the result of your investigation was?

21  A   The result of my investigation at the time I closed it,

22      at that time, there was no evidence of policyholder

23      involvement.

24  Q   Did you ever find any evidence that Ryan or Rani had

25      committed arson?

**Roberta S. Schultz**
**October 25, 2016**

1  A  **At the time I closed my file, at that time there was no**

2     **evidence --**

3  Q  Okay.

4  A  **-- that I found.**

5  Q  Did you learn about any other evidence at a future date?

6  A  **As of right now, no, I have not learned of anything.  If**

7     **there's anything out there, I have not learned of it.**

8  Q  Okay.  Do you have any reason at all to think that Ryan

9     or Rani might have committed arson?

10 A  **Based on my investigation, when I closed the file, there**

11    **was no evidence at that time.**

12 Q  Do you have any reason to be suspicious of Ryan or Rani?

13 A  **At the time I closed my investigation, there was no**

14    **evidence.**

15 Q  And still to this day, there's nothing that -- no reason

16    for you to be suspicious; is that correct?

17 A  **Based on what I know to date, yes.**

18 Q  Do you have an opinion on who you think may have caused

19    the fire?

20 A  **I do not have an opinion on who caused the fire.**

21 Q  Do you think it may have been caused by transients that

22    were living in the house or burglarizing the house?

23 A  **I don't know that.  No suspect was ever identified, so I**

24    **don't know.**

25 Q  And was coverage ultimately granted to Ryan and Rani for

```
 1   Q   Okay.  Have you had a situation in prior claims where a

 2       fire was caused by a squatter living in an unoccupied

 3       house?

 4   A   Not that I can think of sitting right here today.

 5                               (Exhibit No. 2 marked

 6                                for identification.)

 7

 8   Q   (By Mr. Hanson)  You've been handed Exhibit No. 2, which

 9       is a cause and origin synopsis from Case Forensics.  Do

10       you see that?

11   A   Yes.

12   Q   Do you remember receiving this Case Forensics report?

13   A   Okay.  This was not sent to me.

14   Q   Was it shared with you?

15   A   I'm not recalling it at this time.

16   Q   So maybe you didn't see the cause and origin report; is

17       that correct?

18   A   I don't recall at this point in time if I did see this.

19   Q   Okay.  Can you please look at Page 2787?

20   A   (Complies.)  Okay.

21   Q   Do you see that there's a photo with drug paraphernalia?

22   A   2787?

23   Q   Yes.

24   A   Specifically...

25   Q   There's two photos actually with drug paraphernalia on
```

```
 1        that page.  Do you see that?
 2   A    Okay.  I see maybe a needle.
 3   Q    The lower photo has a needle and the upper photo has some
 4        kind of pipe?
 5   A    Right.
 6   Q    Do you remember seeing those items when you visited the
 7        house?
 8   A    I would have to look at my photographs.
 9   Q    Okay.  Do you remember that issue coming up during your
10        investigation?
11   A    I think there were things pointed out, but I would have
12        to look at my photos to...
13   Q    Okay.  And just to clarify for the record, Exhibit 2 is
14        labeled LM002784 through 2789, correct?
15   A    Yes.
16   Q    Can you go to 2786?
17   A    (Complies.)
18   Q    Do you see the last sentence on that page, it says,
19        "During the investigation, evidence of transient and drug
20        activity within the house" -- or pardon me -- "within the
21        home was observed."  Do you see that?
22   A    Yes, uh-huh.
23   Q    Would you agree with that conclusion by this Case
24        Forensics investigator?
25   A    Well, I don't know who would have left it, I mean, based
```

Page 25

1     on what he's saying here, if the insureds say it wasn't

2     theirs.

3  Q  Okay.  Did you have any reason to think it might have

4     been Ryan or Rani's drug paraphernalia?

5  A  I had no information to that effect.

6  Q  Okay.  Do you recall reviewing police reports that

7     indicated prior reports of burglary into the house or in

8     the neighborhood?

9  A  Yes.

10 Q  And were those burglaries limited to just Ryan and Rani's

11    house or were there burglaries to other homes in the

12    neighborhood as well?

13 A  To their home.

14 Q  Okay.  Did you look into whether there were reports of

15    burglaries at other houses in the neighborhood?

16 A  No, I did not.

17 Q  Did you have any reason to think that those reported

18    burglaries to Ryan and Rani's house did not happen?

19 A  I only went off of what was on the reports.

20 Q  So that's a "no"?

21 A  Yes.

22 Q  Now I'm going to ask you about the investigation you

23    needed -- or pardon me -- the information you needed for

24    your investigation.

25        Can you tell me what information you needed to

```
 1        feel like there was documents that you got or requested

 2        that weren't included in this letter?

 3     A  What was that again?

 4     Q  After reviewing the topics we just looked at in the June

 5        5th, 2015, letter, do you remember either getting

 6        documents or requesting documents that weren't included

 7        in this letter?

 8     A  I don't -- without reviewing my file, I can't tell you.

 9     Q  Okay.  Did Ryan and Rani provide you with everything you

10        needed for your investigation?

11     A  As I sit here today, I can't -- I believe that they did.

12     Q  So that's a "yes"?

13     A  Yes.

14     Q  Okay.  Did you ever feel that Ryan or Rani were ever

15        dishonest to you during your investigation?

16     A  Were they dishonest to me?  I just gathered the facts.

17     Q  Okay.  So to your knowledge, they weren't dishonest to

18        you?

19     A  I have no recollection of it as we sit here today.

20     Q  Do you recall how long your investigation took?

21     A  I don't.

22                              (Exhibit No. 7 marked

23                                 for identification.)

24

25     Q  (By Mr. Hanson)  You've been handed Exhibit No. 7, I
```

Page 51

**Roberta S. Schultz**
**October 25, 2016**

1        think.

2    A   **Uh-huh, yes.**

3    Q   This contains a lot of notes, including, I believe, some

4        of your notes.  Can you go to -- oh, actually, let me ask

5        you to confirm the numbers on it.  Do you see that the

6        first page is LM005737?

7    A   **Uh-huh.**

8    Q   And then the last page is LM005808?

9    A   **Yes.**

10   Q   Can you go to Page 5778?

11   A   **Okay.**

12   Q   Do you see that on October 7th, 2015, there is a note

13       from you saying that you are closing your investigation?

14   A   **Yes.**

15   Q   And then do you see that the note says, "At this time, no

16       evidence of policyholder involvement.  Special

17       investigation unit closing.  Returning to front end of

18       regular handling."  Do you see that?

19   A   **Yes.**

20   Q   So this is where you made a record that you had -- there

21       was no evidence of Ryan or Rani had involvement in the

22       arson, correct?

23   A   **At the time of this note, yes.**

24   Q   Okay.  And then let's see here.  Do you recall when you

25       became involved in the claim?  I think earlier we looked

```
 1     STATE OF WASHINGTON )     I, Barbara Castrow, CCR, RMR,
                           )     ss CCR #2395, a certified court
 2     County of King      )       reporter in the State of
                                   Washington, do hereby certify:
 3

 4
                  That the foregoing deposition of BOBBIE S. SCHULTZ
 5     was taken before me and completed on October 25, 2016, and
       thereafter was transcribed under my direction; that the
 6     deposition is a full, true and complete transcript of the
       testimony of said witness, including all questions, answers,
 7     objections, motions and exceptions;

 8                That the witness, before examination, was by me
       duly sworn to testify the truth, the whole truth, and
 9     nothing but the truth, and that the witness reserved the
       right of signature;
10
                  That I am not a relative, employee, attorney or
11     counsel of any party to this action or relative or employee
       of any such attorney or counsel and that I am not
12     financially interested in the said action or the outcome
       thereof;
13
                  That I am herewith securely sealing the said
14     deposition and promptly delivering the same to
       Attorney Joel Hanson.
15
                  IN WITNESS WHEREOF, I have hereunto set my
16     signature this 27th day of October, 2016.

17

18

19     Barbara Castrow, CCR, RMR
       Certified Court Reporter No. 2395
20     (Certification expires 11/24/16.)

21

22

23

24

25
```

# EXHIBIT E

Print  |  Close Window

Subject: **029279274 - Thykkuttathil - New Claim**
From: joel@joelhansonlaw.com
Date: Tue, May 19, 2015 5:18 pm
To: "Charles Blackburn" <CHARLES.BLACKBURN@LibertyMutual.com>, "Alycia Price" <ALYCIA.PRICE@LibertyMutual.com>

Charles and Alycia:

I just learned that Rani visited the house today and discovered people inside. Presumably, these are the same people that had robbed the house approximately a day ago. I don't yet know all the details, but apparently the people set a fire when they learned they had been discovered.

Rani went to a neighbor's house and the police were called. I do not think the suspects have been caught. The fire department put out the fire but I do not know the scope of the damage.

Ryan and Rani say they still have insurance with Liberty Mutual. Accordingly, I think we should probably treat this as a new insurance claim. Please let me know what you need from them.

Regards,

Joel

**_My Address Has Changed_**

New Address:
Joel B. Hanson, Attorney at Law, PLLC
6100 - 219th St. SW, Suite 480
Mountlake Terrace, WA 98043
Office: 425-582-5636
Cell:206-412-8765
Fax: 425-368-7442
joel@joelhansonlaw.com

The information contained in this email message is intended only for the personal and confidential use of the recipient(s) named above. This message may be privileged and confidential. If you are not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify me immediately by email, and delete the original message. Thank you.

-------- Original Message --------
Subject: 029279274 - Thykkuttathil Status
From: <joel@joelhansonlaw.com>
Date: Mon, May 18, 2015 12:25 pm
To: "Charles Blackburn" <CHARLES.BLACKBURN@LibertyMutual.com>, "Alycia Price" <ALYCIA.PRICE@LibertyMutual.com>

Charles and Alycia:

I just learned that there was a theft at Rani and Ryan's house. Someone broke into the back door using a crowbar. The thieves stole items that had been left behind by ServPro. ServPro had told Rani that the left-behind items were all unsalvageable and that is why they did not take them with the other items. Accordingly, this theft should not change the value of the claim because Rani and Ryan were going to claim those items anyways.

If you would like them to board-up the house in order to discourage additional theft, please let me know. I am hopeful that remediation will get underway soon and that activity will discourage any additional theft.

Also, while listing the unsalvageable items, Rani recently discovered some boxed items that she thinks might be salvageable that were left at the house. But she is not a professional and does no have experience restoring damaged items. Our understanding is that everything left behind was determined to be unsalvageable by ServPro. However, if you would like to visit the house and make your own determination concerning whether those items are salvageable, please let me know.

Regards,

Joel

**_My Address Has Changed_**

New Address:
Joel B. Hanson, Attorney at Law, PLLC
6100 - 219th St. SW, Suite 480
Mountlake Terrace, WA 98043
Office: 425-582-5636
Cell:206-412-8765
Fax: 425-368-7442
joel@joelhansonlaw.com

The information contained in this email message is intended only for the personal and confidential use of the recipient(s) named above. This message may be privileged and confidential. If you are not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify me immediately by email, and delete the original message. Thank you.

Copyright © 2003-2016. All rights reserved.

# EXHIBIT F



**Liberty Mutual Insurance**

P.O. Box 9099
150 Liberty Way
Dover, NH 03820
Telephone: (603)740-1200

July 14, 2015

GINA TANGUSSO
175 BERKELEY ST.
BOSTON, MA 02116
Attn:   GINA TANGUSSO

**RE: RANI  THYKKUTTATHIL**
**H32-268-030846-40**
**CLAIM ID: N/A**
**DOL: 5/19/2015**
**POLICY EFFECTIVE:  11/12/2013**

I hereby certify that the attached is a true and accurate copy of the documents requested
for the policy listed above as maintained by the Liberty Mutual Insurance Group Inc. in
the usual and customary course of its business.

*Brittani Labrecque*

Brittani Labrecque, Office Assistant
Personal Insurance Production
July 14, 2015

BL
Enclosures

LM003098

# Policy Declarations



## A summary of your homeowners insurance coverage

Thank you for insuring with us. Here is your renewal homeowners policy summary, which is effective as of 11/12/2014.

 **INSURANCE INFORMATION**

| | |
|---|---|
| Named Insured<br>Rani J Thykkuttathil | Policy Number<br>H32-268-030846-40 |
| Mailing Address<br>10403 67th Ave S<br>Seattle WA 98178-2518 | Policy Period<br>11/12/2014-11/12/2015  12:01AM<br>standard time at the address of the<br>Named Insured at Insured Location. |
| Insured Location<br>Same as Mailing address above | |

| Premium Summary | | |
|---|---|---|
| Standard Policy | $ | 1,712.00 |
| Additional Coverages | $ | 189.00 |
| Discounts and Benefits | $ | (245.00) |
| Total 12 Month Policy Premium | $ | 1,656.00 |

Through your affiliation with the University of Washington Alumni Association your policy includes exclusive group savings on your home insurance.

THIS IS NOT YOUR HOME INSURANCE BILL.

## Coverage Information

| Standard Policy | | | |
|---|---|---|---|
| Section I Coverages | | LIMITS | PREMIUM |
| A. Dwelling with Expanded Replacement Cost | $ | 441,900 | |
| B. Other Structures on Insured Location | $ | 44,190 | |
| C. Personal Property with Replacement Cost | $ | 331,430 | |
| D. Loss of Use of Insured Location | Actual Loss Sustained | | |
| Section II Coverages | | | |
| E. Personal Liability (each occurrence) | $ | 300,000 | |
| F. Medical Payments to Others (each person) | $ | 5,000 | |
| Policy Deductibles | | | |

Losses covered under Section I are subject to a deductible of: $1,000

| Total Standard Policy | | | $ | 1,712 |
|---|---|---|---|---|

| Additional Coverages | | | | |
|---|---|---|---|---|
| | DEDUCTIBLE | LIMITS | | PREMIUM |
| Credit Card, Fund Transfer Card, Forgery | $ | 1,000 | $ | 0 |
| Home Protector Plus | | | $ | 163 |
| Coverage E & F increased limit | | | $ | 26 |
| Total Additional Coverages | | | $ | 189 |

 **QUESTIONS ABOUT YOUR POLICY?**

By phone
1-206-277-7838
1-800-922-7013

Liberty Mutual Office
14900 Interurban Ave
S Ste 142
Tukwila WA 98168

To report a claim
By phone
1-800-225-2467
Online
LibertyMutual.com/Claims

 **INSURANCE GLOSSARY**

For definitions of insurance terms, please visit LibertyMutual.com/insurance-glossary.

 Your policy includes HomeProtector Plus, which provides enhanced coverage in case of a loss. Please see your endorsement for details.

LM003099




## Discounts and Benefits

Your discounts and benefits have been applied to your total policy premium.

|  |  | PREMIUM |
|---|---|---|
| • Insurance to Value Discount | $ | (98) |
| • Inflation Protection Discount | $ | (49) |
| • Group Savings Plus® (5% discount included in total policy premium) | | |
| University of Washington Alumni Association | | |
| • Protective Device Discounts: | $ | (98) |
| Smoke/Heat Alarm-All Floors, Extinguishers and Dead Bolt Locks | | |
| Total Discounts and Benefits | $ | (245) |

**HOME DISCOUNTS**

For more information on discounts, please visit LibertyMutual.com/home-discounts.

## Endorsements — Changes to Your Policy

- LibertyGuard® Deluxe Homeowner Policy (HO-3WA 05/91)
- Credit Card, Fund Transfer Card, Forgery (HO-53 04/84)
- Amendmt Pol Definitions (FMHO-2934 7/04)
- Amendatory Mold End (FMHO 3373 1212)
- Lender's Loss Payable (438 BFU NS 5/42)
- Protective Devices (HO-216 04/84)
- Increased Ord Or Law (FMHO-2055)
- Waiver of Small Premium Adjustment (FMHO 3220 1009)

- Home Protector Plus (FMHO-2171 R2)
- Homeowner Amendatory Endorsement (FMHO 3389 0614)
- No Secll/Limit I-Daycare (HO-322WA 06/92)
- Seepage Exclusion Endorsement (FMHO 3403 1212)
- Inflation Protection (FMHO 3219 1009)
- Lead Poisoning Exclusion - WA (FMHO-1082 9/95)
- Fuel Storage Exclusion (FMHO 3209 1009)
- LMHC Membership (2340)

## Mortgage Information

Mortgagee 1:
BECU
ITS SUCCESSORS AND/OR ASSIGNS
LOAN NO. 0055931281
PO Box 202028
Florence, SC 29502

## Important Messages

Premium Change: Your total 12 Month Policy Premium last year was $1,337.

Flood Insurance: This policy does not cover damage to your property caused by flooding. The federal government offers flood insurance through the National Flood Insurance Program to residents of communities that participate in its program. You can learn more about the National Flood Insurance Program at www.floodsmart.gov or by calling (888) 379-9531.

Earthquake coverage: Your Homeowners insurance policy does not include coverage for loss caused by an earthquake. However this coverage can be purchased as an endorsement to your Homeowners policy. If you would like to learn more about earthquake coverage or obtain a quote, please contact your representative.

LibertyGuard® Deluxe Homeowners Policy Declarations
Coverage provided and underwritten by Liberty Mutual Fire Insurance Company, Boston MA.

This policy, including endorsements listed above, is countersigned by:

*Dexter R. Legg*

Dexter R. Legg
Secretary

*David H. Long*

David H. Long
President

*Stephen J. McAnena*

Stephen McAnena
Authorized Representative

LM003100



# LibertyGuard Homeowners Policy
Please read your policy and each endorsement carefully.

**To serve you best...**

Liberty Mutual has over 350 service offices throughout the United States and Canada.  Please contact your service office shown on your Declarations Page to report losses, or for any changes or questions about your insurance. Payments should be sent to the office indicated on your bill.

**THIS POLICY IS NON ASSESSABLE**

FMHO 3216 10 09



Homeowners 3WA
Special Form
Ed. 5-91
Washington

## AGREEMENT

We will provide the insurance described in this policy in return for the premium and compliance with all applicable provisions of this policy.

## DEFINITIONS

In this policy, "you" and "your" refer to the "named insured" shown in the Declarations and the spouse if a resident of the same household. "We," "us" and "our" refer to the Company providing this insurance. In addition, certain words and phrases are defined as follows:

1. **"bodily injury"** means bodily harm, sickness or disease, except a disease which is transmitted by an **insured** through sexual contact. **"Bodily injury"** includes required care, loss of services and death resulting from covered bodily harm, sickness or disease.

2. **"business"** includes trade, profession or occupation.

3. **"insured"** means you and residents of your household who are:

   a. your relatives; or

   b. other persons under the age of 21 and in the care of any person named above.

   Under Section II, **"insured"** also means:

   c. with respect to animals or watercraft to which this policy applies, any person or organization legally responsible for these animals or watercraft which are owned by you or any person included in 3a or 3b above. A person or organization using or having custody of these animals or watercraft in the course of any **business** or without consent of the owner is not an **insured;**

   d. with respect to any vehicle to which this policy applies:

      (1) persons while engaged in your employ or that of any person included in 3a or 3b above; or

      (2) other persons using the vehicle on an **insured location** with your consent.

4. **"insured location"** means:

   a. the **residence premises;**

   b. the part of other premises, other structures and grounds used by you as a residence and:

      (1) which is shown in the Declarations; or

      (2) which is acquired by you during the policy period for your use as a residence;

   c. any premises used by you in connection with a premises in 4a or 4b above;

   d. any part of a premises:

      (1) not owned by an **insured;** and

      (2) where an **insured** is temporarily residing;

   e. vacant land, other than farm land, owned by or rented to an **insured;**

   f. land owned by or rented to an **insured** on which a one or two family dwelling is being built as a residence for an **insured;**

   g. individual or family cemetery plots or burial vaults of an **insured;** or

   h. any part of a premises occasionally rented to an **insured** for other than **business** use.

5. **"occurrence"** means an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, during the policy period, in:

   a. **bodily injury;** or

   b. **property damage.**

Copyright, Washington Surveying and Rating Bureau,
includes copyrighted material of
Insurance Services Office, Inc. with its permission, 1990

LM003102



6. **"property damage"** means physical injury to, destruction of, or loss of use of tangible property.
7. **"residence employee"** means:
    a. an employee of an **insured** whose duties are related to the maintenance or use of the **residence premises**, including household or domestic services; or
    b. one who performs similar duties elsewhere not related to the **business** of an **insured**.
8. **"residence premises"** means:
    a. the one family dwelling, other structures, and grounds; or
    b. that part of any other building;
    where you reside and which is shown as the **"residence premises"** in the Declarations.
    **"Residence premises"** also means a two family dwelling where you reside in at least one of the family units and which is shown as the **"residence premises"** in the Declarations.
9. **"actual cash value"** means:
    a. When the damage to property is economically repairable, **"actual cash value"** means the cost of repairing the damage, less reasonable deduction for wear and tear, deterioration and obsolescence.
    b. When the loss or damage to property creates a total loss, **"actual cash value"** means the market value of property in a used condition equal to that of the destroyed property, if reasonably available on the used market.
    c. Otherwise, **"actual cash value"** means the market value of new, identical or nearly identical property less reasonable deduction for wear and tear, deterioration and obsolescence.
10. **"replacement cost"** means:
    a. In case of loss or damage to buildings, **"replacement cost"** means the cost, at the time of loss, to repair or replace the damaged property with new materials of like kind and quality, without deduction for depreciation.
    b. In case of loss to personal property, **"replacement cost"** means the cost, at the time of loss, of a new article identical to the one damaged, destroyed or stolen. When the identical article is no longer manufactured or is not available, **"replacement cost"** means the cost of a new article similar to the one damaged or destroyed and which is of comparable quality and usefulness, without deduction for depreciation.
11. **"fully enclosed building"** means:
    A building with continuous walls on all sides, extending from the ground level to the roof, with doors and windows (as deemed necessary) at various locations in the walls and including a continuous roof sheltering all areas within the wall perimeter.

## SECTION I - PROPERTY COVERAGES

### COVERAGE A - Dwelling
We cover:
1. the dwelling on the **residence premises** shown in the Declarations, including structures attached to the dwelling; and
2. materials and supplies located on or next to the **residence premises** used to construct, alter or repair the dwelling or other structures on the **residence premises**.
This coverage does not apply to land, including land on which the dwelling is located.

### COVERAGE B - Other Structures
We cover other structures on the **residence premises** set apart from the dwelling by clear space. This includes structures connected to the dwelling by only a fence, utility line, or similar connection.
This coverage does not apply to land, including land on which the other structures are located.

Copyright, Washington Surveying and Rating Bureau,
includes copyrighted material of
Insurance Services Office, Inc. with its permission, 1990

LM003103



We do not cover other structures:

1. used in whole or in part for **business**; or
2. rented or held for rental to any person not a tenant of the dwelling, unless used solely as a private garage.

The limit of liability for this coverage will not be more than 10% of the limit of liability that applies to Coverage A. Use of this coverage does not reduce the Coverage A limit of liability.

**COVERAGE C - Personal Property**

We cover personal property owned or used by an **insured** while it is anywhere in the world. At your request, we will cover personal property owned by:

1. others while the property is on the part of the **residence premises** occupied by an **insured**;
2. a guest or a **residence employee**, while the property is in any residence occupied by an **insured**.

Our limit of liability for personal property usually located at an **insured's** residence, other than the **residence premises**, is 10% of the limit of liability for Coverage C, or $1000, whichever is greater. Personal property in a newly acquired principal residence is not subject to this limitation for the 30 days from the time you begin to move the property there.

**Special Limits of Liability.** These limits do not increase the Coverage C limit of liability. The special limit for each numbered category below is the total limit for each loss for all property in that category.

1. $200 on money, bank notes, bullion, gold other than goldware, silver other than silverware, platinum, coins and medals.
2. $1000 on securities, accounts, deeds, evidences of debt, letters of credit, notes other than bank notes, manuscripts, personal records, passports, tickets and stamps. This dollar limit applies to these categories regardless of the medium (such as paper or computer software) on which the material exists.

   This limit includes the cost to research, replace or restore the information from the lost or damaged material.
3. $1000 on watercraft, including their trailers, furnishings, equipment and outboard motors.
4. $1000 on trailers not used with watercraft.
5. $1000 on grave markers.
6. $1000 for loss by theft of jewelry, watches, furs, precious and semi-precious stones.
7. $2000 for loss by theft of firearms.
8. $2500 for loss by theft of silverware, silver-plated ware, goldware, gold-plated ware and pewterware. This includes flatware, hollowware, tea sets, trays and trophies made of or including silver, gold or pewter.
9. $2500 on property, on the **residence premises**, used at any time or in any manner for any **business** purpose.
10. $250 on property, away from the **residence premises**, used at any time or in any manner for any **business** purpose.

**Property Not Covered.** We do not cover:

1. articles separately described and specifically insured in this or other insurance;
2. animals, birds or fish;
3. motor vehicles or all other motorized land conveyances. This includes:
   a. their equipment and accessories; or
   b. any device or instrument for the transmitting, recording, receiving or reproduction of sound or pictures which is operated by power from the electrical system of motor vehicles or all other motorized land conveyances, including:
      (1) accessories or antennas; or
      (2) tapes, wires, records, discs or other media for use with any such device or instrument;
   while in or upon the vehicle or conveyance.

Copyright, Washington Surveying and Rating Bureau,
includes copyrighted material of
Insurance Services Office, Inc. with its permission, 1990

LM003104



We do cover vehicles or conveyances:

    a. not subject to licensing requirements which are used exclusively to service an **insured's** residence; or

    b. which are both designed and used exclusively for assisting the handicapped and have a maximum attainable speed of 10 miles per hour;

4. aircraft and parts. Aircraft means any contrivance used or designed for flight, except model or hobby aircraft not used or designed to carry people or cargo;

5. property of roomers, boarders and other tenants, except property of roomers and boarders related to an **insured**;

6. property in an apartment regularly rented or held for rental to others by an **insured**;

7. property rented or held for rental to others off the **residence premises**;

8. **business** data, including such data stored in:

    a. books of account, drawings or other paper records; or

    b. electronic data processing tapes, wires, records, discs or other software media.

    However, we do cover the cost of blank recording or storage media, and of prerecorded computer programs available on the retail market.

9. credit cards or fund transfer cards except as provided in Additional Coverages 6.

## COVERAGE D - Loss of Use

The limit of liability for Coverage D is the total limit for all the coverages that follow.

1. If a loss covered under this Section makes that part of the **residence premises** where you reside not fit to live in, we cover, at your choice, either of the following. However, if the **residence premises** is not your principal place of residence, we will not provide the option under paragraph b. below.

    a. **Additional Living Expense,** meaning any necessary increase in living expenses incurred by you so that your household can maintain its normal standard of living; or

    b. **Fair Rental Value,** meaning the fair rental value of that part of the **residence premises** where you reside less any expenses that do not continue while the premises is not fit to live in.

    Payment under a. or b. will be for the shortest time required to repair or replace the damage or, if you permanently relocate, the shortest time required for your household to settle elsewhere.

2. If a loss covered under this Section makes that part of the **residence premises** rented to others or held for rental by you not fit to live in, we cover the:

    **Fair Rental Value,** meaning the fair rental value of that part of the **residence premises** rented to others or held for rental by you less any expenses that do not continue while the premises is not fit to live in.

    Payment will be for the shortest time required to repair or replace that part of the premises rented or held for rental.

3. If a civil authority prohibits you from use of the **residence premises** as a result of direct damage to neighboring premises by a Peril Insured Against in this policy, we cover the Additional Living Expense or Fair Rental Value loss as provided under 1 and 2 above for no more than two weeks.

The periods of time under 1, 2 and 3 above are not limited by expiration of this policy.

We do not cover loss or expense due to cancellation of a lease or agreement.

## ADDITIONAL COVERAGES

1. **Debris Removal.** We will pay your reasonable expense for the removal of debris of covered property if a Peril Insured Against that applies to the damaged property causes the loss.

    This expense is included in the limit of liability that applies to the damaged property. If the amount to be paid for the actual damage to the property plus the debris removal expense is more than the limit of liability for the damaged property, an additional 5% of that limit of liability is available for debris removal expense.

    We will also pay your reasonable expense, up to $500 in the aggregate for the removal from the **residence premises** of:

    a. your tree(s) felled by the peril of Windstorm or Hail;

    b. your tree(s) felled by the peril of Weight of Ice, Snow or Sleet; or



c. a neighbor's tree(s) felled by a Peril Insured Against under Coverage C;

provided the tree(s) damages a covered structure.

2. **Reasonable Repairs.** In the event that covered property is damaged by an applicable Peril Insured Against, we will pay the reasonable cost incurred by you for necessary measures taken solely to protect against further damage. If the measures taken involve repair to other damaged property, we will pay for those measures only if that property is covered under this policy and the damage to that property is caused by an applicable Peril Insured Against.

This coverage:

a. does not increase the limit of liability that applies to the covered property;

b. does not relieve you of your duties, in case of a loss to covered property, as set forth in Section I Condition 2.d.

3. **Trees, Shrubs and Other Plants.** We cover trees, shrubs, plants or lawns, on the **residence premises**, for loss caused by the following Perils Insured Against: Fire or lightning, Explosion, Riot or civil commotion, Aircraft, Vehicles not owned or operated by a resident of the **residence premises**, Vandalism or malicious mischief or Theft.

The limit of liability for this coverage will not be more than 5% of the limit of liability that applies to the dwelling, or more than $500 for any one tree, shrub or plant. We do not cover property grown for **business** purposes.

This coverage is additional insurance.

4. **Fire Department Service Charge.** We will pay up to $500 for your liability assumed by contract or agreement for fire department charges incurred when the fire department is called to save or protect covered property from a Peril Insured Against. We do not cover fire department service charges if the property is located within the limits of the city, municipality or protection district furnishing the fire department response.

This coverage is additional insurance. No deductible applies to this coverage.

5. **Property Removed.** We insure covered property against direct loss from any cause while being removed from a premises endangered by a Peril Insured Against and for no more than 30 days while removed. This coverage does not change the limit of liability that applies to the property being removed.

6. **Credit Card, Fund Transfer Card, Forgery and Counterfeit Money.**

We will pay up to $500 for:

a. the legal obligation of an **insured** to pay because of the theft or unauthorized use of credit cards issued to or registered in an **insured's** name;

b. loss resulting from theft or unauthorized use of a fund transfer card used for deposit, withdrawal or transfer of funds, issued to or registered in an **insured's** name;

c. loss to an **insured** caused by forgery or alteration of any check or negotiable instrument; and

d. loss to an **insured** through acceptance in good faith of counterfeit United States or Canadian paper currency.

We do not cover use of a credit card or fund transfer card:

a. by a resident of your household;

b. by a person who has been entrusted with either type of card; or

c. if an **insured** has not complied with all terms and conditions under which the cards are issued.

All loss resulting from a series of acts committed by any one person or in which any one person is concerned or implicated is considered to be one loss.

We do not cover loss arising out of **business** use or dishonesty of an **insured**.

This coverage is additional insurance. No deductible applies to this coverage.

Defense:

a. We may investigate and settle any claim or suit that we decide is appropriate. Our duty to defend a claim or suit ends when the amount we pay for the loss equals our limit of liability.

b. If a suit is brought against an **insured** for liability under the Credit Card or Fund Transfer Card coverage, we will provide a defense at our expense by counsel of our choice.

Copyright, Washington Surveying and Rating Bureau, includes copyrighted material of Insurance Services Office, Inc. with its permission, 1990

LM003106



c. We have the option to defend at our expense an **insured** or an **insured's** bank against any suit for the enforcement of payment under the Forgery coverage.

7. **Loss Assessment:** We will pay up to $1000 for your share of loss assessment charged during the policy period against you by a corporation or association of property owners, when the assessment is made as a result of direct loss to the property, owned by all members collectively, caused by a Peril Insured Against under Coverage A - Dwelling, other than earthquake or land shock waves or tremors before, during or after a volcanic eruption.

This coverage applies only to loss assessments charged against you as owner or tenant of the **residence premises**.

We do not cover loss assessments charged against you or a corporation or association of property owners by any governmental body.

The limit of $1000 is the most we will pay with respect to any one loss, regardless of the number of assessments.

Condition 1. Policy Period, under Sections I and II Conditions, does not apply to this coverage.

8. **Collapse.** We insure for direct physical loss to covered property involving collapse of a building or any part of a building caused only by one or more of the following:

a. Perils Insured Against in Coverage C - Personal Property. These perils apply to covered building and personal property for loss insured by this additional coverage;

b. hidden decay;

c. hidden insect or vermin damage;

d. weight of contents, equipment, animals or people;

e. weight of rain which collects on a roof; or

f. use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation.

Loss to an awning, fence, patio, pavement, swimming pool, underground pipe, flue, drain, cesspool, septic tank, foundation, retaining wall, bulkhead, pier, wharf or dock is not included under items b, c, d, e, and f unless the loss is a direct result of the collapse of a building.

Collapse does not include settling, cracking, shrinking, bulging or expansion.

This coverage does not increase the limit of liability applying to the damaged covered property.

## SECTION I - PERILS INSURED AGAINST

**COVERAGE A - DWELLING and**
**COVERAGE B - OTHER STRUCTURES**

We insure against risks of direct loss to property described in Coverages A and B only if that loss is a physical loss to property; however, we do not insure loss:

1. involving collapse, other than as provided in Additional Coverage 8;

2. caused by:

a. freezing of a plumbing, heating, air conditioning or automatic fire protective sprinkler system or of a household appliance, or by discharge, leakage or overflow from within the system or appliance caused by freezing. This exclusion applies only while the dwelling is vacant, unoccupied or being constructed unless you have used reasonable care to:

(1) maintain heat in the building; or

(2) shut off the water supply and drain the system and appliances of water;

b. freezing, thawing, pressure or weight of water or ice, whether driven by wind or not, to a:

(1) fence, pavement, patio or swimming pool;

(2) foundation, retaining wall or bulkhead; or

(3) pier, wharf or dock;

Copyright, Washington Surveying and Rating Bureau,
includes copyrighted material of
Insurance Services Office, Inc. with its permission, 1990

LM003107



c. theft in or to a dwelling under construction, or of materials and supplies for use in the construction until the dwelling is finished and occupied;

d. vandalism and malicious mischief or breakage of glass and safety glazing materials if the dwelling has been vacant for more than 30 consecutive days immediately before the loss. A dwelling being constructed is not considered vacant;

e. constant or repeated seepage or leakage of water or steam over a period of weeks, months or years from within a plumbing, heating, air conditioning or automatic fire protective sprinkler system or from within a household appliance;

f. (1) wear and tear, marring, deterioration;

   (2) inherent vice, latent defect, mechanical breakdown;

   (3) smog, rust, mold, wet or dry rot;

   (4) smoke from agricultural smudging or industrial operations;

   (5) release, discharge or dispersal of contaminants or pollutants;

   (6) settling, cracking, shrinking, bulging or expansion of pavements, patios, foundations, walls, floors, roofs or ceilings; or

   (7) birds, vermin, rodents, insects or domestic animals.

   But if loss or damage by collapse, as provided in **ADDITIONAL COVERAGES, Collapse,** results, we will pay for that resulting loss or damage.

   If any of these cause water damage not otherwise excluded from a plumbing, heating, air conditioning or automatic fire protective sprinkler system or household appliance, we cover loss caused by the water including the cost of tearing out and replacing any part of a building necessary to repair the system or appliance. We do not cover loss to the system or appliance from which this water escaped.

3. excluded under Section I - Exclusions.

Under items 1 and 2, any ensuing loss to property described in Coverages A and B not excluded or excepted in this policy is covered.

**COVERAGE C - Personal Property**

We insure for direct physical loss to the property described in Coverage C caused by a peril listed below unless the loss is excluded in Section I - Exclusions.

1. **Fire or lightning.**

2. **Windstorm or hail.**

   This peril does not include loss to the property contained in a building caused by rain, snow, sleet, sand or dust unless the direct force of wind or hail damages the building causing an opening in a roof or wall and the rain, snow, sleet, sand or dust enters through this opening.

   This peril includes loss to watercraft and their trailers, furnishings, equipment, and outboard motors, only while inside a **fully enclosed building.**

3. **Explosion.**

4. **Riot or civil commotion.**

5. **Aircraft,** including self-propelled missiles and spacecraft.

6. **Vehicles** means a device designed or used to transport persons or property.

7. **Smoke,** meaning sudden and accidental damage from smoke.

   This peril does not include loss caused by smoke from agricultural smudging or industrial operations, such as slash burns.

8. **Vandalism or malicious mischief.**

9. **Theft,** including attempted theft and loss of property from a known place when it is likely that the property has been stolen.

   This peril does not include loss caused by theft:

   a. committed by an **insured;**

Copyright, Washington Surveying and Rating Bureau, includes copyrighted material of Insurance Services Office, Inc. with its permission, 1990

LM003108



b. in or to a dwelling under construction, or of materials and supplies for use in the construction until the dwelling is finished and occupied; or

c. from that part of a **residence premises** rented by an **insured** to other then an **insured**.

This peril does not include loss caused by theft that occurs off the **residence premises** of:

a. property while at any other residence owned by, rented to, or occupied by an **insured**, except while an **insured** is temporarily living there. Property of a student who is an **insured** is covered while at a residence away from home if the student has been there at any time during the 45 days immediately before the loss;

b. watercraft, including their furnishings, equipment and outboard motors; or

c. trailers and campers.

However, property described in b. above is covered if, at the time of loss caused by theft, it is parked inside a private garage or in street parking areas immediately adjacent to the **residence premises**.

10. **Falling objects.**

This peril does not include loss to property contained in a building unless the roof or an outside wall of the building is first damaged by a falling object. Damage to the falling object itself is not included.

11. **Weight of ice, snow or sleet** which causes damage to property contained in a building.

12. **Accidental discharge or overflow of water or steam** from within a plumbing, heating, air conditioning or automatic fire protective sprinkler system or from within a household appliance.

This peril does not include loss:

a. to the system or appliance from which the water or steam escaped;

b. caused by or resulting from freezing except as provided in the peril of freezing below; or

c. on the **residence premises** caused by accidental discharge or overflow which occurs off the **residence premises**.

In this peril, a plumbing system does not include a sump, sump pump or related equipment.

13. **Sudden and accidental tearing apart, cracking, burning or bulging** of a steam or hot water heating system, an air conditioning or automatic fire protective sprinkler system, or an appliance for heating water.

We do not cover loss caused by or resulting from freezing under this peril.

14. **Freezing** of a plumbing, heating, air conditioning or automatic fire protective sprinkler system or of a household appliance.

This peril does not include loss on the **residence premises** while the dwelling is unoccupied, unless you have used reasonable care to:

a. maintain heat in the building; or

b. shut off the water supply and drain the system and appliances of water.

15. **Sudden and accidental damage from artificially generated electrical current.**

This peril does not include loss to a tube, transistor or similar electronic component.

16. **Damage by glass or safety glazing material** which is part of a building, storm door or storm window.

This peril does not include loss on the **residence premises** if the dwelling has been vacant for more than 30 consecutive days immediately before the loss. A dwelling being constructed is not considered vacant.

17. **Volcanic Action**, meaning direct loss or damage resulting from the eruption of a volcano when the loss or damage is caused by:

a. volcanic blast or airborne shock waves;

b. ash, dust or particulate matter; or

c. lava flow.

This peril does not provide coverage for damage to land; property in the open or in open sheds; or portions of buildings not completely enclosed, or personal property contained within those buildings. All volcanic eruptions that occur within any 72-hour period will be considered as one volcanic eruption.

Copyright, Washington Surveying and Rating Bureau,
includes copyrighted material of
Insurance Services Office, Inc. with its permission, 1990

LM003109



Direct loss includes the cost to remove the ash, dust or particulate matter from the interior and exterior surfaces of the covered building and from personal property contained in the building.

Payment for removal applies only to the initial deposit of ash, dust or particulate matter following a volcanic eruption.  Subsequent deposits arising from the movement of volcanic dust or ash by wind or other means are not covered.

## SECTION I - EXCLUSIONS

We will not pay for loss or damage caused by any of the following excluded events as described in 1 through 11 below.  Loss or damage will be considered to have been caused by an excluded event if that event:

    a.  directly and solely results in loss or damage; or

    b.  initiates a sequence of events that results in loss or damage, regardless of the nature of any intermediate or final event in that sequence.

1. **Ordinance or Law,** meaning enforcement of any ordinance or law regulating the construction, repair, or demolition of a building or other structure, unless specifically provided under this policy.

2. **Earth Movement,** meaning earthquake including land shock waves or tremors before, during or after a volcanic eruption; landslide; mudflow; earth sinking, rising or shifting; unless direct loss by:

    a.  fire;

    b.  explosion; or

    c.  breakage of glass or safety glazing material which is part of a building, storm door or storm window;

    ensues and then we will pay only for the ensuing loss.

    This exclusion does not apply to loss by theft.

3. **Water Damage,** meaning:

    a.  flood, surface water, waves, tidal water, overflow of a body of water, or spray from any of these, whether or not driven by wind;

    b.  water which backs up through sewers or drains or which overflows from a sump; or

    c.  water below the surface of the ground, including water which exerts pressure on or seeps or leaks through a building, sidewalk, driveway, foundation, swimming pool or other structure.

    Direct loss by fire, explosion or theft resulting from water damage is covered.

4. **Power Failure,** meaning the failure of power or other utility service if the failure takes place off the **residence premises**.  But, if a Peril Insured Against ensues on the **residence premises**, we will pay only for that ensuing loss.

5. **Neglect,** meaning neglect of the **insured** to use all reasonable means to save and preserve property at and after the time of a loss.

6. **War,** including undeclared war, civil war, insurrection, rebellion, revolution, warlike act by a military force or military personnel, destruction or seizure or use for a military purpose, and including any consequence of any of these.  Discharge of a nuclear weapon will be deemed a warlike act even if accidental.

7. **Nuclear Hazard,** to the extent set forth in the Nuclear Hazard Clause of Section I - Conditions.

8. **Intentional Loss,** meaning any loss arising out of any act committed:

    a.  by or at the direction of an **insured**; and

    b.  with the intent to cause a loss.

9. **Weather Conditions.**

    A weather condition which results in:

    a.  landslide or mudflow;

    b.  earth sinking, rising or shifting;

    c.  flood, surface water, waves, tidal water, overflow of a body of water, or spray from any of these,whether or not driven by wind;

Copyright, Washington Surveying and Rating Bureau,
includes copyrighted material of
Insurance Services Office, Inc. with its permission, 1990

LM003110



    d.  water backing up from a sewer or drain or overflowing from a sump; or

    e.  water below the surface of the ground, including water which exerts pressure on or seeps or leaks through a building, sidewalk, driveway, foundation, swimming pool or other structure.

However, if loss or damage by fire or explosion results, we will pay for that resulting loss or damage.

10. **Acts or decisions,** including the failure to act or decide, of any person, group, organization or governmental body.  However, any ensuing loss to property described in Coverages A and B not excluded or excepted in this policy is covered.

11. **Faulty, inadequate or defective:**

    a.  planning, zoning, development, surveying, siting;

    b.  design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

    c.  materials used in repair, construction, renovation or remodeling; or

    d.  maintenance;

of part or all of any property whether on or off the **residence premises.**

However, any ensuing loss to property described in Coverages A and B not excluded or excepted in this policy is covered.

## SECTION I - CONDITIONS

1. **Insurable Interest and Limit of Liability.**  Even if more than one person has an insurable interest in the property covered, we will not be liable in any one loss:

    a.  to the **insured** for more than the amount of the **insured's** interest at the time of loss; or

    b.  for more than the applicable limit of liability.

2. **Your Duties After Loss.**  In case of a loss to covered property, you must see that the following are done:

    a.  give prompt notice to us or our agent;

    b.  notify the police in case of loss by theft;

    c.  notify the credit card or fund transfer card company in case of loss under Credit Card or Fund Transfer Card coverage;

    d.  (1) protect the property from further damage;

        (2) make reasonable and necessary repairs to protect the property; and

        (3) keep an accurate record of repair expenses;

    e.  prepare an inventory of damaged personal property showing the quantity, description, **actual cash value** and amount of loss.  Attach all bills, receipts and related documents that justify the figures in the inventory;

    f.  as often as we reasonably require:

        (1) show the damaged property;

        (2) provide us with records and documents we request and permit us to make copies; and

        (3) submit to examination under oath, while not in the presence of any other **insured,** and sign the same;

    g.  send to us, within 60 days after our request, your signed, sworn proof of loss which sets forth, to the best of your knowledge and belief:

        (1) the time and cause of loss;

        (2) the interest of the **insured** and all others in the property involved and all liens on the property;

        (3) other insurance which may cover the loss;

        (4) changes in title or occupancy of the property during the term of the policy;

        (5) specifications of damaged buildings and detailed repair estimates;

        (6) the inventory of damaged personal property described in 2e above;

Copyright, Washington Surveying and Rating Bureau,
includes copyrighted material of
Insurance Services Office, Inc. with its permission, 1990

LM003111



(7) receipts for additional living expenses incurred and records that support the fair rental value loss; and

(8) evidence or affidavit that supports a claim under the Credit Card, Fund Transfer Card, Forgery and Counterfeit Money coverage, stating the amount and cause of loss.

3. **Loss Settlement.**  Covered property losses are settled as follows:

  a. (1) Personal property;

    (2) Awnings, carpeting, household appliances, outdoor antennas and outdoor equipment, whether or not attached to buildings; and

    (3) Structures that are not buildings;

    at **actual cash value** at the time of loss but not more than the amount required to repair or replace.

  b. Buildings under Coverage A or B at **replacement cost** without deduction for depreciation, subject to the following:

    (1) If, at the time of loss, the amount of insurance in this policy on the damaged building is 80% or more of the full **replacement cost** of the building immediately before the loss, we will pay the cost to repair or replace, after application of deductible and without deduction for depreciation, but not more than the least of the following amounts:

      (a) the limit of liability under this policy that applies to the building;

      (b) the **replacement cost** of that part of the building damaged for like construction and use on the same premises; or

      (c) the necessary amount actually spent to repair or replace the damaged building.

    (2) If, at the time of loss, the amount of insurance in this policy on the damaged building is less than 80% of the full **replacement cost** of the building immediately before the loss, we will pay the greater of the following amounts, but not more than the limit of liability under this policy that applies to the building:

      (a) the **actual cash value** of that part of the building damaged; or

      (b) that proportion of the cost to repair or replace, after application of deductible and without deduction for depreciation, that part of the building damaged, which the total amount of insurance in this policy on the damaged building bears to 80% of the **replacement cost** of the building.

    (3) To determine the amount of insurance required to equal 80% of the full **replacement cost** of the building immediately before the loss, do not include the value of:

      (a) excavations, foundations, piers or any supports which are below the undersurface of the lowest basement floor;

      (b) those supports in (a) above which are below the surface of the ground inside the foundation walls, if there is no basement; and

      (c) underground flues, pipes, wiring and drains.

    (4) We will pay no more than the **actual cash value** of the damage unless:

      (a) actual repair or replacement is complete; or

      (b) the cost to repair or replace the damage is both:

        (i) less than 5% of the amount of insurance in this policy on the building; and

        (ii) less than $2500.

    (5) You may disregard the **replacement cost** loss settlement provisions and make claim under this policy for loss or damage to buildings on an **actual cash value** basis.  You may then make claim within 180 days after loss for any additional liability on a **replacement cost** basis.

4. **Loss to a Pair or Set.**  In case of loss to a pair or set we may elect to:

  a. repair or replace any part to restore the pair or set to its value before the loss; or

  b. pay the difference between **actual cash value** of the property before and after the loss.

5. **Glass Replacement.**  Loss for damage to glass caused by a Peril Insured Against will be settled on the basis of replacement with safety glazing materials when required by ordinance or law.

LM003112



6. **Appraisal.** If you and we fail to agree on the amount of loss, either may demand an appraisal of the loss. In this event, each party will choose a competent appraiser within 20 days after receiving a written request from the other. The two appraisers will choose an umpire. If they cannot agree upon an umpire within 15 days, you or we may request that the choice be made by a judge of a court of record in the state where the **residence premises** is located. The appraisers will separately set the amount of loss. If the appraisers submit a written report of an agreement to us, the amount agreed upon will be the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will set the amount of loss.

   Each party will:

   a. pay its own appraiser; and

   b. bear the other expenses of the appraisal and umpire equally.

7. **Other Insurance.** If a loss covered by this policy is also covered by other insurance, we will pay only the proportion of the loss that the limit of liability that applies under this policy bears to the total amount of insurance covering the loss.

8. **Suit Against Us.** No action can be brought unless the policy provisions have been complied with and the action is started within one year after the date of loss.

9. **Our Option.** If we give you written notice within 30 days after we receive your signed, sworn proof of loss, we may repair or replace any part of the damaged property with like property.

10. **Loss Payment.** We will adjust all losses with you. We will pay you unless some other person is named in the policy or is legally entitled to receive payment. Loss will be payable 30 days after we receive your proof of loss and:

    a. reach an agreement with you;

    b. there is an entry of a final judgment; or

    c. there is a filing of an appraisal award with us.

11. **Abandonment of Property.** We need not accept any property abandoned by an **insured**.

12. **Mortgage Clause.** Insurance Commissioner's Regulation No. 335/WAC-284-21-010 requires that Form 372 (Ed. 11 -50) or Form 438 BFU (Ed. 5-42) be endorsed on this policy, if applicable.

13. **No Benefit to Bailee.** We will not recognize any assignment or grant any coverage that benefits a person or organization holding, storing or moving property for a fee regardless of any other provision of this policy.

14. **Nuclear Hazard Clause.**

    a. "Nuclear Hazard" means any nuclear reaction, radiation, or radioactive contamination, all whether controlled or uncontrolled or however caused, or any consequence of any of these.

    b. Loss caused by the nuclear hazard will not be considered loss caused by fire, explosion, or smoke, whether these perils are specifically named in or otherwise included within the Perils Insured Against in Section I.

    c. This policy does not apply under Section I to loss caused directly or indirectly by nuclear hazard, except that direct loss by fire resulting from the nuclear hazard is covered.

15. **Recovered Property.** If you or we recover any property for which we have made payment under this policy, you or we will notify the other of the recovery. At your option, the property will be returned to or retained by you or it will become our property. If the recovered property is returned to or retained by you, the loss payment will be adjusted based on the amount you received for the recovered property.

## SECTION II - LIABILITY COVERAGES

**COVERAGE E - Personal Liability**

If a claim is made or a suit is brought against an **insured** for damages because of **bodily injury** or **property damage** caused by an **occurrence** to which this coverage applies, we will:

1. pay up to our limit of liability for the damages for which the **insured** is legally liable. Damages include prejudgment interest awarded against the **insured**.

Copyright, Washington Surveying and Rating Bureau,
includes copyrighted material of
Insurance Services Office, Inc. with its permission, 1990

LM003113



2.  provide a defense at our expense by counsel of our choice, even if the suit is groundless, false or fraudulent. We may investigate and settle any claim or suit that we decide is appropriate. Our duty to settle or defend ends when the amount we pay for damages resulting from the **occurrence** equals our limit of liability.

**COVERAGE F - Medical Payments To Others**

We will pay the necessary medical expenses that are incurred or medically ascertained within three years from the date of an accident causing **bodily injury**. Medical expenses means reasonable charges for medical, surgical, x-ray, dental, ambulance, hospital, professional nursing, prosthetic devices and funeral services. This coverage does not apply to you or regular residents of your household except **residence employees**. As to others, this coverage applies only:

1.  to a person on the **insured location** with the permission of an **insured**; or
2.  to a person off the **insured location**, if the **bodily injury**:
    a.  arises out of a condition on the **insured location** or the ways immediately adjoining;
    b.  is caused by the activities of an **insured**;
    c.  is caused by a **residence employee** in the course of the **residence employee's** employment by an **insured**; or
    d.  is caused by an animal owned by or in the care of an **insured**.

---

## SECTION II - EXCLUSIONS

---

1.  **Coverage E - Personal Liability and Coverage F - Medical Payments to Others** do not apply to **bodily injury** or **property damage**:
    a.  which is expected or intended by the **insured**;
    b.  (1) arising out of or in connection with a **business** engaged in by an **insured**. This exclusion applies but is not limited to an act or omission, regardless of its nature or circumstance, involving a service or duty rendered, promised, owed, or implied to be provided because of the nature of the **business**;
        (2) arising out of the rental or holding for rental of any part of any premises by an **insured**. This exclusion does not apply to the rental or holding for rental of an **insured location**:
            (a) on an occasional basis if used only as residence;
            (b) in part for use only as a residence, unless a single family unit is intended for use by the occupying family to lodge more than two roomers or boarders; or
            (c) in part, as an office, school, studio or private garage;
    c.  arising out of the rendering of or failure to render professional services;
    d.  arising out of a premises:
        (1) owned by an **insured**;
        (2) rented to an **insured**; or
        (3) rented to others by an **insured**;
        that is not an **insured location**;
    e.  arising out of:
        (1) the ownership, maintenance, use, loading or unloading of motor vehicles or all other motorized land conveyances, including trailers, owned or operated by or rented or loaned to an **insured**;
        (2) the entrustment by an **insured** of a motor vehicle or any other motorized land conveyance to any person; or
        (3) statutorily imposed vicarious parental liability for the actions of a child or minor using a conveyance excluded in paragraph (1) or (2) above.
        This exclusion does not apply to:
        (1) a trailer not towed by or carried on a motorized land conveyance;

Copyright, Washington Surveying and Rating Bureau, includes copyrighted material of Insurance Services Office, Inc. with its permission, 1990

LM003114



    (2) a motorized land conveyance which is both designed and used exclusively for recreational purposes off public roads, not subject to licensing requirements and:

       (a) not owned by an **insured;** or

       (b) owned by an **insured** and on an **insured location;**

    (3) a motorized golf cart when used to play golf on a golf course;

    (4) a vehicle or conveyance not subject to licensing requirements which is:

       (a) used exclusively to service an **insured's** residence;

       (b) in dead storage on an **insured location;**

    (5) a vehicle or conveyance which is both designed and used exclusively for assisting the handicapped and has a maximum attainable speed of 10 miles per hour;

f.  arising out of:

    (1) the ownership, maintenance, use, loading or unloading of a watercraft described below;

    (2) the entrustment by an **insured** of a watercraft described below to any person; or

    (3) statutorily imposed vicarious parental liability for the actions of a child or minor using a watercraft described below.

    Watercraft:

    (1) with inboard or inboard-outdrive motor power owned by an **insured;**

    (2) with inboard or inboard-outdrive motor power of more than 50 horsepower rented to an **insured;**

    (3) that is a sailing vessel, with or without auxiliary power, 26 feet or more in length owned by or rented to an **insured;** or

    (4) powered by one or more outboard motors with more than 25 total horsepower if the outboard motor is owned by an **insured.**  But, outboard motors of more than 25 total horsepower are covered for the policy period if:

       (a) you acquire them prior to the policy period and:

          (i) you declare them at policy inception; or

          (ii) your intention to insure is reported to us in writing within 45 days after you acquire the out-board motors.

       (b) you acquire them during the policy period.

    This exclusion does not apply while the watercraft is stored;

g.  arising out of:

    (1) the ownership, maintenance, use, loading or unloading of an aircraft;

    (2) the entrustment by an **insured** of an aircraft to any person; or

    (3) statutorily imposed vicarious parental liability for the actions of a child or minor using an aircraft.

    An aircraft means any contrivance used or designed for flight, except model or hobby aircraft not used or designed to carry people or cargo;

h.  caused directly or indirectly by war, including undeclared war, civil war, insurrection, rebellion, revolution, warlike act by a military force or military personnel, destruction or seizure or use for a military purpose, and including any consequence of any of these.  Discharge of a nuclear weapon will be deemed a warlike act even if accidental.

Exclusions d., e., f., and g. do not apply to **bodily injury** to a **residence employee** arising out of and in the course of the **residence employee's** employment by an **insured.**

2. **Coverage E - Personal Liability,** does not apply to:

a.  liability:

    (1) for any loss assessment charged against you as a member of an association, corporation or community of property owners;

    (2) under any contract or agreement.  However, this exclusion does not apply to written contracts:

       (a) that directly relate to the ownership, maintenance or use of an **insured location;** or



      (b)  where the liability of others is assumed by the **insured** prior to an occurrence;
         unless excluded in (1) above or elsewhere in this policy;

  b.  **property damage** to property owned by the **insured**;

  c.  **property damage** to property rented to, occupied or used by or in the care of the **insured**.  This exclusion does not apply to **property damage** caused by fire, smoke or explosion;

  d.  **bodily injury** to any person eligible to receive any benefits:
      (1)  voluntarily provided; or
      (2)  required to be provided;
     by the **insured** under any:
      (1)  workers' compensation law;
      (2)  non-occupational disability law; or
      (3)  occupational disease law;

  e.  **bodily injury** or **property damage** for which an **insured** under this policy:
      (1)  is also an insured under a nuclear energy liability policy; or
      (2)  would be an insured under that policy but for the exhaustion of its limit of liability.
     A nuclear energy liability policy is one issued by:
      (1)  American Nuclear Insurers;
      (2)  Mutual Atomic Energy Liability Underwriters;
      (3)  Nuclear Insurance Association of Canada;
     or any of their successors; or

  f.  **bodily injury** to you or an **insured** within the meaning of part a. or b. of "**insured**" as defined.

3.  **Coverage F - Medical Payments to Others**, does not apply to **bodily injury**:

  a.  to a **residence employee** if the **bodily injury**:
      (1)  occurs off the **insured location**; and
      (2)  does not arise out of or in the course of the **residence employee's** employment by an **insured**;

  b.  to any person eligible to receive benefits:
      (1)  voluntarily provided; or
      (2)  required to be provided;
     under any:
      (1)  workers' compensation law;
      (2)  non-occupational disability law; or
      (3)  occupational disease law;

  c.  from any:
      (1)  nuclear reaction;
      (2)  nuclear radiation; or
      (3)  radioactive contamination;
     all whether controlled or uncontrolled or however caused; or
      (4)  any consequence of any of these.

  d.  to any person, other than a **residence employee** of an **insured**, regularly residing on any part of the **insured location**.

Copyright, Washington Surveying and Rating Bureau,
includes copyrighted material of
Insurance Services Office, Inc. with its permission, 1990

LM003116



---

## SECTION II - ADDITIONAL COVERAGES

We cover the following in addition to the limits of liability:

1. **Claim Expenses.** We pay:
   a. expenses we incur and costs taxed against an **insured** in any suit we defend;
   b. premiums on bonds required in a suit we defend, but not for bond amounts more than the limit of liability for Coverage E. We need not apply for or furnish any bond;
   c. reasonable expenses incurred by an **insured** at our request, including actual loss of earnings (but not loss of other income) up to $50 per day, for assisting us in the investigation or defense of a claim or suit;
   d. interest on the entire judgment which accrues after entry of the judgment and before we pay or tender, or deposit in court that part of the judgment which does not exceed the limit of liability that applies.

2. **First Aid Expenses.** We will pay expenses for first aid to others incurred by an **insured** for **bodily injury** covered under this policy. We will not pay for first aid to you or any other **insured**.

3. **Damage to Property of Others.** We will pay, at **replacement cost**, up to $500 per **occurrence** for **property damage** to property of others caused by an **insured**.
   We will not pay for **property damage**:
   a. to the extent of any amount recoverable under Section I of this policy;
   b. caused intentionally by an **insured** who is 13 years of age or older;
   c. to property owned by an **insured**;
   d. to property owned by or rented to a tenant of an **insured** or a resident in your household; or
   e. arising out of;
      (1) a **business** engaged in by an **insured**;
      (2) any act or omission in connection with a premises owned, rented or controlled by an **insured**, other than the **insured location**; or
      (3) the ownership, maintenance, or use of aircraft, watercraft or motor vehicles or all other motorized land conveyances.
         This exclusion does not apply to a motorized land conveyance which is both designed and used exclusively for recreational purposes off public roads, not subject to licensing requirements and not owned by an **insured**.

4. **Loss Assessment.** We will pay up to $1000 for your share of loss assessment charged during the policy period against you by a corporation or association of property owners, when the assessment is made as a result of:
   a. **bodily injury** or **property damage** not excluded under Section II of this policy; or
   b. liability for an act of a director, officer or trustee in the capacity as a director, officer or trustee, provided:
      (1) the director, officer or trustee is elected by the members of a corporation or association of property owners; and
      (2) the director, officer or trustee serves without deriving any income from the exercise of duties which are solely on behalf of a corporation or association of property owners.

   This coverage applies only to loss assessments charged against you as owner or tenant of the **residence premises**.

   We do not cover loss assessments charged against you or a corporation or association of property owners by any governmental body.

   Regardless of the number of assessments, the limit of $1000 is the most we will pay for loss arising out of:
   a. one accident, including continuous or repeated exposure to substantially the same general harmful conditions; or

Copyright, Washington Surveying and Rating Bureau, includes copyrighted material of Insurance Services Office, Inc. with its permission, 1990

LM003117



b. a covered act of a director, officer or trustee.  An act involving more than one director, officer or trustee is considered to be a single act.

The following do not apply to this coverage:

1. Section II - Coverage E - Personal Liability Exclusion 2.a.(1);
2. Condition 1. Policy Period, Under Sections I and II Conditions.

## SECTION II - CONDITIONS

1. **Limit of Liability.**  Our total liability under Coverage E for all damages resulting from any one **occurrence** will not be more than the limit of liability for Coverage E as shown in the Declarations. This limit is the same regardless of the number of **insureds**, claims made or persons injured.  All **bodily injury** and **property damage** resulting from any one accident or from continuous or repeated exposure to substantially the same general harmful conditions shall be considered to be the result of one **occurrence**.

   Our total liability under Coverage F for all medical expense payable for **bodily injury** to one person as the result of one accident will not be more than the limit of Liability for Coverage F as shown in the Declarations.

2. **Severability of Insurance.**  This insurance applies separately to each **insured**.  This condition will not increase our limit of liability for any one **occurrence**.

3. **Duties After Loss.**  In case of an accident or **occurrence**, the **insured** will perform the following duties that apply.  You will help us by seeing that these duties are performed.

   a. give written notice to us or our agent as soon as is practical, which sets forth:

      (1) the identity of the policy and **insured**;

      (2) reasonably available information on the time, place and circumstances of the accident or **occurrence**; and

      (3) names and addresses of any claimants and witnesses;

   b. promptly forward to us every notice, demand, summons or other process relating to the accident or **occurrence**;

   c. at our request, help us:

      (1) to make settlement;

      (2) to enforce any right of contribution or indemnity against any person or organization who may be liable to an **insured**;

      (3) with the conduct of suits and attend hearings and trials;

      (4) to secure and give evidence and obtain the attendance of witnesses;

   d. under the coverage - Damage to Property of Others - submit to us within 60 days after the loss, a sworn statement of loss and show the damaged property, if in the **insured's** control;

   e. the **insured** will not, except at the **insured's** own cost, voluntarily make payment, assume obligation or incur expense other than for first aid to others at the time of the **bodily injury**.

4. **Duties of an Injured Person - Coverage F - Medical Payments to Others.**  The injured person or someone acting for the injured person will:

   a. give us written proof of claim, under oath if required, as soon as is practical; and

   b. authorize us to obtain copies of medical reports and records.

   The injured person will submit to a physical exam by a doctor of our choice when and as often as we reasonably require.

5. **Payment of Claim - Coverage F - Medical Payments to Others.**  Payment under this coverage is not an admission of liability by an **insured** or us.

6. **Suit Against Us.**  No action can be brought against us unless there has been compliance with the policy provisions.

Copyright, Washington Surveying and Rating Bureau,
includes copyrighted material of
Insurance Services Office, Inc. with its permission, 1990

LM003118



No one will have the right to join us as a party to any action against an **insured**. Also, no action with respect to Coverage E can be brought against us until the obligation of the **insured** has been determined by final judgment or agreement signed by us.

7. **Bankruptcy of an Insured.**   Bankruptcy or insolvency of an **insured** will not relieve us of our obligations under this policy.

8. **Other Insurance - Coverage E - Personal Liability.**   This insurance is excess over other valid and collectible insurance except insurance written specifically to cover as excess over the limits of liability that apply in this policy.

## SECTION I AND II - CONDITIONS

1. **Policy Period.**   This policy applies only to loss in Section I or **bodily injury** or **property damage** in Section II, which occurs during the policy period.

2. **Concealment or Fraud.**   The entire policy will be void if, whether before or after a loss, an **insured** has:
   a. intentionally concealed or misrepresented any material fact or circumstance; or
   b. engaged in fraudulent conduct;
   relating to this insurance.

3. **Liberalization Clause.**   If we make a change which broadens coverage under this edition of our policy without additional premium charge, that change will automatically apply to your insurance as of the date we implement the change in your state, provided that this implementation date falls within 60 days prior to or during the policy period stated in the Declarations.
   This Liberalization Clause does not apply to changes implemented through introduction of a subsequent edition of our policy.

4. **Waiver or Change of Policy Provisions.**
   A waiver or change of a provision of this policy must be in writing by us to be valid.  Our request for an appraisal or examination will not waive any rights.

5. **Cancellation.**
   a. You may cancel this policy at any time by returning it to us or by letting us know in writing of the date cancellation is to take effect.
   b. We may cancel this policy only for the reasons stated below by letting you know in writing of the date cancellation takes effect.   This cancellation notice, together with our reason for cancellation, will be mailed to you and, if applicable, your agent or broker at the last addresses known to us or shown by our records.  Proof of mailing will be sufficient proof of notice.
      (1) When you have not paid the premium, we may cancel at any time by letting you know at least 10 days before the date cancellation takes effect.
      (2) When this policy has been in effect for less than 60 days and is not a renewal with us, we may cancel for any reason by letting you know at least 45 days before the date cancellation takes effect.
      (3) When this policy has been in effect for 60 days or more, or at any time if it is a renewal with us, we may cancel:
         (a) if there has been a material misrepresentation of fact which if known to us would have caused us not to issue the policy; or
         (b) if the risk has changed substantially since the policy was issued.
         This can be done by letting you know at least 45 days before the date cancellation takes effect.
      (4) When this policy is written for a period of more than one year, we may cancel for any reason at anniversary by letting you know at least 45 days before the date cancellation takes effect.
         However, with respect to paragraphs b. (2), (3) and (4) above, if two or more of the following conditions exist at any building that is covered under this policy, we may cancel this policy by letting you and, if applicable, your agent or broker know at least 5 days before the date cancellation takes effect. We will also let any mortgagee or other person shown by the policy to have an interest in a covered loss know at least 20 days before the date cancellation takes effect.

Copyright, Washington Surveying and Rating Bureau,
includes copyrighted material of
Insurance Services Office, Inc. with its permission, 1990

LM003119



(1) Without reasonable explanation, the building is unoccupied for more than 60 consecutive days, or at least 65% of the rental units are unoccupied for more than 120 consecutive days unless the building is maintained for seasonal occupancy or is under construction or repair;

(2) Without reasonable explanation, progress toward completion of permanent repairs to the building has not occurred within 60 days after receipt of funds following satisfactory adjustment or adjudication of loss resulting from a fire;

(3) Because of its physical condition, the building is in danger of collapse;

(4) Because of its physical condition, a vacation or demolition order has been issued for the building, or it has been declared unsafe in accordance with applicable law;

(5) Fixed and salvageable items have been removed from the building, indicating an intent to vacate the building;

(6) Without reasonable explanation, heat, water, sewer, and electricity are not furnished for the building for 60 consecutive days; or

(7) The building is not maintained in substantial compliance with fire, safety and building codes.

c. When this policy is cancelled, the premium for the period from the date of cancellation to the expiration date will be refunded pro rata.

d. If the return premium is not refunded with the notice of cancellation or when this policy is returned to us, we will refund it as soon as possible, but no later than:

(1) 45 days after we send a notice of cancellation to you; or

(2) 30 days after we receive the policy or a notice of cancellation from you.

e. Except as noted below, if the policy is cancelled by us, we will give the same advance notice of cancellation in writing to any mortgagee or other person shown by the policy to have an interest in a covered loss as we give to you. The cancellation notice may be delivered or mailed; if mailed, proof of mailing will be sufficient proof of notice.

6. **Nonrenewal.** We may elect not to renew this policy. We may do so by mailing to you and, if applicable, your agent or broker at the last addresses known to us or shown by our records, written notice, including our reason for refusing to renew, at least 45 days before the expiration date of this policy. Proof of mailing will be sufficient proof of notice.

If we have offered in writing, either directly or through our agent, at least 20 days before the expiration date of this policy, to renew this policy, and have included a statement of the renewal premium due, we may terminate this policy on its expiration date if you fail to pay the required premium when due.

For the purpose of determining the date when nonrenewal can be effected: A policy with a term of six months or less is considered as if written for a policy period of six months. A policy written for a term longer than one year or a policy with no fixed expiration date is considered as if written for a period of one year.

7. **Assignment.** Assignment of this policy will not be valid unless we give our written consent.

8. **Subrogation.** An **insured** may waive in writing before a loss all rights of recovery against any person. If not waived, we may require an assignment of rights of recovery for a loss to the extent that payment is made by us.

If an assignment is sought, an **insured** must sign and deliver all related papers and cooperate with us.

Subrogation does not apply under Section II to Medical Payments to Others or Damage to Property of Others.

9. **Death.** If any person named in the Declarations or the spouse, if a resident of the same household, dies:

a. we insure the legal representative of the deceased but only with respect to the premises and property of the deceased covered under the policy at the time of death;

b. **insured** includes:

(1) any member of your household who is an **insured** at the time of your death, but only while a resident of the **residence premises**; and

(2) with respect to your property, the person having proper temporary custody of the property until appointment and qualification of a legal representative.

Copyright, Washington Surveying and Rating Bureau,
includes copyrighted material of
Insurance Services Office, Inc. with its permission, 1990

LM003120



## MUTUAL POLICY CONDITIONS

This policy is issued by a mutual company having special regulations lawfully applicable to its organization, membership, policies or contracts of insurance, of which the following shall apply to and form a part of this policy:

This policy is non-assessable. The policyholder is a member of the company and shall participate, to the extent and upon the conditions fixed and determined by the Board of Directors in accordance with the provisions of law, in the distribution of dividends so fixed and determined.

For dividend classification purposes, this policy is classified, except as to coverage afforded by any rider or endorsement providing otherwise, in Dividend Class II.

The named insured is hereby notified that by virtue of this policy he is a member of Liberty Mutual Group and is entitled to vote either in person or by proxy at any and all meetings of said company.

The annual meetings are held at its home office, Boston, Massachusetts on the second Wednesday of April in each year, at eleven o'clock in the morning.

IN WITNESS WHEREOF, the company has executed and attested these presents; but this policy shall not be valid unless countersigned on the Declarations Page.

**SECRETARY**

**PRESIDENT**

LM003121



# HOMEPROTECTOR PLUS ENDORSEMENT

FMHO 2171 R2

**A. INCREASED SPECIAL LIMIT OF LIABILITY - JEWELRY, WATCHES, FURS, PRECIOUS AND SEMI-PRECIOUS STONES**

Section I Coverage C - Personal Property. Special Limits of Liability. Paragraph 6 is replaced with:

6. Jewelry, watches, furs, precious and semi-precious stones are insured for accidental direct physical loss or damage. The following exclusions and limitations apply:

   a. $2500 for loss by theft, subject to a maximum of $1000 for any one article.

   b. The limit of liability stated in the declarations page for Coverage C, for loss caused by perils named under Coverage C of this policy, other than theft.

   c. $2500 for loss caused by perils not named and not excluded in this policy, subject to a maximum of $1000 for any article.

   d. We do not cover loss or damage caused by mechanical breakdown, wear and tear, gradual deterioration, insects, vermin or inherent vice.

**B. REPLACEMENT COST PROVISION - DWELLING AND PERSONAL PROPERTY**

You must meet the following additional condition for this provision to apply:

17. Additions or Changes to Dwelling - Notice to Company. You must inform us within 90 days of the start of any additions, alterations or improvements to the dwelling that will increase the replacement cost of the dwelling by $5000 or more.

If you meet Condition 17, then Section I, Conditions of the policy, Item 3. Loss Settlement, is replaced as follows:

3. Loss Settlement. Covered property losses are settled as follows:

   a. The applicable limit of liability for Buildings under Coverage A or B is the replacement cost without deduction for depreciation, subject to the following:

      (1) We will pay the cost of repair or replacement, but not exceeding:

         (a) The replacement cost of that part of the building damaged using new materials of like kind and quality on the same premises and intended for the same occupancy and use;

         (b) With respect to Coverage A, an amount not exceeding 20% greater than the limit of liability stated in the declarations, as modified by the Inflation Protection Provision of the policy;

         (c) With respect to Coverage B, the limit of liability stated in the declarations, as modified by the Inflation Protection Provision of the policy;

         (d) The amount actually and necessarily spent to repair or replace the damage.

      (2) When the cost of repair or replacement is more than $2500 or more than 5% of the amount of insurance in this policy on the building, whichever is less, we will pay no more than the actual cash value of the damage until actual repair or replacement is complete.

      **(3) If the policy includes optional Earthquake coverage, FMHO 2168, this Loss Settlement provision will not apply for direct physical loss to property caused by earthquake, including land shock waves or tremors before, during or after a volcanic eruption.**

   b. Awnings, outdoor antennas and outdoor equipment, whether or not attached to buildings, and structures that are not buildings: at actual cash value at the time of loss but not exceeding the amount needed to repair or replace.

   c. Personal property, carpeting and domestic appliances: at replacement cost but not exceeding the amount needed to repair or replace subject to the following:

      (1) Our limit of liability for loss to Personal Property shall not exceed the smallest of the following:

         (a) Replacement cost with a new item of like kind and quality at the time of loss;

         (b) The full cost of repair;

         (c) Any special limit of liability described in the policy or stated in this endorsement; or

LM003122



      (d) The Coverage C limit of liability stated in the declarations, as modified by the Inflation Protection Provision of the policy.

    (2) This endorsement shall not apply to:

      (a) Fine arts and items which, by their nature cannot be replaced with new items.

      (b) Articles whose age or history contribute substantially to their value including souvenirs or collector's items.

      (c) Property that is unusable for the purpose for which it was originally intended due to age or historic condition.

    (3) We will not pay for any loss to personal property under this endorsement until actual repair or replacement is complete.

  d. You may disregard the replacement cost provision and make a claim for loss of damage to property on an actual cash value basis and then make claim within 180 days after loss for additional liability under this endorsement.

## C. INCREASED LIMIT - COVERAGE D

We will pay the amount of loss covered by Coverage D which is actually sustained by you during the 12 consecutive months following the date of loss, subject to the periods of time under paragraphs 1, 2 and 3 of Coverage D - Loss of Use.

## D. ADDITIONAL COVERAGES

### REFRIGERATORS AND FREEZERS CONTENTS COVERAGE

We cover the contents of deep freeze or refrigerated units on the residence premises from the perils of:

1. Fluctuation or total interruption of electric power, either on or off premises, resulting from conditions beyond the control of the Insured.

2. Mechanical breakdown of any refrigeration equipment on premises including the blowing of fuses or circuit breakers.

We do not cover loss caused by the following additional exclusions:

1. Disconnection or termination of power due to turning off any switch.

2. Inability of power source to provide sufficient power due to government order, lack of fuel or lack of generating capacity to meet demand.

SPECIAL LIMIT - We will not pay more than $500 of your loss of refrigerator or freezer contents resulting from the above perils.

All other provisions of this policy apply.

### LOCK REPLACEMENT COVERAGE

We will pay up to $250 for replacing the locks or cylinders on the exterior doors of the residence premises when your keys have been stolen. The theft of the keys must be reported to the police for this coverage to apply.

This coverage is additional insurance. No deductible applies to this coverage.

LM003123



## CREDIT CARD, FUND TRANSFER CARD, FORGERY
## AND COUNTERFEIT MONEY COVERAGE

**HO-53** (Ed. 4-84)

Increased Limit

For an additional premium, the limit of liability for Additional Coverage 6., Credit Card, Fund Transfer Card, Forgery and Counterfeit Money, is increased to $ *

*Entries may be left blank if shown elsewhere in this policy for this coverage.

All other provisions of this policy apply.

HO-53 (Ed. 4-84)          Copyright, Insurance Services Office, Inc., 1984          Page 1 of 1

LM003124



# AMENDATORY ENDORSEMENT

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

*THIS ENDORSEMENT SUPERSEDES ALL OTHER ENDORSEMENTS WHICH HAVE BEEN MADE PART OF YOUR POLICY AND REFERENCE THESE SAME PROVISIONS*

## SECTION I - PROPERTY COVERAGES

### COVERAGE A - Dwelling

Item 1. is amended as follows:

We cover:

1. The dwelling on the "residence premises" shown in the Declarations, including structures attached to the dwelling, and attached wall-to-wall carpeting;

### COVERAGE C - Personal Property

The introductory paragraph of **Special Limits of Liability** is amended to read:

These do not increase the Coverage C limit of liability. The special limit for each numbered category below is the total limit for each loss for all property in that category. If personal property can reasonably be considered a part of two or more of the groups listed below, the lowest limit will apply.

The following limits are added:

11. $5000 on electronic data processing system equipment and the recording or storage media or accessories used with that equipment.

12. $5000 on any one article and $10000 in the aggregate for loss by theft of any rug, carpet (excluding attached wall-to-wall carpet), tapestry, wall-hanging or other similar article.

13. $2500 in the aggregate for loss of any of the following whether or not they are part of a collection: trading cards, comic books, figurines, stamps, advertising materials, stuffed animals, dolls, sports and entertainment memorabilia, toys, games, militaria, and books.

14. $1200 for any one electrical appliance for loss by sudden and accidental damage from artificially generated electrical currents. This special limit does not apply to electronic data processing equipment or storage media.

In the event Landlord Endorsement FMHO 3307 is part of this policy, the above coverage contained in Special Limits of Liability introductory paragraph and subparagraphs

11 through 14 are deleted.

**Property Not Covered** under **COVERAGE C - Personal Property**

The final two subparagraphs of Item **3. (a.** and **b.)** are replaced by the following:

We do cover vehicles or conveyances not subject to motor vehicle registration which are:

    **a.** Used solely to service an "insured's" residence; or

    **b.** Designed for assisting the handicapped;

In the event Landlord Endorsement FMHO 3307 is part of this policy, the above coverage contained in the final two subparagraphs of Item **3. (a.** and **b.)** is deleted.

Item **10.** is added as personal property items not covered.

10. Water or steam

**ADDITIONAL COVERAGES** is revised as follows:

Item **7. Loss Assessment** is deleted in its entirety.

The following is added to Item **8. Collapse:**

    With respect to this Additional Coverage:

    **(1)** Collapse means the sudden and entire falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied or used for its current intended purpose.

    **(2)** A building or any part of a building that is in danger of falling down or caving in is not considered to be in a state of collapse.

    **(3)** A part of a building that is standing is not considered to be in a state of collapse even if it has separated from another part of the building.

LM003125



(4) A building or any part of a building that is standing is not considered to be in a state of collapse even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

Under **Form HO 00 03**, the following Additional Coverage is added:

8. **Damage to Siding and/or Roofing.** In case of damage to siding and/or roofing of the covered dwelling and other structures at the insured location, we will reimburse you for the cost you incur, up to a maximum of $15,000 in aggregate to replace any undamaged siding, soffit, fascia, and/or roofing material of like kind and quality to match those materials that were used to repair or replace the damaged property.

This coverage applies only if reasonably similar siding and/or roofing materials are no longer available to repair or replace the damaged portion of the damaged covered dwelling and other structures at the insured location due to a covered peril.

This coverage does not apply to:

a. Mismatches caused by weathering, fading, oxidizing, wear and tear, deterioration, or product defect;

b. Damage to siding material other than vinyl or metal siding;

c. Roofing material other than architectural (laminated) asphalt shingle or 3-tab asphalt shingle.

However, we will not pay to:

a. Replace siding and/or roofing material of any undamaged dwelling or other structure at the insured location in order to match newly repaired or replaced siding and/or roofing material of any damaged dwelling or other structure;

b. Repair or replace undamaged roofing and/or siding material due to mismatch between undamaged material and new material used to repair or replace damaged material because of:

(1) Texture, quality, dimensional differences color, fading;

(2) Oxidation, rust, corrosion, weathering differences;

(3) Wear and tear, marring, scratching, deterioration;

(4) Inherent vice, latent defect, mechanical breakdown;

(5) Obsolescence, discontinuation; or

(6) Material type variation.

**SECTION I - PERILS INSURED AGAINST**

**COVERAGE A - DWELLING and COVERAGE B - OTHER STRUCTURES**

The following is added to item **2.b.**

(4) Footing(s)

The following are added to item **2.e.** Any of the following:

(8) Growth of trees, shrubs, plants or lawns whether or not such growth is above or below the surface of the ground;

The final paragraph of item **2.** is further revised as follows:

If any of these cause sudden and accidental water damage not otherwise excluded, from a plumbing, heating, air conditioning or automatic fire protective sprinkler system or household appliance, we cover loss caused by the water including the cost of tearing out and replacing any part of a building necessary to repair the system or appliance. We do not cover loss to the system or appliance from which this water escaped.

**SECTION I - EXCLUSIONS**

2. **Earth Movement** is deleted and replaced by the following:

2. **Earth Movement,** meaning movement of the earth, whether combined with water or not, in any direction, including but not limited to:

a. Earthquake, including land shock waves or tremors before, during, or after a volcanic eruption;

b. Landslide, mud slide, or mud flow;

c. Subsidence or sinkhole; or

d. Any other earth movement, including earth sinking, rising, shifting, expanding, contracting, or eroding;

caused by or resulting from manmade, animal, or natural actions, events, or conditions.

If direct loss by fire or explosion ensues, we will pay only for the ensuing loss.

LM003126



This exclusion does not apply to loss by theft.

(This is Exclusion **1.b.** in Form **HO 00 03**.)

For form **HO 00 03**, the following is added as item **12.**

**12. Cosmetic Loss or Damage,** meaning any loss that alters only the physical appearance of the metal roof covering but:

**(1)** does not result in the penetration of water through the metal roof covering; or

**(2)** does not result in the failure of the metal roof covering to perform its intended function of keeping out the elements over an extended period of time.

Metal roof covering means the metal roofing material exposed to the weather; the underlayments applied for moisture protection; and all flashings required in the replacement of a metal roof covering.

We do cover loss or damage by hail to roof coverings that allow the penetration of water through the roof covering or that results in the failure of the roof covering to perform its intended function of keeping out the elements over an extended period of time.

## SECTION I – CONDITIONS

**2. Your Duties After Loss**

Paragraph **a.** is deleted and replaced by the following:

Give prompt notice to us or our agent. With respect to a loss caused by the peril of windstorm or hail, that notice must occur no later than 365 days after the date of loss

**3. Loss Settlement.** Under form **HO 00 06,** the following is added under item **b.(2):**

The following paragraph is added and applies to this policy and to any Loss Settlement provision in any other endorsement applicable to this policy:

Loss Settlement does not include payment for any actual or perceived decrease in market or resale value resulting from loss to or repair of your covered property.

## SECTION II - EXCLUSIONS

Item **1.a.** under **Coverage E - Personal Liability and Coverage F - Medical Payments to Others** is amended as follows:

Which is expected or intended by the "insured", even if the resulting "bodily injury" or "property damage"

**1)** is of a different kind, quality, or degree than initially expected or intended; or

**2)** is sustained by a different person, entity, real or personal property, than initially expected or intended.

However, this exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

## SECTION II - ADDITIONAL COVERAGES

Item **1.c.** under **Claims Expenses** is amended as follows:

Reasonable expenses incurred by an "insured" at our request, including actual loss of earnings (but not loss of other income) up to $250 per day, for assisting us in the investigation or defense of a claim or suit.

Item **4. Loss Assessment** is deleted in its entirety.

All other policy terms and conditions apply.

LM003127



# HOMEOWNER AMENDATORY ENDORSEMENT

## THIS ENDORSEMENT CHANGES YOUR POLICY - PLEASE READ IT CAREFULLY

*THIS ENDORSEMENT SUPERSEDES ALL OTHER ENDORSEMENTS WHICH HAVE BEEN MADE PART OF YOUR POLICY AND REFERENCE THESE SAME PROVISIONS*

### DEFINITIONS

The introductory paragraph of **Definitions** is amended to read:

In this policy, "you" and "your" refer to the "named insured" shown in the Declarations and
  (1) the spouse of the "named insured" shown on the Declarations, if a resident of the same household; or
  (2) the partner in a civil union, registered domestic partnership, or similar union or partnership, with the "named insured" shown on the Declarations, if a resident of the same household.
  Section (2), above, only applies if the civil union, registered domestic partnership or other similar union or partnership is validly entered into under the law of any state, territory or possession of the United States of America, any territory or province of Canada, or the equivalent of a state or province in any other country.
"We," "us" and "our" refer to the Company providing this insurance.  In addition, certain words and phrases are defined as follows:

### SECTIONS I AND II - CONDITIONS

The introductory paragraph of **9. Death.** is amended to read:

If any person named in the Declarations or the spouse, if a resident of the same household; or the partner in a civil union, registered domestic partnership or similar union or partnership, if a resident of the same household, dies:

LM003128



# NO SECTION II - LIABILITY COVERAGES FOR HOME DAY
# CARE BUSINESS LIMITED SECTION I - PROPERTY COVERAGES
# FOR HOME DAY CARE BUSINESS
**HO-322 WA** (Ed. 6-92)

If an **insured** regularly provides home day care services to a person or persons other than **insureds** and receives monetary or other compensation for such services, that enterprise is a **business.** Mutual exchange of home day care services, however, is not considered compensation. The rendering of home day care services by an **insured** to a relative of an **insured** is not considered a **business.**

Therefore, with respect to a home day care enterprise which is considered to be a **business,** this policy:

1. does not provide Section **II** - Liability Coverages because a **business** of an **insured** is excluded under exclusion **1.b.(1)** of Section **II** - Exclusions;

2. does not provide Section **I** - Coverage B coverage where other structures are used in whole or in part for **business;**

3. limits coverage for property used on the **residence premises** for home day care enterprise to $2,500, because Coverage C - Special Limits of Liability - item 9 imposes that limit on **business** property on the **residence premises.** (Item 9 corresponds to item 6 in Form **HO-8**);

4. limits coverage for property used off the **residence premises** for home day care enterprise to $250, because Coverage C - Special Limits of Liability - item 10 imposes that limit on **business** property off the **residence premises.** (Item 10 corresponds to item 7 in Form **HO-8**.)


THIS ENDORSEMENT DOES **NOT** CONSTITUTE A REDUCTION OF COVERAGE.

Copyright, Washington Surveying and Rating Bureau, includes copyrighted material
of Insurance Services Office, Inc. with its permission, 1992

LM003129



# AMENDATORY MOLD, FUNGUS, WET ROT, DRY ROT, BACTERIA, OR VIRUS ENDORSEMENT

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**DEFINITIONS**

The following definition is added to the DEFINITIONS section:

12. **"Mold, Fungus, Wet Rot, Dry Rot, Bacteria, or Virus"** means any type or form of fungus, rot, virus or bacteria.  This includes mold, mildew and any mycotoxins  (meaning a toxin produced by a fungus), other microbes, spores, scents or byproducts produced or released by mold, mildew, fungus, rot, bacteria, or viruses.

**SECTION I – PROPERTY COVERAGES**

**Additional Coverages**

The following Additional Coverage is added:

9. **Remediation of "Mold, Fungus, Wet Rot, Dry Rot, Bacteria, or Virus" Resulting Directly From Any Covered Loss**

We will pay, up to the Additional Coverage – Mold Limit of Liability shown below, for the **"Remediation"** of **"Mold, Fungus, Wet Rot, Dry Rot, Bacteria, or Virus"** resulting directly from any covered loss.

**"Remediation"** means the reasonable and necessary treatment, containment, decontamination, removal or disposal of **"Mold, Fungus, Wet Rot, Dry Rot, Bacteria, or Virus"** as required to complete the repair or replacement of property, covered under Section I of the policy, that is damaged by any covered peril insured against, and also consists of the following:

1. The reasonable costs or expense to remove, repair, restore, and replace that property including the costs to tear out and replace any part of the building as needed to gain access to the **"Mold, Fungus, Wet Rot, Dry Rot, Bacteria, or Virus"**; and

2. the reasonable costs or expense for the testing or investigation necessary to detect, evaluate or measure **"Mold, Fungus, Wet Rot, Dry Rot, Bacteria, or Virus"**; and

3. any loss of fair rental value, or reasonable increase in additional living expenses, that is necessary to maintain your normal standard of living, if **"Mold, Fungus, Wet Rot, Dry Rot, Bacteria, or Virus"** resulting directly from any covered loss makes your residence premises uninhabitable.

We will pay no more than the Additional Coverage - Mold Limit of Liability shown below for the **"Remediation"** of **"Mold, Fungus, Wet Rot, Dry Rot, Bacteria, or Virus"** resulting directly from any covered loss during the policy period, regardless of the number of locations under the policy to which this endorsement is attached, the number of persons whose property is damaged, the number of "insureds,"or the number of losses or claims made.

If there is a covered loss or damage to covered property, not caused, in whole or in part, by **"Mold, Fungus, Wet Rot, Dry Rot, Bacteria, or Virus,"** loss payment will not be limited by the terms of this Additional Coverage, except to the extent that **"Mold, Fungus, Wet Rot, Dry Rot, Bacteria, or Virus"** causes an increase in the loss. Any such increase in the loss will be subject to the terms of this Additional Coverage.

LM003130



### *ADDITIONAL COVERAGE -- MOLD LIMIT OF LIABILITY*

| Mold Limit of Liability: | SECTION I | Aggregate Limit | $5,000 |
|---|---|---|---|

This limitation does not apply to **"Mold, Fungus, Wet Rot, Dry Rot, Bacteria, or Virus"** ensuing from a covered fire or lightning loss.

This Additional Coverage does not increase the limits of liability under Section I of the policy as shown in the Declarations.

### SECTION I – EXCLUSIONS

Exclusion **12.** is added:

12. Except as provided by **Additional Coverage 9.**, loss consisting of or caused by **"Mold, Fungus, Wet Rot, Dry Rot, Bacteria, or Virus"** is excluded, even if resulting from a peril insured against under Section I. We do not cover **"Remediation"** of **"Mold, Fungus, Wet Rot, Dry Rot, Bacteria, or Virus,"** even if resulting from a peril insured against under Section I, except as provided by **Additional Coverage 9.**

This exclusion does not apply to **"Mold, Fungus, Wet Rot, Dry Rot, Bacteria, or Virus"** ensuing from a covered fire or lightning loss.

### SECTION II – EXCLUSIONS

**Coverage E - Personal Liability and Coverage F - Medical Payments to Others**
Exclusion 1.i. is added:

i.  Arising out of or aggravated by, in whole or in part by, **"Mold, Fungus, Wet Rot, Dry Rot, Bacteria, or Virus."**

**This endorsement takes precedence over all other endorsements attached to your policy.**

LM003131



# SEEPAGE EXCLUSION ENDORSEMENT

**THIS ENDORSEMENT CHANGES THE POLICY.   PLEASE READ IT CAREFULLY.**

**SECTION I – PERILS INSURED AGAINST**

**Coverage A – Dwelling and Coverage B – Other Structures**

**Paragraph 2.e. is added:**

  **e.** Seepage, meaning a gradual, continuous, or repeated seepage or leakage of water, steam or fuel over a period of 14 days or more, resulting in damage to the structure, whether hidden or not.

**This endorsement takes precedence over all other endorsements attached to your policy.**

LM003132

S.F. FORM

Form **438BFU NS**
(Rev. May 1, 1942) X

## LENDER'S LOSS PAYABLE ENDORSEMENT

1.  Loss or damage, if any, under this policy, shall be paid **to the Payee named on the first page of this policy**, its successors and assigns, hereinafter referred to as "the Lender", in whatever form or capacity its interests may appear and whether said interest be vested in said Lender in its individual or in its disclosed or undisclosed fiduciary or representative capacity, or otherwise, or vested in a nominee or trustee of said Lender.

2.  The insurance under this policy, or any rider or endorsement attached thereto, as to the interest only of the Lender, its successors and assigns, shall not be invalidated nor suspended: (a) by any error, omission, or change respecting the ownership, description, possession, or location of the subject of the insurance or the interest therein, or the title thereto; (b) by the commencement of foreclosure proceedings or the giving of notice of sale of any of the property covered by this policy by virtue of any mortgage or trust deed; (c) by any breach of warranty, act, omission, neglect, or non-compliance with any of the provisions of this policy, including any and all riders now or hereafter attached thereto, by the named insured, the borrower, mortgagor, trustor, vendee, owner, tenant, warehouseman, custodian, occupant, or by the agents of either or any of them or by the happening of any event permitted by them or either of them, or their agents, or which they failed to prevent, whether occurring before or after the attachment of this endorsement, or whether before or after a loss, which under the provisions of this policy of insurance or of any rider or endorsement attached thereto would invalidate or suspend the insurance as to the named insured, excluding herefrom, however, any acts or omissions of the Lender while exercising active control and management of the property.

3.  In the event of failure of the insured to pay any premium or additional premium which shall be or become due under the terms of this policy or on account of any change in occupancy or increase in hazard not permitted by this policy, this Company agrees to give written notice to the Lender of such non-payment of premium after sixty (60) days from and within one hundred and twenty (120) days after due date of such premium and it is a condition of the continuance of the rights of the Lender hereunder that the Lender when so notified in writing by this Company of the failure of the insured to pay such premium shall pay or cause to be paid the premium due within ten (10) days following receipt of the Company's demand in writing therefor. If the Lender shall decline to pay said premium or additional premium, the rights of the Lender under this Lender's Loss Payable Endorsement shall not be terminated before ten (10) days after receipt of said written notice by the Lender.

4.  Whenever this Company shall pay to the Lender any sum for loss or damage under this policy and shall claim that as to the insured no liability therefor exists, this Company, at its option, may pay to the Lender the whole principal sum and interest and other indebtedness due or to become due from the insured, whether secured or unsecured, (with refund of all interest not accrued), and this Company, to the extent of such payment, shall thereupon receive a full assignment and transfer, without recourse, of the debt and all rights and securities held as collateral thereto.

5.  If there be any other insurance upon the within described property, this Company shall be liable under this policy as to the Lender for the proportion of such loss or damage that the sum hereby insured bears to the entire insurance of similar character on said property under policies held by, payable to and expressly consented to by the Lender. Any Contribution Clause included in any Fallen Building Clause Waiver or any Extended Coverage Endorsement attached to this contract of insurance is hereby nullified, and also any Contribution Clause in any other endorsement or rider attached to this contract of insurance is hereby nullified except Contribution Clauses for the compliance with which the insured has received reduction in the rate charged or has received extension of the coverage to include hazards other than fire and compliance with such Contribution Clause is made a part of the consideration for insuring such other hazards. The Lender upon the payment to it of the full amount of its claim, will subrogate this Company (pro rata with all other insurers contributing to said payment) to all of the Lender's rights of contribution under said other insurance.

6.  This Company reserves the right to cancel this policy at any time, as provided by its terms, but in such case this policy shall continue in force for the benefit of the Lender for ten (10) days after written notice of such cancellation is received by the Lender and shall then cease.

7.  This policy shall remain in full force and effect as to the interest of the Lender for a period of ten (10) days after its expiration unless an acceptable policy in renewal thereof with loss thereunder payable to the Lender in accordance with the terms of this Lender's Loss Payable Endorsement, shall have been issued by some insurance company and accepted by the Lender.

8.  Should legal title to and beneficial ownership of any of the property covered under this policy become vested in the Lender or its agents, insurance under this policy shall continue for the term thereof for the benefit of the Lender but, in such event, any privileges granted by this Lender's Loss Payable Endorsement which are not also granted the insured under the terms and conditions of this policy and/or under other riders or endorsements attached thereto shall not apply to the insurance hereunder as respects such property.

9.  All notices herein provided to be given by the Company to the Lender in connection with this policy and this Lender's Loss Payable Endorsement shall be mailed to or delivered to the Lender at its office or branch described on the first page of the policy.

Approved:

Board of Fire Underwriters of the Pacific,
California Bankers' Association,
          Committee on Insurance.

LM003133



## INFLATION PROTECTION ENDORSEMENT

It is agreed that the limits of liability for:

      Coverage A, Dwelling;

      Coverage B, Structure;

      Coverage C, Personal Property;

      and Coverage D, Loss of Use,

shall be raised by the rate of increase in the Xactware Pricing Indices published by Xactware Inc.

## METHOD

To find the limits of liability on a given date, the Index Level the Company assigns to that date will be divided by the Index Level for the effective date of this Endorsement.  This Factor is then multiplied by the limit for Coverages A, B, C and D separately.

If during this policy's term the Coverage A limit is changed at the insured's request, the effective date of this Endorsement is amended to the effective date of such change.

This Endorsement shall not reduce the limits of liability to less than the amount shown on:

      a.  The policy; or
      b.  The most recent Homeowners Policy Renewal Declaration.

This Endorsement must be attached to Change Endorsement when issued after the policy is written.

LM003134



## PREMISES ALARM OR FIRE PROTECTION SYSTEM          HO-216 (Ed. 4-84)

For a premium credit, we acknowledge the installation of an alarm system or automatic sprinkler system approved by us on the **residence premises**.  You agree to maintain this system in working order and to notify us promptly of any change made to the system or if it is removed.

HO-216 (Ed. 4-84)          Copyright, Insurance Services Office, Inc., 1984          Page 1 of 1



# LEAD POISONING EXCLUSION ENDORSEMENT - WASHINGTON

The following provisions are added to and made part of your Homeowners Policy:

Section I - Property Coverages do not apply to any costs or expenses incurred or loss arising out of:

1. the removal, testing for, monitoring, clean-up, abatement, treatment, or neutralization of lead; paint, putty or plaster containing lead; soil or earth containing lead; or any other substance or material containing lead; or

2. any governmental direction or other request that you test for, monitor, clean-up, remove, abate, contain, treat or neutralize lead; paint, putty or plaster containing lead; soil or earth containing lead; or any other substance or material containing lead.

Coverage E - Personal Liability and Coverage F - Medical Payments to Others do not apply to bodily injury or property damage:

1. arising out of absorption, ingestion or inhalation of lead from lead paint, plaster or putty containing lead; soil or earth containing lead or any other material or substance containing lead; or

2. any costs or expenses incurred or loss arising out of any claim, governmental direction, or request that you test for, monitor, cleanup, remove, abate, contain, treat or neutralize lead; paint, putty or plaster containing lead; or any other substance or material containing lead.

This exclusion applies to any obligation to share damages, costs or expenses with someone else or to repay someone else who must pay damages, costs or expenses.

FMHO 1082 (ED. 9-95)                                                                    Page 1 of 1

LM003136



# ORDINANCE OR LAW COVERAGE - WASHINGTON

For the Premium charged, the percentage applied to the Coverage A limit of liability under Form HO 00 03 or Form HO 00 06, or the percentage applied to the building Additions and Alterations limit of liability under Form HO 00 04, is increased to 10%. This applies to covered property or the building containing the covered property for loss resulting from a Peril Insured Against.  The loss will be settled on the basis of any ordinance or law that regulates the construction, repair or demolition of this property.

All other provisions of this policy apply.

FMHO 2055                                                                                        Page 1 of 1



## UNDERGROUND FUEL STORAGE TANK EXCLUSION

**The following provision is added to and made part of your Homeowners Policy:**

**Section II - Exclusions**

**The Paragraph below is added:**

**Coverage E - Personal Liability and Coverage F - Medical Payments to Others do not apply to "bodily injury" or "property damage":**

arising out of the release of fuel or fuel products from an "underground storage tank system."

"Underground storage tank system" means the underground tank, the fill pipe, the vent pipes, and all associated fixtures, including pipe and tubing which contains or conveys fuel or fuel products from the underground storage tank to the point of combustion.

All other provisions of this policy apply.

FMHO 3209 10 09

LM003138



## WAIVER OF SMALL PREMIUM ADJUSTMENT

Section I and II - Conditions, Item #4.  Waiver or Change of Policy Provisions is changed by adding this sentence:  If a change results in a premium adjustment of less than $3.00, the refund or additional premium will be waived unless the insured requests a refund.

FMHO 3220 10 09                                        Liberty Mutual Group                                        Page 1 of 1

LM003139



## Notice of Membership in Liberty Mutual Holding Company Inc.

While this policy is in effect, the named insured first named in the Declarations is a member of Liberty Mutual Holding Company Inc. and is entitled to vote either in person or by proxy at any and all meetings of the members of said company. The Annual Meeting of Liberty Mutual Holding Company Inc. is in Boston, Massachusetts, on the second Wednesday in April each year at ten o'clock in the morning.

The named insured first named in the Declarations shall participate in the distribution of any dividends declared by us for this Policy. The amount of such Named Insured's participation is determined by the decision of our Board of Directors in compliance with any laws that apply.

Any provisions in the policy relating to:

1. Membership in Liberty Mutual Insurance Company or Liberty Mutual Fire Insurance Company; or

2. Entitlement to dividends as a member of Liberty Mutual Insurance Company or Liberty Mutual Fire Insurance Company

are deleted and replaced by the preceding paragraphs.

2340e

LM003140

# EXHIBIT G

*000001*
Liberty Mutual Office
14900 Interurban Ave S Ste 142
Tukwila WA 98168



**INSURANCE**

AUTO | HOME

Rani J Thykkuttathil
10403 67th Ave S
Seattle WA 98178-2518

# Thank you for insuring with Liberty Mutual.

This package contains your homeowners insurance policy. The declarations page summarizes your selected coverages and lists any discounts and savings. Please refer to the Change Detail section for a description of the changes applied to your policy.

Please review this information and keep it with your important documents. For your reference, we have provided A Guide to Your Declarations Page on the reverse side of this letter.

Remember, you can visit LibertyMutual.com/eService 24 hours a day to get information and manage your Liberty Mutual account.

If you have any questions about your coverage, please call us at 1-206-277-7838/ 1-800-922-7013.

Sincerely,

Your Liberty Mutual Service Team

 **CONTACT US**

Questions About
Your Policy
By phone
1-206-277-7838
1-800-922-7013
Mon - Fri 8AM-10PM EST
Sat 8AM-8PM EST
Sun 11AM-5PM EST

Liberty Mutual Office
14900 Interurban Ave S Ste 142
Tukwila WA 98168

Visit us online
LibertyMutual.com

To report a claim
By phone
1-800-2CLAIMS
(1-800-225-2467)

Online
LibertyMutual.com/Claims

Mobile
Scan QR Code with your iPhone
or Android smartphone to
download the claims app or
download a free reader app at
www.i-nigma.mobi



 **MANAGE YOUR
ACCOUNT ONLINE**

Sign up for eService
LibertyMutual.com/
eService

 

PROUD PARTNER

THIS IS NOT YOUR HOME INSURANCE BILL.

4000003H32268030846400000000



 # A Guide to Your Declarations Page

To help you understand where to find information on your Policy Declarations page, below are descriptions of the different sections that may appear.

For information pertaining to your own policy, please refer to the enclosed Policy Declarations Page, which declares the specific details of the insurance policy you have purchased. If you have any questions, please call us at 1-206-277-7838/1-800-922-7013.

## Coverage Information

Standard Policy Coverages
This section includes the basic coverages to protect your home and property with corresponding coverage limits, which are the amounts available for covered losses. Section I Coverages apply to property loss and Section II Coverages apply to liability protection for accidental bodily injury or property damage.

Additional Coverages
Optional coverages you have selected are listed in this section. These coverages enhance your policy and/or increase your limits for certain coverages.

Scheduled Property
If you elect to purchase additional coverage for specific items such as jewelry or silverware, your scheduled personal property is listed with the applicable limits.

## Other Charges

If there are any additional charges applied to your policy, they will be listed in this section, and may include charges that are required by your state.

## Discounts and Benefits

This section lists the discounts applied to your policy. For a list of available discounts, please visit LibertyMutual.com/home-discounts.

## Endorsements

Endorsements included on your policy are listed in this section. An endorsement is a change to your policy.

## Important Messages

This section contains special notes about certain coverages or state-specific information.

Please visit LibertyMutual.com/insurance-glossary for our Insurance Glossary, which includes explanations of some key terms.

This Guide is intended to provide a general explanation only and is not part of your insurance policy. The provisions, limitations and exclusions of your insurance policy, including your Policy Declarations, will determine whether a claim is covered. You should carefully review your contract for specific details pertaining to your policy.

# Policy Declarations



**Liberty Mutual** INSURANCE

## A summary of your homeowners insurance coverage

Reason for your new declarations page: Changes made to your policy
Please refer to the Change Detail section on page 2 for more information.
Effective date of this change: 02/27/2014


INSURANCE INFORMATION

| | |
|---|---|
| **Named Insured**<br>Rani J Thykkuttathil | **Policy Number**<br>H32-268-030846-40 |
| **Mailing Address**<br>10403 67th Ave S<br>Seattle WA 98178-2518 | **Policy Period**<br>11/12/2013-11/12/2014  12:01AM<br>standard time at the address of the<br>Named Insured at Insured Location. |
| **Insured Location**<br>Same as Mailing address above | |



---

**Premium Summary**

| | | |
|---|---|---|
| Standard Policy | $ | 1,621.00 |
| Additional Coverages | $ | 180.00 |
| Discounts and Benefits | $ | (464.00) |
| | | |
| Total 12 Month Policy Premium | $ | 1,337.00 |

Through your affiliation with the University of Washington Alumni Association your policy includes exclusive group savings on your home insurance.

THIS IS NOT YOUR HOME INSURANCE BILL.

---

## Coverage Information

### Standard Policy

| Section I Coverages | | LIMITS | PREMIUM |
|---|---|---|---|
| A. Dwelling with Expanded Replacement Cost | $ | 429,500 | |
| B. Other Structures on Insured Location | $ | 42,950 | |
| C. Personal Property with Replacement Cost | $ | 322,130 | |
| D. Loss of Use of Insured Location | Actual Loss Sustained | | |

Section II Coverages

| | | LIMITS | |
|---|---|---|---|
| E. Personal Liability (each occurrence) | $ | 300,000 | |
| F. Medical Payments to Others (each person) | $ | 5,000 | |

Policy Deductibles

Losses covered under Section I are subject to a deductible of: $1,000

| Total Standard Policy | | | $ | 1,621 |
|---|---|---|---|---|

### Additional Coverages

| | DEDUCTIBLE | LIMITS | PREMIUM |
|---|---|---|---|
| Credit Card, Fund Transfer Card, Forgery | $ 1,000 | $ | 0 |
| Home Protector Plus | | | $ 154 |

---



QUESTIONS ABOUT YOUR POLICY?

**By phone**
1-206-277-7838
1-800-922-7013

Liberty Mutual Office
14900 Interurban Ave
S Ste 142
Tukwila WA 98168

To report a claim
By phone
1-800-225-2467
Online
LibertyMutual.com/Claims



INSURANCE GLOSSARY

For definitions of insurance terms, please visit LibertyMutual.com/insurance-glossary.

Your policy includes HomeProtector Plus, which provides enhanced coverage in case of a loss. Please see your endorsement for details.



## Coverage Information (continued)

| Additional Coverages (continued) | | | | |
|---|---|---|---|---|
| | DEDUCTIBLE | LIMITS | | PREMIUM |
| Coverage E & F increased limit | | | $ | 26 |
| Total Additional Coverages | | | $ | 180 |

## Discounts and Benefits

Your discounts and benefits have been applied to your total policy premium.

| | | PREMIUM |
|---|---|---|
| • Insurance to Value Discount | $ | (93) |
| • Inflation Protection Discount | $ | (46) |
| • Safe Homeowner Program | $ | (232) |
| • Group Savings Plus® (5% discount included in total policy premium) University of Washington Alumni Association | | |
| • Protective Device Discounts: Smoke/Heat Alarm-All Floors, Extinguishers and Dead Bolt Locks | $ | (93) |
| Total Discounts and Benefits | $ | (464) |



**HOME DISCOUNTS**
For more information on discounts, please visit LibertyMutual.com/home-discounts.

## Change Detail

Change Mortgagee 1
Changes made to your policy for Policy Change 1.
There is no premium increase for above changes.

## Endorsements — Changes to Your Policy

- LibertyGuard® Deluxe Homeowner Policy (HO-3WA 05/91)
- Credit Card, Fund Transfer Card, Forgery (HO-53 04/84)
- Amendmt Pol Definitions (FMHO-2934 7/04)
- Amendatory Mold End (FMHO 3373 1212)

- Inflation Protection (FMHO 3219 1009)
- Lead Poisoning Exclusion - WA (FMHO-1082 9/95)
- Fuel Storage Exclusion (FMHO 3209 1009)

- LMHC Membership (2340)

- Home Protector Plus (FMHO-2171 R2)

- Homeowner Amendatory Endorsement (FMHO 3389 1212)
- No SecII/Limit I-Daycare (HO-322WA 06/92)
- Seepage Exclusion Endorsement (FMHO 3403 1212)
- Protective Devices (HO-216 04/84)
- Increased Ord Or Law (FMHO-2055)

- Waiver of Small Premium Adjustment (FMHO 3220 1009)

## Mortgage Information

Mortgagee 1:
BECU
ISAOA, ATIMA
C/O CENLAR
LOAN NO. 0055931281
PO Box 202028
Florence, SC 29502-2028

## Important Messages

Flood Insurance: This policy does not cover damage to your property caused by flooding. The federal government offers flood insurance through the National Flood Insurance Program to residents of communities that participate in its program. You can learn more about the National Flood Insurance Program at www.floodsmart.gov or by calling (888) 379-9531.



LibertyGuard® Deluxe Homeowners Policy Declarations
Coverage provided and underwritten by Liberty Mutual Fire Insurance Company, Boston MA.

This policy, including endorsements listed above, is countersigned by:

Dexter R. Legg
Secretary

David H. Long
President

Stephen McAnena
Authorized Representative

**Liberty Mutual.**
INSURANCE

# LibertyGuard Homeowners Policy

Please read your policy and each endorsement carefully.

**To serve you best...**

Liberty Mutual has over 350 service offices throughout the United States and Canada.  Please contact your service office shown on your Declarations Page to report losses, or for any changes or questions about your insurance. Payments should be sent to the office indicated on your bill.

**THIS POLICY IS NON ASSESSABLE**



Homeowners 3WA
Special Form
Ed. 5-91
Washington

---

## AGREEMENT

We will provide the insurance described in this policy in return for the premium and compliance with all applicable provisions of this policy.

---

## DEFINITIONS

---

In this policy, "you" and "your" refer to the "named insured" shown in the Declarations and the spouse if a resident of the same household. "We," "us" and "our" refer to the Company providing this insurance. In addition, certain words and phrases are defined as follows:

1. **"bodily injury"** means bodily harm, sickness or disease, except a disease which is transmitted by an **insured** through sexual contact. **"Bodily injury"** includes required care, loss of services and death resulting from covered bodily harm, sickness or disease.

2. **"business"** includes trade, profession or occupation.

3. **"insured"** means you and residents of your household who are:
   a. your relatives; or
   b. other persons under the age of 21 and in the care of any person named above.
   Under Section II, **"insured"** also means:
   c. with respect to animals or watercraft to which this policy applies, any person or organization legally responsible for these animals or watercraft which are owned by you or any person included in 3a or 3b above. A person or organization using or having custody of these animals or watercraft in the course of any **business** or without consent of the owner is not an **insured**;
   d. with respect to any vehicle to which this policy applies:
      (1) persons while engaged in your employ or that of any person included in 3a or 3b above; or
      (2) other persons using the vehicle on an **insured location** with your consent.

4. **"insured location"** means:
   a. the **residence premises**;
   b. the part of other premises, other structures and grounds used by you as a residence and:
      (1) which is shown in the Declarations; or
      (2) which is acquired by you during the policy period for your use as a residence;
   c. any premises used by you in connection with a premises in 4a or 4b above;
   d. any part of a premises:
      (1) not owned by an **insured**; and
      (2) where an **insured** is temporarily residing;
   e. vacant land, other than farm land, owned by or rented to an **insured**;
   f. land owned by or rented to an **insured** on which a one or two family dwelling is being built as a residence for an **insured**;
   g. individual or family cemetery plots or burial vaults of an **insured**; or
   h. any part of a premises occasionally rented to an **insured** for other than **business** use.

5. **"occurrence"** means an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, during the policy period, in:
   a. **bodily injury**; or
   b. **property damage.**

---

Copyright, Washington Surveying and Rating Bureau,
includes copyrighted material of
Insurance Services Office, Inc. with its permission, 1990



6. **"property damage"** means physical injury to, destruction of, or loss of use of tangible property.

7. **"residence employee"** means:
   a. an employee of an **insured** whose duties are related to the maintenance or use of the **residence premises**, including household or domestic services; or
   b. one who performs similar duties elsewhere not related to the **business** of an **insured**.

8. **"residence premises"** means:
   a. the one family dwelling, other structures, and grounds; or
   b. that part of any other building;
   where you reside and which is shown as the **"residence premises"** in the Declarations.
   **"Residence premises"** also means a two family dwelling where you reside in at least one of the family units and which is shown as the **"residence premises"** in the Declarations.

9. **"actual cash value"** means:
   a. When the damage to property is economically repairable, **"actual cash value"** means the cost of repairing the damage, less reasonable deduction for wear and tear, deterioration and obsolescence.
   b. When the loss or damage to property creates a total loss, **"actual cash value"** means the market value of property in a used condition equal to that of the destroyed property, if reasonably available on the used market.
   c. Otherwise, **"actual cash value"** means the market value of new, identical or nearly identical property less reasonable deduction for wear and tear, deterioration and obsolescence.

10. **"replacement cost"** means:
   a. In case of loss or damage to buildings, **"replacement cost"** means the cost, at the time of loss, to repair or replace the damaged property with new materials of like kind and quality, without deduction for depreciation.
   b. In case of loss to personal property, **"replacement cost"** means the cost, at the time of loss, of a new article identical to the one damaged, destroyed or stolen.  When the identical article is no longer manufactured or is not available, **"replacement cost"** means the cost of a new article similar to the one damaged or destroyed and which is of comparable quality and usefulness, without deduction for depreciation.

11. **"fully enclosed building"** means:
   A building with continuous walls on all sides, extending from the ground level to the roof, with doors and windows (as deemed necessary) at various locations in the walls and including a continuous roof sheltering all areas within the wall perimeter.

## SECTION I - PROPERTY COVERAGES

**COVERAGE A - Dwelling**
We cover:
1. the dwelling on the **residence premises** shown in the Declarations, including structures attached to the dwelling; and
2. materials and supplies located on or next to the **residence premises** used to construct, alter or repair the dwelling or other structures on the **residence premises**.
This coverage does not apply to land, including land on which the dwelling is located.

**COVERAGE B - Other Structures**
We cover other structures on the **residence premises** set apart from the dwelling by clear space.  This includes structures connected to the dwelling by only a fence, utility line, or similar connection.
This coverage does not apply to land, including land on which the other structures are located.



We do not cover other structures:

1. used in whole or in part for **business**; or
2. rented or held for rental to any person not a tenant of the dwelling, unless used solely as a private garage.

The limit of liability for this coverage will not be more than 10% of the limit of liability that applies to Coverage A.  Use of this coverage does not reduce the Coverage A limit of liability.

**COVERAGE C - Personal Property**

We cover personal property owned or used by an **insured** while it is anywhere in the world.  At your request, we will cover personal property owned by:

1. others while the property is on the part of the **residence premises** occupied by an **insured**;
2. a guest or a **residence employee**, while the property is in any residence occupied by an **insured**.

Our limit of liability for personal property usually located at an **insured's** residence, other than the **residence premises**, is 10% of the limit of liability for Coverage C, or $1000, whichever is greater. Personal property in a newly acquired principal residence is not subject to this limitation for the 30 days from the time you begin to move the property there.

**Special Limits of Liability.**  These limits do not increase the Coverage C limit of liability.  The special limit for each numbered category below is the total limit for each loss for all property in that category.

1. $200 on money, bank notes, bullion, gold other than goldware, silver other than silverware, platinum, coins and medals.
2. $1000 on securities, accounts, deeds, evidences of debt, letters of credit, notes other than bank notes, manuscripts, personal records, passports, tickets and stamps.  This dollar limit applies to these categories regardless of the medium (such as paper or computer software) on which the material exists.

   This limit includes the cost to research, replace or restore the information from the lost or damaged material.
3. $1000 on watercraft, including their trailers, furnishings, equipment and outboard motors.
4. $1000 on trailers not used with watercraft.
5. $1000 on grave markers.
6. $1000 for loss by theft of jewelry, watches, furs, precious and semi-precious stones.
7. $2000 for loss by theft of firearms.
8. $2500 for loss by theft of silverware, silver-plated ware, goldware, gold-plated ware and pewterware.  This includes flatware, hollowware, tea sets, trays and trophies made of or including silver, gold or pewter.
9. $2500 on property, on the **residence premises**, used at any time or in any manner for any **business** purpose.
10. $250 on property, away from the **residence premises**, used at any time or in any manner for any **business** purpose.

**Property Not Covered.**  We do not cover:

1. articles separately described and specifically insured in this or other insurance;
2. animals, birds or fish;
3. motor vehicles or all other motorized land conveyances.  This includes:
   a. their equipment and accessories; or
   b. any device or instrument for the transmitting, recording, receiving or reproduction of sound or pictures which is operated by power from the electrical system of motor vehicles or all other motorized land conveyances, including:
      (1) accessories or antennas; or
      (2) tapes, wires, records, discs or other media for use with any such device or instrument;
   while in or upon the vehicle or conveyance.

Copyright, Washington Surveying and Rating Bureau,
includes copyrighted material of
Insurance Services Office, Inc. with its permission, 1990



We do cover vehicles or conveyances:

   a. not subject to licensing requirements which are used exclusively to service an **insured's** residence; or

   b. which are both designed and used exclusively for assisting the handicapped and have a maximum attainable speed of 10 miles per hour;

4. aircraft and parts.  Aircraft means any contrivance used or designed for flight, except model or hobby aircraft not used or designed to carry people or cargo;

5. property of roomers, boarders and other tenants, except property of roomers and boarders related to an **insured**;

6. property in an apartment regularly rented or held for rental to others by an **insured**;

7. property rented or held for rental to others off the **residence premises**;

8. **business** data, including such data stored in:

   a. books of account, drawings or other paper records; or

   b. electronic data processing tapes, wires, records, discs or other software media.

   However, we do cover the cost of blank recording or storage media, and of prerecorded computer programs available on the retail market.

9. credit cards or fund transfer cards except as provided in Additional Coverages 6.

**COVERAGE D - Loss of Use**

The limit of liability for Coverage D is the total limit for all the coverages that follow.

1. If a loss covered under this Section makes that part of the **residence premises** where you reside not fit to live in, we cover, at your choice, either of the following.  However, if the **residence premises** is not your principal place of residence, we will not provide the option under paragraph b. below.

   a. **Additional Living Expense,** meaning any necessary increase in living expenses incurred by you so that your household can maintain its normal standard of living; or

   b. **Fair Rental Value,** meaning the fair rental value of that part of the **residence premises** where you reside less any expenses that do not continue while the premises is not fit to live in.

   Payment under a. or b. will be for the shortest time required to repair or replace the damage or, if you permanently relocate, the shortest time required for your household to settle elsewhere.

2. If a loss covered under this Section makes that part of the **residence premises** rented to others or held for rental by you not fit to live in, we cover the:

   **Fair Rental Value,** meaning the fair rental value of that part of the **residence premises** rented to others or held for rental by you less any expenses that do not continue while the premises is not fit to live in.

   Payment will be for the shortest time required to repair or replace that part of the premises rented or held for rental.

3. If a civil authority prohibits you from use of the **residence premises** as a result of direct damage to neighboring premises by a Peril Insured Against in this policy, we cover the Additional Living Expense or Fair Rental Value loss as provided under 1 and 2 above for no more than two weeks.

The periods of time under 1, 2 and 3 above are not limited by expiration of this policy.

We do not cover loss or expense due to cancellation of a lease or agreement.

**ADDITIONAL COVERAGES**

1. **Debris Removal.** We will pay your reasonable expense for the removal of debris of covered property if a Peril Insured Against that applies to the damaged property causes the loss.

   This expense is included in the limit of liability that applies to the damaged property.  If the amount to be paid for the actual damage to the property plus the debris removal expense is more than the limit of liability for the damaged property, an additional 5% of that limit of liability is available for debris removal expense.

   We will also pay your reasonable expense, up to $500 in the aggregate for the removal from the **residence premises** of:

   a. your tree(s) felled by the peril of Windstorm or Hail;

   b. your tree(s) felled by the peril of Weight of Ice, Snow or Sleet; or

c. a neighbor's tree(s) felled by a Peril Insured Against under Coverage C;

provided the tree(s) damages a covered structure.

2. **Reasonable Repairs.** In the event that covered property is damaged by an applicable Peril Insured Against, we will pay the reasonable cost incurred by you for necessary measures taken solely to protect against further damage. If the measures taken involve repair to other damaged property, we will pay for those measures only if that property is covered under this policy and the damage to that property is caused by an applicable Peril Insured Against.

This coverage:

a. does not increase the limit of liability that applies to the covered property;

b. does not relieve you of your duties, in case of a loss to covered property, as set forth in Section I Condition 2.d.

3. **Trees, Shrubs and Other Plants.** We cover trees, shrubs, plants or lawns, on the **residence premises**, for loss caused by the following Perils Insured Against: Fire or lightning, Explosion, Riot or civil commotion, Aircraft, Vehicles not owned or operated by a resident of the **residence premises**, Vandalism or malicious mischief or Theft.

The limit of liability for this coverage will not be more than 5% of the limit of liability that applies to the dwelling, or more than $500 for any one tree, shrub or plant. We do not cover property grown for **business** purposes.

This coverage is additional insurance.

4. **Fire Department Service Charge.** We will pay up to $500 for your liability assumed by contract or agreement for fire department charges incurred when the fire department is called to save or protect covered property from a Peril Insured Against. We do not cover fire department service charges if the property is located within the limits of the city, municipality or protection district furnishing the fire department response.

This coverage is additional insurance. No deductible applies to this coverage.

5. **Property Removed.** We insure covered property against direct loss from any cause while being removed from a premises endangered by a Peril Insured Against and for no more than 30 days while removed. This coverage does not change the limit of liability that applies to the property being removed.

6. **Credit Card, Fund Transfer Card, Forgery and Counterfeit Money.**

We will pay up to $500 for:

a. the legal obligation of an **insured** to pay because of the theft or unauthorized use of credit cards issued to or registered in an **insured's** name;

b. loss resulting from theft or unauthorized use of a fund transfer card used for deposit, withdrawal or transfer of funds, issued to or registered in an **insured's** name;

c. loss to an **insured** caused by forgery or alteration of any check or negotiable instrument; and

d. loss to an **insured** through acceptance in good faith of counterfeit United States or Canadian paper currency.

We do not cover use of a credit card or fund transfer card:

a. by a resident of your household;

b. by a person who has been entrusted with either type of card; or

c. if an **insured** has not complied with all terms and conditions under which the cards are issued.

All loss resulting from a series of acts committed by any one person or in which any one person is concerned or implicated is considered to be one loss.

We do not cover loss arising out of **business** use or dishonesty of an **insured**.

This coverage is additional insurance. No deductible applies to this coverage.

Defense:

a. We may investigate and settle any claim or suit that we decide is appropriate. Our duty to defend a claim or suit ends when the amount we pay for the loss equals our limit of liability.

b. If a suit is brought against an **insured** for liability under the Credit Card or Fund Transfer Card coverage, we will provide a defense at our expense by counsel of our choice.

Copyright, Washington Surveying and Rating Bureau, includes copyrighted material of Insurance Services Office, Inc. with its permission, 1990



c. We have the option to defend at our expense an **insured** or an **insured's** bank against any suit for the enforcement of payment under the Forgery coverage.

7. **Loss Assessment:** We will pay up to $1000 for your share of loss assessment charged during the policy period against you by a corporation or association of property owners, when the assessment is made as a result of direct loss to the property, owned by all members collectively, caused by a Peril Insured Against under Coverage A - Dwelling, other than earthquake or land shock waves or tremors before, during or after a volcanic eruption.

This coverage applies only to loss assessments charged against you as owner or tenant of the **residence premises.**

We do not cover loss assessments charged against you or a corporation or association of property owners by any governmental body.

The limit of $1000 is the most we will pay with respect to any one loss, regardless of the number of assessments.

Condition 1. Policy Period, under Sections I and II Conditions, does not apply to this coverage.

8. **Collapse.** We insure for direct physical loss to covered property involving collapse of a building or any part of a building caused only by one or more of the following:
   a. Perils Insured Against in Coverage C - Personal Property.  These perils apply to covered building and personal property for loss insured by this additional coverage;
   b. hidden decay;
   c. hidden insect or vermin damage;
   d. weight of contents, equipment, animals or people;
   e. weight of rain which collects on a roof; or
   f. use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation.

Loss to an awning, fence, patio, pavement, swimming pool, underground pipe, flue, drain, cesspool, septic tank, foundation, retaining wall, bulkhead, pier, wharf or dock is not included under items b, c, d, e, and f unless the loss is a direct result of the collapse of a building.

Collapse does not include settling, cracking, shrinking, bulging or expansion.

This coverage does not increase the limit of liability applying to the damaged covered property.

## SECTION I - PERILS INSURED AGAINST

**COVERAGE A - DWELLING and**
**COVERAGE B - OTHER STRUCTURES**

We insure against risks of direct loss to property described in Coverages A and B only if that loss is a physical loss to property; however, we do not insure loss:

1. involving collapse, other than as provided in Additional Coverage 8;
2. caused by:
   a. freezing of a plumbing, heating, air conditioning or automatic fire protective sprinkler system or of a household appliance, or by discharge, leakage or overflow from within the system or appliance caused by freezing.  This exclusion applies only while the dwelling is vacant, unoccupied or being constructed unless you have used reasonable care to:
      (1) maintain heat in the building; or
      (2) shut off the water supply and drain the system and appliances of water;
   b. freezing, thawing, pressure or weight of water or ice, whether driven by wind or not, to a:
      (1) fence, pavement, patio or swimming pool;
      (2) foundation, retaining wall or bulkhead; or
      (3) pier, wharf or dock;

Copyright, Washington Surveying and Rating Bureau,
includes copyrighted material of
Insurance Services Office, Inc. with its permission, 1990



c. theft in or to a dwelling under construction, or of materials and supplies for use in the construction until the dwelling is finished and occupied;

d. vandalism and malicious mischief or breakage of glass and safety glazing materials if the dwelling has been vacant for more than 30 consecutive days immediately before the loss.  A dwelling being constructed is not considered vacant;

e. constant or repeated seepage or leakage of water or steam over a period of weeks, months or years from within a plumbing, heating, air conditioning or automatic fire protective sprinkler system or from within a household appliance;

f. (1) wear and tear, marring, deterioration;

   (2) inherent vice, latent defect, mechanical breakdown;

   (3) smog, rust, mold, wet or dry rot;

   (4) smoke from agricultural smudging or industrial operations;

   (5) release, discharge or dispersal of contaminants or pollutants;

   (6) settling, cracking, shrinking, bulging or expansion of pavements, patios, foundations, walls, floors, roofs or ceilings; or

   (7) birds, vermin, rodents, insects or domestic animals.

But if loss or damage by collapse, as provided in **ADDITIONAL COVERAGES, Collapse,** results, we will pay for that resulting loss or damage.

If any of these cause water damage not otherwise excluded from a plumbing, heating, air conditioning or automatic fire protective sprinkler system or household appliance, we cover loss caused by the water including the cost of tearing out and replacing any part of a building necessary to repair the system or appliance.  We do not cover loss to the system or appliance from which this water escaped.

3. excluded under Section I - Exclusions.

Under items 1 and 2, any ensuing loss to property described in Coverages A and B not excluded or excepted in this policy is covered.

**COVERAGE C - Personal Property**

We insure for direct physical loss to the property described in Coverage C caused by a peril listed below unless the loss is excluded in Section I - Exclusions.

1. **Fire or lightning.**

2. **Windstorm or hail.**

   This peril does not include loss to the property contained in a building caused by rain, snow, sleet, sand or dust unless the direct force of wind or hail damages the building causing an opening in a roof or wall and the rain, snow, sleet, sand or dust enters through this opening.

   This peril includes loss to watercraft and their trailers, furnishings, equipment, and outboard motors, only while inside a **fully enclosed building.**

3. **Explosion.**

4. **Riot or civil commotion.**

5. **Aircraft,** including self-propelled missiles and spacecraft.

6. **Vehicles** means a device designed or used to transport persons or property.

7. **Smoke,** meaning sudden and accidental damage from smoke.

   This peril does not include loss caused by smoke from agricultural smudging or industrial operations, such as slash burns.

8. **Vandalism or malicious mischief.**

9. **Theft,** including attempted theft and loss of property from a known place when it is likely that the property has been stolen.

   This peril does not include loss caused by theft:

   a. committed by an **insured;**



b. in or to a dwelling under construction, or of materials and supplies for use in the construction until the dwelling is finished and occupied; or

c. from that part of a **residence premises** rented by an **insured** to other then an **insured**.

This peril does not include loss caused by theft that occurs off the **residence premises** of:

a. property while at any other residence owned by, rented to, or occupied by an **insured**, except while an **insured** is temporarily living there.  Property of a student who is an **insured** is covered while at a residence away from home if the student has been there at any time during the 45 days immediately before the loss;

b. watercraft, including their furnishings, equipment and outboard motors; or

c. trailers and campers.

However, property described in b. above is covered if, at the time of loss caused by theft, it is parked inside a private garage or in street parking areas immediately adjacent to the **residence premises**.

10. **Failing objects.**

This peril does not include loss to property contained in a building unless the roof or an outside wall of the building is first damaged by a falling object.  Damage to the falling object itself is not included.

11. **Weight of ice, snow or sleet** which causes damage to property contained in a building.

12. **Accidental discharge or overflow of water or steam** from within a plumbing, heating, air conditioning or automatic fire protective sprinkler system or from within a household appliance.

This peril does not include loss:

a. to the system or appliance from which the water or steam escaped;

b. caused by or resulting from freezing except as provided in the peril of freezing below; or

c. on the **residence premises** caused by accidental discharge or overflow which occurs off the **residence premises**.

In this peril, a plumbing system does not include a sump, sump pump or related equipment.

13. **Sudden and accidental tearing apart, cracking, burning or bulging** of a steam or hot water heating system, an air conditioning or automatic fire protective sprinkler system, or an appliance for heating water.

We do not cover loss caused by or resulting from freezing under this peril.

14. **Freezing** of a plumbing, heating, air conditioning or automatic fire protective sprinkler system or of a household appliance.

This peril does not include loss on the **residence premises** while the dwelling is unoccupied, unless you have used reasonable care to:

a. maintain heat in the building; or

b. shut off the water supply and drain the system and appliances of water.

15. **Sudden and accidental damage from artificially generated electrical current.**

This peril does not include loss to a tube, transistor or similar electronic component.

16. **Damage by glass or safety glazing material** which is part of a building, storm door or storm window.

This peril does not include loss on the **residence premises** if the dwelling has been vacant for more than 30 consecutive days immediately before the loss.  A dwelling being constructed is not considered vacant.

17. **Volcanic Action**, meaning direct loss or damage resulting from the eruption of a volcano when the loss or damage is caused by:

a. volcanic blast or airborne shock waves;

b. ash, dust or particulate matter; or

c. lava flow.

This peril does not provide coverage for damage to land; property in the open or in open sheds; or portions of buildings not completely enclosed, or personal property contained within those buildings. All volcanic eruptions that occur within any 72-hour period will be considered as one volcanic eruption.

Copyright, Washington Surveying and Rating Bureau,
includes copyrighted material of
Insurance Services Office, Inc. with its permission, 1990



Direct loss includes the cost to remove the ash, dust or particulate matter from the interior and exterior surfaces of the covered building and from personal property contained in the building.

Payment for removal applies only to the initial deposit of ash, dust or particulate matter following a volcanic eruption.  Subsequent deposits arising from the movement of volcanic dust or ash by wind or other means are not covered.

## SECTION I - EXCLUSIONS

We will not pay for loss or damage caused by any of the following excluded events as described in 1 through 11 below.  Loss or damage will be considered to have been caused by an excluded event if that event:

    a.  directly and solely results in loss or damage; or

    b.  initiates a sequence of events that results in loss or damage, regardless of the nature of any intermediate or final event in that sequence.

1.  **Ordinance or Law,** meaning enforcement of any ordinance or law regulating the construction, repair, or demolition of a building or other structure, unless specifically provided under this policy.

2.  **Earth Movement,** meaning earthquake including land shock waves or tremors before, during or after a volcanic eruption; landslide; mudflow; earth sinking, rising or shifting; unless direct loss by:

    a.  fire;

    b.  explosion; or

    c.  breakage of glass or safety glazing material which is part of a building, storm door or storm window;

ensues and then we will pay only for the ensuing loss.

This exclusion does not apply to loss by theft.

3.  **Water Damage,** meaning:

    a.  flood, surface water, waves, tidal water, overflow of a body of water, or spray from any of these, whether or not driven by wind;

    b.  water which backs up through sewers or drains or which overflows from a sump; or

    c.  water below the surface of the ground, including water which exerts pressure on or seeps or leaks through a building, sidewalk, driveway, foundation, swimming pool or other structure.

Direct loss by fire, explosion or theft resulting from water damage is covered.

4.  **Power Failure,** meaning the failure of power or other utility service if the failure takes place off the **residence premises**.  But, if a Peril Insured Against ensues on the **residence premises,** we will pay only for that ensuing loss.

5.  **Neglect,** meaning neglect of the **insured** to use all reasonable means to save and preserve property at and after the time of a loss.

6.  **War,** including undeclared war, civil war, insurrection, rebellion, revolution, warlike act by a military force or military personnel, destruction or seizure or use for a military purpose, and including any consequence of any of these.  Discharge of a nuclear weapon will be deemed a warlike act even if accidental.

7.  **Nuclear Hazard,** to the extent set forth in the Nuclear Hazard Clause of Section I - Conditions.

8.  **Intentional Loss,** meaning any loss arising out of any act committed:

    a.  by or at the direction of an **insured**; and

    b.  with the intent to cause a loss.

9.  **Weather Conditions.**

    A weather condition which results in:

    a.  landslide or mudflow;

    b.  earth sinking, rising or shifting;

    c.  flood, surface water, waves, tidal water, overflow of a body of water, or spray from any of these,whether or not driven by wind;



    d.  water backing up from a sewer or drain or overflowing from a sump; or

    e.  water below the surface of the ground, including water which exerts pressure on or seeps or leaks through a building, sidewalk, driveway, foundation, swimming pool or other structure.

    However, if loss or damage by fire or explosion results, we will pay for that resulting loss or damage.

10. **Acts or decisions,** including the failure to act or decide, of any person, group, organization or governmental body.   However, any ensuing loss to property described in Coverages A and B not excluded or excepted in this policy is covered.

11. **Faulty, inadequate or defective:**

    a.  planning, zoning, development, surveying, siting;

    b.  design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

    c.  materials used in repair, construction, renovation or remodeling; or

    d.  maintenance;

    of part or all of any property whether on or off the **residence premises.**

    However, any ensuing loss to property described in Coverages A and B not excluded or excepted in this policy is covered.

---

## SECTION I - CONDITIONS

1. **Insurable Interest and Limit of Liability.**  Even if more than one person has an insurable interest in the property covered, we will not be liable in any one loss:

    a.  to the **insured** for more than the amount of the **insured's** interest at the time of loss; or

    b.  for more than the applicable limit of liability.

2. **Your Duties After Loss.**  In case of a loss to covered property, you must see that the following are done:

    a.  give prompt notice to us or our agent;

    b.  notify the police in case of loss by theft;

    c.  notify the credit card or fund transfer card company in case of loss under Credit Card or Fund Transfer Card coverage;

    d.  (1) protect the property from further damage;

        (2) make reasonable and necessary repairs to protect the property; and

        (3) keep an accurate record of repair expenses;

    e.  prepare an inventory of damaged personal property showing the quantity, description, **actual cash value** and amount of loss.  Attach all bills, receipts and related documents that justify the figures in the inventory;

    f.  as often as we reasonably require:

        (1) show the damaged property;

        (2) provide us with records and documents we request and permit us to make copies; and

        (3) submit to examination under oath, while not in the presence of any other **insured**, and sign the same;

    g.  send to us, within 60 days after our request, your signed, sworn proof of loss which sets forth, to the best of your knowledge and belief:

        (1) the time and cause of loss;

        (2) the interest of the **insured** and all others in the property involved and all liens on the property;

        (3) other insurance which may cover the loss;

        (4) changes in title or occupancy of the property during the term of the policy;

        (5) specifications of damaged buildings and detailed repair estimates;

        (6) the inventory of damaged personal property described in 2e above;

Copyright, Washington Surveying and Rating Bureau,
includes copyrighted material of
Insurance Services Office, Inc. with its permission, 1990



(7) receipts for additional living expenses incurred and records that support the fair rental value loss; and

(8) evidence or affidavit that supports a claim under the Credit Card, Fund Transfer Card, Forgery and Counterfeit Money coverage, stating the amount and cause of loss.

3. **Loss Settlement.** Covered property losses are settled as follows:

a. (1) Personal property;

(2) Awnings, carpeting, household appliances, outdoor antennas and outdoor equipment, whether or not attached to buildings; and

(3) Structures that are not buildings;

at **actual cash value** at the time of loss but not more than the amount required to repair or replace.

b. Buildings under Coverage A or B at **replacement cost** without deduction for depreciation, subject to the following:

(1) If, at the time of loss, the amount of insurance in this policy on the damaged building is 80% or more of the full **replacement cost** of the building immediately before the loss, we will pay the cost to repair or replace, after application of deductible and without deduction for depreciation, but not more than the least of the following amounts:

(a) the limit of liability under this policy that applies to the building;

(b) the **replacement cost** of that part of the building damaged for like construction and use on the same premises; or

(c) the necessary amount actually spent to repair or replace the damaged building.

(2) If, at the time of loss, the amount of insurance in this policy on the damaged building is less than 80% of the full **replacement cost** of the building immediately before the loss, we will pay the greater of the following amounts, but not more than the limit of liability under this policy that applies to the building:

(a) the **actual cash value** of that part of the building damaged; or

(b) that proportion of the cost to repair or replace, after application of deductible and without deduction for depreciation, that part of the building damaged, which the total amount of insurance in this policy on the damaged building bears to 80% of the **replacement cost** of the building.

(3) To determine the amount of insurance required to equal 80% of the full **replacement cost** of the building immediately before the loss, do not include the value of:

(a) excavations, foundations, piers or any supports which are below the undersurface of the lowest basement floor;

(b) those supports in (a) above which are below the surface of the ground inside the foundation walls, if there is no basement; and

(c) underground flues, pipes, wiring and drains.

(4) We will pay no more than the **actual cash value** of the damage unless:

(a) actual repair or replacement is complete; or

(b) the cost to repair or replace the damage is both:

(i) less than 5% of the amount of insurance in this policy on the building; and

(ii) less than $2500.

(5) You may disregard the **replacement cost** loss settlement provisions and make claim under this policy for loss or damage to buildings on an **actual cash value** basis. You may then make claim within 180 days after loss for any additional liability on a **replacement cost** basis.

4. **Loss to a Pair or Set.** In case of loss to a pair or set we may elect to:

a. repair or replace any part to restore the pair or set to its value before the loss; or

b. pay the difference between **actual cash value** of the property before and after the loss.

5. **Glass Replacement.** Loss for damage to glass caused by a Peril Insured Against will be settled on the basis of replacement with safety glazing materials when required by ordinance or law.

Copyright, Washington Surveying and Rating Bureau, includes copyrighted material of Insurance Services Office, Inc. with its permission, 1990



6. **Appraisal.** If you and we fail to agree on the amount of loss, either may demand an appraisal of the loss. In this event, each party will choose a competent appraiser within 20 days after receiving a written request from the other. The two appraisers will choose an umpire. If they cannot agree upon an umpire within 15 days, you or we may request that the choice be made by a judge of a court of record in the state where the **residence premises** is located. The appraisers will separately set the amount of loss. If the appraisers submit a written report of an agreement to us, the amount agreed upon will be the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will set the amount of loss.

Each party will:

a. pay its own appraiser; and

b. bear the other expenses of the appraisal and umpire equally.

7. **Other Insurance.** If a loss covered by this policy is also covered by other insurance, we will pay only the proportion of the loss that the limit of liability that applies under this policy bears to the total amount of insurance covering the loss.

8. **Suit Against Us.** No action can be brought unless the policy provisions have been complied with and the action is started within one year after the date of loss.

9. **Our Option.** If we give you written notice within 30 days after we receive your signed, sworn proof of loss, we may repair or replace any part of the damaged property with like property.

10. **Loss Payment.** We will adjust all losses with you. We will pay you unless some other person is named in the policy or is legally entitled to receive payment. Loss will be payable 30 days after we receive your proof of loss and:

a. reach an agreement with you;

b. there is an entry of a final judgment; or

c. there is a filing of an appraisal award with us.

11. **Abandonment of Property.** We need not accept any property abandoned by an **insured**.

12. **Mortgage Clause.** Insurance Commissioner's Regulation No. 335/WAC-284-21-010 requires that Form 372 (Ed. 11 -50) or Form 438 BFU (Ed. 5-42) be endorsed on this policy, if applicable.

13. **No Benefit to Bailee.** We will not recognize any assignment or grant any coverage that benefits a person or organization holding, storing or moving property for a fee regardless of any other provision of this policy.

14. **Nuclear Hazard Clause.**

a. "Nuclear Hazard" means any nuclear reaction, radiation, or radioactive contamination, all whether controlled or uncontrolled or however caused, or any consequence of any of these.

b. Loss caused by the nuclear hazard will not be considered loss caused by fire, explosion, or smoke, whether these perils are specifically named in or otherwise included within the Perils Insured Against in Section I.

c. This policy does not apply under Section I to loss caused directly or indirectly by nuclear hazard, except that direct loss by fire resulting from the nuclear hazard is covered.

15. **Recovered Property.** If you or we recover any property for which we have made payment under this policy, you or we will notify the other of the recovery. At your option, the property will be returned to or retained by you or it will become our property. If the recovered property is returned to or retained by you, the loss payment will be adjusted based on the amount you received for the recovered property.

## SECTION II - LIABILITY COVERAGES

### COVERAGE E - Personal Liability

If a claim is made or a suit is brought against an **insured** for damages because of **bodily injury** or **property damage** caused by an **occurrence** to which this coverage applies, we will:

1. pay up to our limit of liability for the damages for which the **insured** is legally liable. Damages include prejudgment interest awarded against the **insured**.

Copyright, Washington Surveying and Rating Bureau,
includes copyrighted material of
Insurance Services Office, Inc. with its permission, 1990



2. provide a defense at our expense by counsel of our choice, even if the suit is groundless, false or fraudulent.  We may investigate and settle any claim or suit that we decide is appropriate.  Our duty to settle or defend ends when the amount we pay for damages resulting from the **occurrence** equals our limit of liability.

**COVERAGE F - Medical Payments To Others**

We will pay the necessary medical expenses that are incurred or medically ascertained within three years from the date of an accident causing **bodily injury**.  Medical expenses means reasonable charges for medical, surgical, x-ray, dental, ambulance, hospital, professional nursing, prosthetic devices and funeral services.  This coverage does not apply to you or regular residents of your household except **residence employees**.  As to others, this coverage applies only:

1. to a person on the **insured location** with the permission of an **insured**; or
2. to a person off the **insured location**, if the **bodily injury**:
   a. arises out of a condition on the **insured location** or the ways immediately adjoining;
   b. is caused by the activities of an **insured**;
   c. is caused by a **residence employee** in the course of the **residence employee's** employment by an **insured**; or
   d. is caused by an animal owned by or in the care of an **insured**.

## SECTION II - EXCLUSIONS

1. **Coverage E - Personal Liability and Coverage F - Medical Payments to Others** do not apply to **bodily injury** or **property damage**:
   a. which is expected or intended by the **insured**;
   b. (1) arising out of or in connection with a **business** engaged in by an **insured**.  This exclusion applies but is not limited to an act or omission, regardless of its nature or circumstance, involving a service or duty rendered, promised, owed, or implied to be provided because of the nature of the **business**;
      (2) arising out of the rental or holding for rental of any part of any premises by an **insured**.  This exclusion does not apply to the rental or holding for rental of an **insured location**:
         (a) on an occasional basis if used only as residence;
         (b) in part for use only as a residence, unless a single family unit is intended for use by the occupying family to lodge more than two roomers or boarders; or
         (c) in part, as an office, school, studio or private garage;
   c. arising out of the rendering of or failure to render professional services;
   d. arising out of a premises:
      (1) owned by an **insured**;
      (2) rented to an **insured**; or
      (3) rented to others by an **insured**;
      that is not an **insured location**;
   e. arising out of:
      (1) the ownership, maintenance, use, loading or unloading of motor vehicles or all other motorized land conveyances, including trailers, owned or operated by or rented or loaned to an **insured**;
      (2) the entrustment by an **insured** of a motor vehicle or any other motorized land conveyance to any person; or
      (3) statutorily imposed vicarious parental liability for the actions of a child or minor using a conveyance excluded in paragraph (1) or (2) above.
      This exclusion does not apply to:
      (1) a trailer not towed by or carried on a motorized land conveyance;

Copyright, Washington Surveying and Rating Bureau, includes copyrighted material of Insurance Services Office, Inc. with its permission, 1990



    (2) a motorized land conveyance which is both designed and used exclusively for recreational purposes off public roads, not subject to licensing requirements and:

        (a) not owned by an **insured**; or

        (b) owned by an **insured** and on an **insured location**;

    (3) a motorized golf cart when used to play golf on a golf course;

    (4) a vehicle or conveyance not subject to licensing requirements which is:

        (a) used exclusively to service an **insured's** residence;

        (b) in dead storage on an **insured location**;

    (5) a vehicle or conveyance which is both designed and used exclusively for assisting the handicapped and has a maximum attainable speed of 10 miles per hour;

f.  arising out of:

    (1) the ownership, maintenance, use, loading or unloading of a watercraft described below;

    (2) the entrustment by an **insured** of a watercraft described below to any person; or

    (3) statutorily imposed vicarious parental liability for the actions of a child or minor using a watercraft described below.

  Watercraft:

    (1) with inboard or inboard-outdrive motor power owned by an **insured**;

    (2) with inboard or inboard-outdrive motor power of more than 50 horsepower rented to an **insured**;

    (3) that is a sailing vessel, with or without auxiliary power, 26 feet or more in length owned by or rented to an **insured**; or

    (4) powered by one or more outboard motors with more than 25 total horsepower if the outboard motor is owned by an **insured**.  But, outboard motors of more than 25 total horsepower are covered for the policy period if:

        (a) you acquire them prior to the policy period and:

            (i) you declare them at policy inception; or

            (ii) your intention to insure is reported to us in writing within 45 days after you acquire the out-board motors.

        (b) you acquire them during the policy period.

  This exclusion does not apply while the watercraft is stored;

g.  arising out of:

    (1) the ownership, maintenance, use, loading or unloading of an aircraft;

    (2) the entrustment by an **insured** of an aircraft to any person; or

    (3) statutorily imposed vicarious parental liability for the actions of a child or minor using an aircraft.

  An aircraft means any contrivance used or designed for flight, except model or hobby aircraft not used or designed to carry people or cargo;

h.  caused directly or indirectly by war, including undeclared war, civil war, insurrection, rebellion, revolution, warlike act by a military force or military personnel, destruction or seizure or use for a military purpose, and including any consequence of any of these.  Discharge of a nuclear weapon will be deemed a warlike act even if accidental.

Exclusions d., e., f., and g. do not apply to **bodily injury** to a **residence employee** arising out of and in the course of the **residence employee's** employment by an **insured**.

2.  **Coverage E - Personal Liability**, does not apply to:

a.  liability:

    (1) for any loss assessment charged against you as a member of an association, corporation or community of property owners;

    (2) under any contract or agreement.  However, this exclusion does not apply to written contracts:

        (a) that directly relate to the ownership, maintenance or use of an **insured location**; or



      (b) where the liability of others is assumed by the **insured** prior to an occurrence; unless excluded in (1) above or elsewhere in this policy;

b.   **property damage** to property owned by the **insured**;

c.   **property damage** to property rented to, occupied or used by or in the care of the **insured**. This exclusion does not apply to **property damage** caused by fire, smoke or explosion;

d.   **bodily injury** to any person eligible to receive any benefits:

    (1) voluntarily provided; or

    (2) required to be provided;

  by the **insured** under any:

    (1) workers' compensation law;

    (2) non-occupational disability law; or

    (3) occupational disease law;

e.   **bodily injury** or **property damage** for which an **insured** under this policy:

    (1) is also an insured under a nuclear energy liability policy; or

    (2) would be an insured under that policy but for the exhaustion of its limit of liability.

  A nuclear energy liability policy is one issued by:

    (1) American Nuclear Insurers;

    (2) Mutual Atomic Energy Liability Underwriters;

    (3) Nuclear Insurance Association of Canada;

  or any of their successors; or

f.   **bodily injury** to you or an **insured** within the meaning of part a. or b. of **"insured"** as defined.

3.   **Coverage F - Medical Payments to Others**, does not apply to **bodily injury**:

a.   to a **residence employee** if the **bodily injury**:

    (1) occurs off the **insured location**; and

    (2) does not arise out of or in the course of the **residence employee's** employment by an **insured**;

b.   to any person eligible to receive benefits:

    (1) voluntarily provided; or

    (2) required to be provided;

  under any:

    (1) workers' compensation law;

    (2) non-occupational disability law; or

    (3) occupational disease law;

c.   from any:

    (1) nuclear reaction;

    (2) nuclear radiation; or

    (3) radioactive contamination;

  all whether controlled or uncontrolled or however caused; or

    (4) any consequence of any of these.

d.   to any person, other than a **residence employee** of an **insured**, regularly residing on any part of the **insured location.**

Copyright, Washington Surveying and Rating Bureau, includes copyrighted material of Insurance Services Office, Inc. with its permission, 1990



## SECTION II - ADDITIONAL COVERAGES

We cover the following in addition to the limits of liability:

1. **Claim Expenses.**  We pay:
   a. expenses we incur and costs taxed against an **insured** in any suit we defend;
   b. premiums on bonds required in a suit we defend, but not for bond amounts more than the limit of liability for Coverage E. We need not apply for or furnish any bond;
   c. reasonable expenses incurred by an **insured** at our request, including actual loss of earnings (but not loss of other income) up to $50 per day, for assisting us in the investigation or defense of a claim or suit;
   d. interest on the entire judgment which accrues after entry of the judgment and before we pay or tender, or deposit in court that part of the judgment which does not exceed the limit of liability that applies.

2. **First Aid Expenses.**  We will pay expenses for first aid to others incurred by an **insured** for **bodily injury** covered under this policy.  We will not pay for first aid to you or any other **insured**.

3. **Damage to Property of Others.**  We will pay, at **replacement cost**, up to $500 per **occurrence** for **property damage** to property of others caused by an **insured**.

   We will not pay for **property damage**:
   a. to the extent of any amount recoverable under Section I of this policy;
   b. caused intentionally by an **insured** who is 13 years of age or older;
   c. to property owned by an **insured**;
   d. to property owned by or rented to a tenant of an **insured** or a resident in your household; or
   e. arising out of:
      (1) a **business** engaged in by an **insured**;
      (2) any act or omission in connection with a premises owned, rented or controlled by an **insured**, other than the **insured location**; or
      (3) the ownership, maintenance, or use of aircraft, watercraft or motor vehicles or all other motorized land conveyances.

      This exclusion does not apply to a motorized land conveyance which is both designed and used exclusively for recreational purposes off public roads, not subject to licensing requirements and not owned by an **insured**.

4. **Loss Assessment.**  We will pay up to $1000 for your share of loss assessment charged during the policy period against you by a corporation or association of property owners, when the assessment is made as a result of:
   a. **bodily injury** or **property damage** not excluded under Section II of this policy; or
   b. liability for an act of a director, officer or trustee in the capacity as a director, officer or trustee, provided:
      (1) the director, officer or trustee is elected by the members of a corporation or association of property owners; and
      (2) the director, officer or trustee serves without deriving any income from the exercise of duties which are solely on behalf of a corporation or association of property owners.

   This coverage applies only to loss assessments charged against you as owner or tenant of the **residence premises**.

   We do not cover loss assessments charged against you or a corporation or association of property owners by any governmental body.

   Regardless of the number of assessments, the limit of $1000 is the most we will pay for loss arising out of:
   a. one accident, including continuous or repeated exposure to substantially the same general harmful conditions; or

Copyright, Washington Surveying and Rating Bureau, includes copyrighted material of Insurance Services Office, Inc. with its permission, 1990



b. a covered act of a director, officer or trustee.  An act involving more than one director, officer or trustee is considered to be a single act.

The following do not apply to this coverage:

1. Section II - Coverage E - Personal Liability Exclusion 2.a.(1);
2. Condition 1. Policy Period, Under Sections I and II Conditions.

## SECTION II - CONDITIONS

1. **Limit of Liability.**  Our total liability under Coverage E for all damages resulting from any one **occurrence** will not be more than the limit of liability for Coverage E as shown in the Declarations. This limit is the same regardless of the number of **insureds**, claims made or persons injured.   All **bodily injury** and **property damage** resulting from any one accident or from continuous or repeated exposure to substantially the same general harmful conditions shall be considered to be the result of one **occurrence**.

   Our total liability under Coverage F for all medical expense payable for **bodily injury** to one person as the result of one accident will not be more than the limit of Liability for Coverage F as shown in the Declarations.

2. **Severability of Insurance.**  This insurance applies separately to each **insured**.  This condition will not increase our limit of liability for any one **occurrence**.

3. **Duties After Loss.**  In case of an accident or **occurrence**, the **insured** will perform the following duties that apply.  You will help us by seeing that these duties are performed.

   a. give written notice to us or our agent as soon as is practical, which sets forth:
      (1) the identity of the policy and **insured**;
      (2) reasonably available information on the time, place and circumstances of the accident or **occurrence**; and
      (3) names and addresses of any claimants and witnesses;

   b. promptly forward to us every notice, demand, summons or other process relating to the accident or **occurrence**;

   c. at our request, help us:
      (1) to make settlement;
      (2) to enforce any right of contribution or indemnity against any person or organization who may be liable to an **insured**;
      (3) with the conduct of suits and attend hearings and trials;
      (4) to secure and give evidence and obtain the attendance of witnesses;

   d. under the coverage - Damage to Property of Others - submit to us within 60 days after the loss, a sworn statement of loss and show the damaged property, if in the **insured's** control;

   e. the **insured** will not, except at the **insured's** own cost, voluntarily make payment, assume obligation or incur expense other than for first aid to others at the time of the **bodily injury**.

4. **Duties of an Injured Person - Coverage F - Medical Payments to Others.**  The injured person or someone acting for the injured person will:

   a. give us written proof of claim, under oath if required, as soon as is practical; and
   b. authorize us to obtain copies of medical reports and records.

   The injured person will submit to a physical exam by a doctor of our choice when and as often as we reasonably require.

5. **Payment of Claim - Coverage F - Medical Payments to Others.**  Payment under this coverage is not an admission of liability by an **insured** or us.

6. **Suit Against Us.**  No action can be brought against us unless there has been compliance with the policy provisions.

Copyright, Washington Surveying and Rating Bureau,
includes copyrighted material of
Insurance Services Office, Inc. with its permission, 1990



No one will have the right to join us as a party to any action against an **insured**. Also, no action with respect to Coverage E can be brought against us until the obligation of the **insured** has been determined by final judgment or agreement signed by us.

7. **Bankruptcy of an Insured.**   Bankruptcy or insolvency of an **insured** will not relieve us of our obligations under this policy.

8. **Other Insurance - Coverage E - Personal Liability.**   This insurance is excess over other valid and collectible insurance except insurance written specifically to cover as excess over the limits of liability that apply in this policy.

## SECTION I AND II - CONDITIONS

1. **Policy Period.**   This policy applies only to loss in Section I or **bodily injury** or **property damage** in Section II, which occurs during the policy period.

2. **Concealment or Fraud.**   The entire policy will be void if, whether before or after a loss, an **insured** has:
   a. intentionally concealed or misrepresented any material fact or circumstance; or
   b. engaged in fraudulent conduct;
   relating to this insurance.

3. **Liberalization Clause.**   If we make a change which broadens coverage under this edition of our policy without additional premium charge, that change will automatically apply to your insurance as of the date we implement the change in your state, provided that this implementation date falls within 60 days prior to or during the policy period stated in the Declarations.

   This Liberalization Clause does not apply to changes implemented through introduction of a subsequent edition of our policy.

4. **Waiver or Change of Policy Provisions.**
   A waiver or change of a provision of this policy must be in writing by us to be valid.  Our request for an appraisal or examination will not waive any rights.

5. **Cancellation.**
   a. You may cancel this policy at any time by returning it to us or by letting us know in writing of the date cancellation is to take effect.
   b. We may cancel this policy only for the reasons stated below by letting you know in writing of the date cancellation takes effect.   This cancellation notice, together with our reason for cancellation, will be mailed to you and, if applicable, your agent or broker at the last addresses known to us or shown by our records.  Proof of mailing will be sufficient proof of notice.
      (1) When you have not paid the premium, we may cancel at any time by letting you know at least 10 days before the date cancellation takes effect.
      (2) When this policy has been in effect for less than 60 days and is not a renewal with us, we may cancel for any reason by letting you know at least 45 days before the date cancellation takes effect.
      (3) When this policy has been in effect for 60 days or more, or at any time if it is a renewal with us, we may cancel:
         (a) if there has been a material misrepresentation of fact which if known to us would have caused us not to issue the policy; or
         (b) if the risk has changed substantially since the policy was issued.
         This can be done by letting you know at least 45 days before the date cancellation takes effect.
      (4) When this policy is written for a period of more than one year, we may cancel for any reason at anniversary by letting you know at least 45 days before the date cancellation takes effect.
         However, with respect to paragraphs b. (2), (3) and (4) above, if two or more of the following conditions exist at any building that is covered under this policy, we may cancel this policy by letting you and, if applicable, your agent or broker know at least 5 days before the date cancellation takes effect.  We will also let any mortgagee or other person shown by the policy to have an interest in a covered loss know at least 20 days before the date cancellation takes effect.

Copyright, Washington Surveying and Rating Bureau, includes copyrighted material of Insurance Services Office, Inc. with its permission, 1990



(1) Without reasonable explanation, the building is unoccupied for more than 60 consecutive days, or at least 65% of the rental units are unoccupied for more than 120 consecutive days unless the building is maintained for seasonal occupancy or is under construction or repair;

(2) Without reasonable explanation, progress toward completion of permanent repairs to the building has not occurred within 60 days after receipt of funds following satisfactory adjustment or adjudication of loss resulting from a fire;

(3) Because of its physical condition, the building is in danger of collapse;

(4) Because of its physical condition, a vacation or demolition order has been issued for the building, or it has been declared unsafe in accordance with applicable law;

(5) Fixed and salvageable items have been removed from the building, indicating an intent to vacate the building;

(6) Without reasonable explanation, heat, water, sewer, and electricity are not furnished for the building for 60 consecutive days; or

(7) The building is not maintained in substantial compliance with fire, safety and building codes.

c. When this policy is cancelled, the premium for the period from the date of cancellation to the expiration date will be refunded pro rata.

d. If the return premium is not refunded with the notice of cancellation or when this policy is returned to us, we will refund it as soon as possible, but no later than:

(1) 45 days after we send a notice of cancellation to you; or

(2) 30 days after we receive the policy or a notice of cancellation from you.

e. Except as noted below, if the policy is cancelled by us, we will give the same advance notice of cancellation in writing to any mortgagee or other person shown by the policy to have an interest in a covered loss as we give to you.  The cancellation notice may be delivered or mailed; if mailed, proof of mailing will be sufficient proof of notice.

6. **Nonrenewal.**  We may elect not to renew this policy.  We may do so by mailing to you and, if applicable, your agent or broker at the last addresses known to us or shown by our records, written notice, including our reason for refusing to renew, at least 45 days before the expiration date of this policy.  Proof of mailing will be sufficient proof of notice.

If we have offered in writing, either directly or through our agent, at least 20 days before the expiration date of this policy, to renew this policy, and have included a statement of the renewal premium due, we may terminate this policy on its expiration date if you fail to pay the required premium when due.

For the purpose of determining the date when nonrenewal can be effected: A policy with a term of six months or less is considered as if written for a policy period of six months.  A policy written for a term longer than one year or a policy with no fixed expiration date is considered as if written for a period of one year.

7. **Assignment.**  Assignment of this policy will not be valid unless we give our written consent.

8. **Subrogation.**  An **insured** may waive in writing before a loss all rights of recovery against any person.  If not waived, we may require an assignment of rights of recovery for a loss to the extent that payment is made by us.

If an assignment is sought, an **insured** must sign and deliver all related papers and cooperate with us.

Subrogation does not apply under Section II to Medical Payments to Others or Damage to Property of Others.

9. **Death.**  If any person named in the Declarations or the spouse, if a resident of the same household, dies:

a. we insure the legal representative of the deceased but only with respect to the premises and property of the deceased covered under the policy at the time of death;

b. **insured** includes:

(1) any member of your household who is an **insured** at the time of your death, but only while a resident of the **residence premises**; and

(2) with respect to your property, the person having proper temporary custody of the property until appointment and qualification of a legal representative.

Copyright, Washington Surveying and Rating Bureau, includes copyrighted material of Insurance Services Office, Inc. with its permission, 1990



## MUTUAL POLICY CONDITIONS

This policy is issued by a mutual company having special regulations lawfully applicable to its organization, membership, policies or contracts of insurance, of which the following shall apply to and form a part of this policy:

> This policy is non-assessable.   The policyholder is a member of the company and shall participate, to the extent and upon the conditions fixed and determined by the Board of Directors in accordance with the provisions of law, in the distribution of dividends so fixed and determined.

For dividend classification purposes, this policy is classified, except as to coverage afforded by any rider or endorsement providing otherwise, in Dividend Class II.

---

The named insured is hereby notified that by virtue of this policy he is a member of Liberty Mutual Group and is entitled to vote either in person or by proxy at any and all meetings of said company.

The annual meetings are held at its home office, Boston, Massachusetts on the second Wednesday of April in each year, at eleven o'clock in the morning.

IN WITNESS WHEREOF, the company has executed and attested these presents; but this policy shall not be valid unless countersigned on the Declarations Page.

**SECRETARY**

**PRESIDENT**

**Liberty Mutual.**
INSURANCE

# LibertyGuard Homeowners Policy

Please read your policy and each endorsement carefully.

**To serve you best...**

Liberty Mutual has over 350 service offices throughout the United States
and Canada.  Please contact your service office shown on your Declarations
Page to report losses, or for any changes or questions about your insurance.
Payments should be sent to the office indicated on your bill.

**THIS POLICY IS NON ASSESSABLE**



## AGREEMENT

We will provide the insurance described in this policy in return for the premium and compliance with all applicable provisions of this policy.

## DEFINITIONS

In this policy, "you" and "your" refer to the "named insured" shown in the Declarations and the spouse if a resident of the same household.   "We," "us" and "our" refer to the Company providing this insurance.  In addition, certain words and phrases are defined as follows:

1. **"bodily injury"** means bodily harm, sickness or disease, except a disease which is transmitted by an **insured** through sexual contact.   **"Bodily injury"** includes required care, loss of services and death resulting from covered bodily harm, sickness or disease.

2. **"business"** includes trade, profession or occupation.

3. **"insured"** means you and residents of your household who are:

   a. your relatives; or

   b. other persons under the age of 21 and in the care of any person named above.

   Under Section II, **"insured"** also means:

   c. with respect to animals or watercraft to which this policy applies, any person or organization legally responsible for these animals or watercraft which are owned by you or any person included in 3a or 3b above.   A person or organization using or having custody of these animals or watercraft in the course of any **business** or without consent of the owner is not an **insured**;

   d. with respect to any vehicle to which this policy applies:

      (1) persons while engaged in your employ or that of any person included in 3a or 3b above; or

      (2) other persons using the vehicle on an **insured location** with your consent.

4. **"insured location"** means:

   a. the **residence premises**;

   b. the part of other premises, other structures and grounds used by you as a residence and:

      (1) which is shown in the Declarations; or

      (2) which is acquired by you during the policy period for your use as a residence;

   c. any premises used by you in connection with a premises in 4a or 4b above;

   d. any part of a premises:

      (1) not owned by an **insured**; and

      (2) where an **insured** is temporarily residing;

   e. vacant land, other than farm land, owned by or rented to an **insured**;

   f. land owned by or rented to an **insured** on which a one or two family dwelling is being built as a residence for an **insured**;

   g. individual or family cemetery plots or burial vaults of an **insured**; or

   h. any part of a premises occasionally rented to an **insured** for other than **business** use.

5. **"occurrence"** means an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, during the policy period, in:

   a. **bodily injury**; or

   b. **property damage**.

Copyright, Washington Surveying and Rating Bureau,
includes copyrighted material of
Insurance Services Office, Inc. with its permission, 1990



6.  **"property damage"** means physical injury to, destruction of, or loss of use of tangible property.
7.  **"residence employee"** means:
    a.  an employee of an **insured** whose duties are related to the maintenance or use of the **residence premises**, including household or domestic services; or
    b.  one who performs similar duties elsewhere not related to the **business** of an **insured**.
8.  **"residence premises"** means:
    a.  the one family dwelling, other structures, and grounds; or
    b.  that part of any other building;
    where you reside and which is shown as the **"residence premises"** in the Declarations.
    **"Residence premises"** also means a two family dwelling where you reside in at least one of the family units and which is shown as the **"residence premises"** in the Declarations.
9.  **"actual cash value"** means:
    a.  When the damage to property is economically repairable, **"actual cash value"** means the cost of repairing the damage, less reasonable deduction for wear and tear, deterioration and obsolescence.
    b.  When the loss or damage to property creates a total loss, **"actual cash value"** means the market value of property in a used condition equal to that of the destroyed property, if reasonably available on the used market.
    c.  Otherwise, **"actual cash value"** means the market value of new, identical or nearly identical property less reasonable deduction for wear and tear, deterioration and obsolescence.
10. **"replacement cost"** means:
    a.  In case of loss or damage to buildings, **"replacement cost"** means the cost, at the time of loss, to repair or replace the damaged property with new materials of like kind and quality, without deduction for depreciation.
    b.  In case of loss to personal property, **"replacement cost"** means the cost, at the time of loss, of a new article identical to the one damaged, destroyed or stolen.  When the identical article is no longer manufactured or is not available, **"replacement cost"** means the cost of a new article similar to the one damaged or destroyed and which is of comparable quality and usefulness, without deduction for depreciation.
11. **"fully enclosed building"** means:
    A building with continuous walls on all sides, extending from the ground level to the roof, with doors and windows (as deemed necessary) at various locations in the walls and including a continuous roof sheltering all areas within the wall perimeter.

## SECTION I - PROPERTY COVERAGES

**COVERAGE A - Dwelling**
We cover:
1.  the dwelling on the **residence premises** shown in the Declarations, including structures attached to the dwelling; and
2.  materials and supplies located on or next to the **residence premises** used to construct, alter or repair the dwelling or other structures on the **residence premises.**
This coverage does not apply to land, including land on which the dwelling is located.

**COVERAGE B - Other Structures**
We cover other structures on the **residence premises** set apart from the dwelling by clear space.  This includes structures connected to the dwelling by only a fence, utility line, or similar connection.
This coverage does not apply to land, including land on which the other structures are located.

Copyright, Washington Surveying and Rating Bureau, includes copyrighted material of Insurance Services Office, Inc. with its permission, 1990



We do not cover other structures:

1. used in whole or in part for **business**; or
2. rented or held for rental to any person not a tenant of the dwelling, unless used solely as a private garage.

The limit of liability for this coverage will not be more than 10% of the limit of liability that applies to Coverage A.  Use of this coverage does not reduce the Coverage A limit of liability.

**COVERAGE C - Personal Property**

We cover personal property owned or used by an **insured** while it is anywhere in the world.  At your request, we will cover personal property owned by:

1. others while the property is on the part of the **residence premises** occupied by an **insured**;
2. a guest or a **residence employee**, while the property is in any residence occupied by an **insured**.

Our limit of liability for personal property usually located at an **insured's** residence, other than the **residence premises**, is 10% of the limit of liability for Coverage C, or $1000, whichever is greater. Personal property in a newly acquired principal residence is not subject to this limitation for the 30 days from the time you begin to move the property there.

**Special Limits of Liability.**  These limits do not increase the Coverage C limit of liability.  The special limit for each numbered category below is the total limit for each loss for all property in that category.

1. $200 on money, bank notes, bullion, gold other than goldware, silver other than silverware, platinum, coins and medals.
2. $1000 on securities, accounts, deeds, evidences of debt, letters of credit, notes other than bank notes, manuscripts, personal records, passports, tickets and stamps.  This dollar limit applies to these categories regardless of the medium (such as paper or computer software) on which the material exists.

   This limit includes the cost to research, replace or restore the information from the lost or damaged material.
3. $1000 on watercraft, including their trailers, furnishings, equipment and outboard motors.
4. $1000 on trailers not used with watercraft.
5. $1000 on grave markers.
6. $1000 for loss by theft of jewelry, watches, furs, precious and semi-precious stones.
7. $2000 for loss by theft of firearms.
8. $2500 for loss by theft of silverware, silver-plated ware, goldware, gold-plated ware and pewterware.  This includes flatware, hollowware, tea sets, trays and trophies made of or including silver, gold or pewter.
9. $2500 on property, on the **residence premises**, used at any time or in any manner for any **business** purpose.
10. $250 on property, away from the **residence premises**, used at any time or in any manner for any **business** purpose.

**Property Not Covered.**  We do not cover:

1. articles separately described and specifically insured in this or other insurance;
2. animals, birds or fish;
3. motor vehicles or all other motorized land conveyances.  This includes:
   a. their equipment and accessories; or
   b. any device or instrument for the transmitting, recording, receiving or reproduction of sound or pictures which is operated by power from the electrical system of motor vehicles or all other motorized land conveyances, including:

      (1) accessories or antennas; or

      (2) tapes, wires, records, discs or other media for use with any such device or instrument;

   while in or upon the vehicle or conveyance.



We do cover vehicles or conveyances:

   a. not subject to licensing requirements which are used exclusively to service an **insured's** residence; or

   b. which are both designed and used exclusively for assisting the handicapped and have a maximum attainable speed of 10 miles per hour;

4. aircraft and parts.  Aircraft means any contrivance used or designed for flight, except model or hobby aircraft not used or designed to carry people or cargo;

5. property of roomers, boarders and other tenants, except property of roomers and boarders related to an **insured**;

6. property in an apartment regularly rented or held for rental to others by an **insured**;

7. property rented or held for rental to others off the **residence premises**;

8. **business** data, including such data stored in:

   a. books of account, drawings or other paper records; or

   b. electronic data processing tapes, wires, records, discs or other software media.

   However, we do cover the cost of blank recording or storage media, and of prerecorded computer programs available on the retail market.

9. credit cards or fund transfer cards except as provided in Additional Coverages 6.

## COVERAGE D - Loss of Use

The limit of liability for Coverage D is the total limit for all the coverages that follow.

1. If a loss covered under this Section makes that part of the **residence premises** where you reside not fit to live in, we cover, at your choice, either of the following.  However, if the **residence premises** is not your principal place of residence, we will not provide the option under paragraph b. below.

   a. **Additional Living Expense,** meaning any necessary increase in living expenses incurred by you so that your household can maintain its normal standard of living; or

   b. **Fair Rental Value,** meaning the fair rental value of that part of the **residence premises** where you reside less any expenses that do not continue while the premises is not fit to live in.

   Payment under a. or b. will be for the shortest time required to repair or replace the damage or, if you permanently relocate, the shortest time required for your household to settle elsewhere.

2. If a loss covered under this Section makes that part of the **residence premises** rented to others or held for rental by you not fit to live in, we cover the:

   **Fair Rental Value,** meaning the fair rental value of that part of the **residence premises** rented to others or held for rental by you less any expenses that do not continue while the premises is not fit to live in.

   Payment will be for the shortest time required to repair or replace that part of the premises rented or held for rental.

3. If a civil authority prohibits you from use of the **residence premises** as a result of direct damage to neighboring premises by a Peril Insured Against in this policy, we cover the Additional Living Expense or Fair Rental Value loss as provided under 1 and 2 above for no more than two weeks.

The periods of time under 1, 2 and 3 above are not limited by expiration of this policy.

We do not cover loss or expense due to cancellation of a lease or agreement.

## ADDITIONAL COVERAGES

1. **Debris Removal.**  We will pay your reasonable expense for the removal of debris of covered property if a Peril Insured Against that applies to the damaged property causes the loss.

   This expense is included in the limit of liability that applies to the damaged property.  If the amount to be paid for the actual damage to the property plus the debris removal expense is more than the limit of liability for the damaged property, an additional 5% of that limit of liability is available for debris removal expense.

   We will also pay your reasonable expense, up to $500 in the aggregate for the removal from the **residence premises** of:

   a. your tree(s) felled by the peril of Windstorm or Hail;

   b. your tree(s) felled by the peril of Weight of Ice, Snow or Sleet; or

**Liberty Mutual.**
INSURANCE

c.  a neighbor's tree(s) felled by a Peril Insured Against under Coverage C;

provided the tree(s) damages a covered structure.

2.  **Reasonable Repairs.**  In the event that covered property is damaged by an applicable Peril Insured Against, we will pay the reasonable cost incurred by you for necessary measures taken solely to protect against further damage.  If the measures taken involve repair to other damaged property, we will pay for those measures only if that property is covered under this policy and the damage to that property is caused by an applicable Peril Insured Against.

This coverage:

a.  does not increase the limit of liability that applies to the covered property;

b.  does not relieve you of your duties, in case of a loss to covered property, as set forth in Section I Condition 2.d.

3.  **Trees, Shrubs and Other Plants.**  We cover trees, shrubs, plants or lawns, on the **residence premises**, for loss caused by the following Perils Insured Against: Fire or lightning, Explosion, Riot or civil commotion, Aircraft, Vehicles not owned or operated by a resident of the **residence premises**, Vandalism or malicious mischief or Theft.

The limit of liability for this coverage will not be more than 5% of the limit of liability that applies to the dwelling, or more than $500 for any one tree, shrub or plant.  We do not cover property grown for **business** purposes.

This coverage is additional insurance.

4.  **Fire Department Service Charge.**  We will pay up to $500 for your liability assumed by contract or agreement for fire department charges incurred when the fire department is called to save or protect covered property from a Peril Insured Against.  We do not cover fire department service charges if the property is located within the limits of the city, municipality or protection district furnishing the fire department response.

This coverage is additional insurance.  No deductible applies to this coverage.

5.  **Property Removed.**  We insure covered property against direct loss from any cause while being removed from a premises endangered by a Peril Insured Against and for no more than 30 days while removed.  This coverage does not change the limit of liability that applies to the property being removed.

6.  **Credit Card, Fund Transfer Card, Forgery and Counterfeit Money.**

We will pay up to $500 for:

a.  the legal obligation of an **insured** to pay because of the theft or unauthorized use of credit cards issued to or registered in an **insured's** name;

b.  loss resulting from theft or unauthorized use of a fund transfer card used for deposit, withdrawal or transfer of funds, issued to or registered in an **insured's** name;

c.  loss to an **insured** caused by forgery or alteration of any check or negotiable instrument; and

d.  loss to an **insured** through acceptance in good faith of counterfeit United States or Canadian paper currency.

We do not cover use of a credit card or fund transfer card:

a.  by a resident of your household;

b.  by a person who has been entrusted with either type of card; or

c.  if an **insured** has not complied with all terms and conditions under which the cards are issued.

All loss resulting from a series of acts committed by any one person or in which any one person is concerned or implicated is considered to be one loss.

We do not cover loss arising out of **business** use or dishonesty of an **insured**.

This coverage is additional insurance.  No deductible applies to this coverage.

Defense:

a.  We may investigate and settle any claim or suit that we decide is appropriate.  Our duty to defend a claim or suit ends when the amount we pay for the loss equals our limit of liability.

b.  If a suit is brought against an **insured** for liability under the Credit Card or Fund Transfer Card coverage, we will provide a defense at our expense by counsel of our choice.



c. We have the option to defend at our expense an **insured** or an **insured's** bank against any suit for the enforcement of payment under the Forgery coverage.

7. **Loss Assessment:** We will pay up to $1000 for your share of loss assessment charged during the policy period against you by a corporation or association of property owners, when the assessment is made as a result of direct loss to the property, owned by all members collectively, caused by a Peril Insured Against under Coverage A - Dwelling, other than earthquake or land shock waves or tremors before, during or after a volcanic eruption.

This coverage applies only to loss assessments charged against you as owner or tenant of the **residence premises.**

We do not cover loss assessments charged against you or a corporation or association of property owners by any governmental body.

The limit of $1000 is the most we will pay with respect to any one loss, regardless of the number of assessments.

Condition 1. Policy Period, under Sections I and II Conditions, does not apply to this coverage.

8. **Collapse.** We insure for direct physical loss to covered property involving collapse of a building or any part of a building caused only by one or more of the following:

a. Perils Insured Against in Coverage C - Personal Property. These perils apply to covered building and personal property for loss insured by this additional coverage;

b. hidden decay;

c. hidden insect or vermin damage;

d. weight of contents, equipment, animals or people;

e. weight of rain which collects on a roof; or

f. use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation.

Loss to an awning, fence, patio, pavement, swimming pool, underground pipe, flue, drain, cesspool, septic tank, foundation, retaining wall, bulkhead, pier, wharf or dock is not included under items b, c, d, e, and f unless the loss is a direct result of the collapse of a building.

Collapse does not include settling, cracking, shrinking, bulging or expansion.

This coverage does not increase the limit of liability applying to the damaged covered property.

## SECTION I - PERILS INSURED AGAINST

**COVERAGE A - DWELLING and**
**COVERAGE B - OTHER STRUCTURES**

We insure against risks of direct loss to property described in Coverages A and B only if that loss is a physical loss to property; however, we do not insure loss:

1. involving collapse, other than as provided in Additional Coverage 8;

2. caused by:

a. freezing of a plumbing, heating, air conditioning or automatic fire protective sprinkler system or of a household appliance, or by discharge, leakage or overflow from within the system or appliance caused by freezing. This exclusion applies only while the dwelling is vacant, unoccupied or being constructed unless you have used reasonable care to:

(1) maintain heat in the building; or

(2) shut off the water supply and drain the system and appliances of water;

b. freezing, thawing, pressure or weight of water or ice, whether driven by wind or not, to a:

(1) fence, pavement, patio or swimming pool;

(2) foundation, retaining wall or bulkhead; or

(3) pier, wharf or dock;

**Liberty Mutual.**
INSURANCE

c. theft in or to a dwelling under construction, or of materials and supplies for use in the construction until the dwelling is finished and occupied;

d. vandalism and malicious mischief or breakage of glass and safety glazing materials if the dwelling has been vacant for more than 30 consecutive days immediately before the loss.  A dwelling being constructed is not considered vacant;

e. constant or repeated seepage or leakage of water or steam over a period of weeks, months or years from within a plumbing, heating, air conditioning or automatic fire protective sprinkler system or from within a household appliance;

f. (1) wear and tear, marring, deterioration;

   (2) inherent vice, latent defect, mechanical breakdown;

   (3) smog, rust, mold, wet or dry rot;

   (4) smoke from agricultural smudging or industrial operations;

   (5) release, discharge or dispersal of contaminants or pollutants;

   (6) settling, cracking, shrinking, bulging or expansion of pavements, patios, foundations, walls, floors, roofs or ceilings; or

   (7) birds, vermin, rodents, insects or domestic animals.

   But if loss or damage by collapse, as provided in **ADDITIONAL COVERAGES, Collapse,** results, we will pay for that resulting loss or damage.

   If any of these cause water damage not otherwise excluded from a plumbing, heating, air conditioning or automatic fire protective sprinkler system or household appliance, we cover loss caused by the water including the cost of tearing out and replacing any part of a building necessary to repair the system or appliance.  We do not cover loss to the system or appliance from which this water escaped.

3. excluded under Section I - Exclusions.

Under items 1 and 2, any ensuing loss to property described in Coverages A and B not excluded or excepted in this policy is covered.

**COVERAGE C - Personal Property**

We insure for direct physical loss to the property described in Coverage C caused by a peril listed below unless the loss is excluded in Section I - Exclusions.

1. **Fire or lightning.**

2. **Windstorm or hail.**

   This peril does not include loss to the property contained in a building caused by rain, snow, sleet, sand or dust unless the direct force of wind or hail damages the building causing an opening in a roof or wall and the rain, snow, sleet, sand or dust enters through this opening.

   This peril includes loss to watercraft and their trailers, furnishings, equipment, and outboard motors, only while inside a **fully enclosed building.**

3. **Explosion.**

4. **Riot or civil commotion.**

5. **Aircraft,** including self-propelled missiles and spacecraft.

6. **Vehicles** means a device designed or used to transport persons or property.

7. **Smoke,** meaning sudden and accidental damage from smoke.

   This peril does not include loss caused by smoke from agricultural smudging or industrial operations, such as slash burns.

8. **Vandalism or malicious mischief.**

9. **Theft,** including attempted theft and loss of property from a known place when it is likely that the property has been stolen.

   This peril does not include loss caused by theft:

   a. committed by an **insured;**



   b. in or to a dwelling under construction, or of materials and supplies for use in the construction until the dwelling is finished and occupied; or

   c. from that part of a **residence premises** rented by an **insured** to other then an **insured**.

This peril does not include loss caused by theft that occurs off the **residence premises** of:

   a. property while at any other residence owned by, rented to, or occupied by an **insured**, except while an **insured** is temporarily living there.  Property of a student who is an **insured** is covered while at a residence away from home if the student has been there at any time during the 45 days immediately before the loss;

   b. watercraft, including their furnishings, equipment and outboard motors; or

   c. trailers and campers.

However, property described in b. above is covered if, at the time of loss caused by theft, it is parked inside a private garage or in street parking areas immediately adjacent to the **residence premises**.

10. **Falling objects.**

This peril does not include loss to property contained in a building unless the roof or an outside wall of the building is first damaged by a falling object.  Damage to the falling object itself is not included.

11. **Weight of ice, snow or sleet** which causes damage to property contained in a building.

12. **Accidental discharge or overflow of water or steam** from within a plumbing, heating, air conditioning or automatic fire protective sprinkler system or from within a household appliance.

This peril does not include loss:

   a. to the system or appliance from which the water or steam escaped;

   b. caused by or resulting from freezing except as provided in the peril of freezing below; or

   c. on the **residence premises** caused by accidental discharge or overflow which occurs off the **residence premises**.

In this peril, a plumbing system does not include a sump, sump pump or related equipment.

13. **Sudden and accidental tearing apart, cracking, burning or bulging** of a steam or hot water heating system, an air conditioning or automatic fire protective sprinkler system, or an appliance for heating water.

We do not cover loss caused by or resulting from freezing under this peril.

14. **Freezing** of a plumbing, heating, air conditioning or automatic fire protective sprinkler system or of a household appliance.

This peril does not include loss on the **residence premises** while the dwelling is unoccupied, unless you have used reasonable care to:

   a. maintain heat in the building; or

   b. shut off the water supply and drain the system and appliances of water.

15. **Sudden and accidental damage from artificially generated electrical current.**

This peril does not include loss to a tube, transistor or similar electronic component.

16. **Damage by glass or safety glazing material** which is part of a building, storm door or storm window.

This peril does not include loss on the **residence premises** if the dwelling has been vacant for more than 30 consecutive days immediately before the loss.  A dwelling being constructed is not considered vacant.

17. **Volcanic Action**, meaning direct loss or damage resulting from the eruption of a volcano when the loss or damage is caused by:

   a. volcanic blast or airborne shock waves;

   b. ash, dust or particulate matter; or

   c. lava flow.

This peril does not provide coverage for damage to land; property in the open or in open sheds; or portions of buildings not completely enclosed, or personal property contained within those buildings. All volcanic eruptions that occur within any 72-hour period will be considered as one volcanic eruption.

Copyright, Washington Surveying and Rating Bureau,
includes copyrighted material of
Insurance Services Office, Inc. with its permission, 1990



Direct loss includes the cost to remove the ash, dust or particulate matter from the interior and exterior surfaces of the covered building and from personal property contained in the building.

Payment for removal applies only to the initial deposit of ash, dust or particulate matter following a volcanic eruption.  Subsequent deposits arising from the movement of volcanic dust or ash by wind or other means are not covered.

## SECTION I - EXCLUSIONS

We will not pay for loss or damage caused by any of the following excluded events as described in 1 through 11 below.  Loss or damage will be considered to have been caused by an excluded event if that event:

    a.  directly and solely results in loss or damage; or

    b.  initiates a sequence of events that results in loss or damage, regardless of the nature of any intermediate or final event in that sequence.

1. **Ordinance or Law,** meaning enforcement of any ordinance or law regulating the construction, repair, or demolition of a building or other structure, unless specifically provided under this policy.

2. **Earth Movement,** meaning earthquake including land shock waves or tremors before, during or after a volcanic eruption; landslide; mudflow; earth sinking, rising or shifting; unless direct loss by:

    a.  fire;

    b.  explosion; or

    c.  breakage of glass or safety glazing material which is part of a building, storm door or storm window;

ensues and then we will pay only for the ensuing loss.

This exclusion does not apply to loss by theft.

3. **Water Damage,** meaning:

    a.  flood, surface water, waves, tidal water, overflow of a body of water, or spray from any of these, whether or not driven by wind;

    b.  water which backs up through sewers or drains or which overflows from a sump; or

    c.  water below the surface of the ground, including water which exerts pressure on or seeps or leaks through a building, sidewalk, driveway, foundation, swimming pool or other structure.

Direct loss by fire, explosion or theft resulting from water damage is covered.

4. **Power Failure,** meaning the failure of power or other utility service if the failure takes place off the **residence premises.**  But, if a Peril Insured Against ensues on the **residence premises,** we will pay only for that ensuing loss.

5. **Neglect,** meaning neglect of the **insured** to use all reasonable means to save and preserve property at and after the time of a loss.

6. **War,** including undeclared war, civil war, insurrection, rebellion, revolution, warlike act by a military force or military personnel, destruction or seizure or use for a military purpose, and including any consequence of any of these.  Discharge of a nuclear weapon will be deemed a warlike act even if accidental.

7. **Nuclear Hazard,** to the extent set forth in the Nuclear Hazard Clause of Section I - Conditions.

8. **Intentional Loss,** meaning any loss arising out of any act committed:

    a.  by or at the direction of an **insured;** and

    b.  with the intent to cause a loss.

9. **Weather Conditions.**

A weather condition which results in:

    a.  landslide or mudflow;

    b.  earth sinking, rising or shifting;

    c.  flood, surface water, waves, tidal water, overflow of a body of water, or spray from any of these,whether or not driven by wind;

Copyright, Washington Surveying and Rating Bureau,
includes copyrighted material of
Insurance Services Office, Inc. with its permission, 1990



d.  water backing up from a sewer or drain or overflowing from a sump; or

e.  water below the surface of the ground, including water which exerts pressure on or seeps or leaks through a building, sidewalk, driveway, foundation, swimming pool or other structure.

However, if loss or damage by fire or explosion results, we will pay for that resulting loss or damage.

10. **Acts or decisions,** including the failure to act or decide, of any person, group, organization or governmental body.  However, any ensuing loss to property described in Coverages A and B not excluded or excepted in this policy is covered.

11. **Faulty, inadequate or defective:**

a.  planning, zoning, development, surveying, siting;

b.  design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

c.  materials used in repair, construction, renovation or remodeling; or

d.  maintenance;

of part or all of any property whether on or off the **residence premises**.

However, any ensuing loss to property described in Coverages A and B not excluded or excepted in this policy is covered.

---

## SECTION I - CONDITIONS

1. **Insurable Interest and Limit of Liability.**  Even if more than one person has an insurable interest in the property covered, we will not be liable in any one loss:

a.  to the **insured** for more than the amount of the **insured's** interest at the time of loss; or

b.  for more than the applicable limit of liability.

2. **Your Duties After Loss.**  In case of a loss to covered property, you must see that the following are done:

a.  give prompt notice to us or our agent;

b.  notify the police in case of loss by theft;

c.  notify the credit card or fund transfer card company in case of loss under Credit Card or Fund Transfer Card coverage;

d.  (1) protect the property from further damage;

   (2) make reasonable and necessary repairs to protect the property; and

   (3) keep an accurate record of repair expenses;

e.  prepare an inventory of damaged personal property showing the quantity, description, **actual cash value** and amount of loss.  Attach all bills, receipts and related documents that justify the figures in the inventory;

f.  as often as we reasonably require:

   (1) show the damaged property;

   (2) provide us with records and documents we request and permit us to make copies; and

   (3) submit to examination under oath, while not in the presence of any other **insured**, and sign the same;

g.  send to us, within 60 days after our request, your signed, sworn proof of loss which sets forth, to the best of your knowledge and belief:

   (1) the time and cause of loss;

   (2) the interest of the **insured** and all others in the property involved and all liens on the property;

   (3) other insurance which may cover the loss;

   (4) changes in title or occupancy of the property during the term of the policy;

   (5) specifications of damaged buildings and detailed repair estimates;

   (6) the inventory of damaged personal property described in 2e above;

Copyright, Washington Surveying and Rating Bureau, includes copyrighted material of Insurance Services Office, Inc. with its permission, 1990



      (7) receipts for additional living expenses incurred and records that support the fair rental value loss; and

      (8) evidence or affidavit that supports a claim under the Credit Card, Fund Transfer Card, Forgery and Counterfeit Money coverage, stating the amount and cause of loss.

3. **Loss Settlement.** Covered property losses are settled as follows:

   a. (1) Personal property;

      (2) Awnings, carpeting, household appliances, outdoor antennas and outdoor equipment, whether or not attached to buildings; and

      (3) Structures that are not buildings;

   at **actual cash value** at the time of loss but not more than the amount required to repair or replace.

   b. Buildings under Coverage A or B at **replacement cost** without deduction for depreciation, subject to the following:

      (1) If, at the time of loss, the amount of insurance in this policy on the damaged building is 80% or more of the full **replacement cost** of the building immediately before the loss, we will pay the cost to repair or replace, after application of deductible and without deduction for depreciation, but not more than the least of the following amounts:

         (a) the limit of liability under this policy that applies to the building;

         (b) the **replacement cost** of that part of the building damaged for like construction and use on the same premises; or

         (c) the necessary amount actually spent to repair or replace the damaged building.

      (2) If, at the time of loss, the amount of insurance in this policy on the damaged building is less than 80% of the full **replacement cost** of the building immediately before the loss, we will pay the greater of the following amounts, but not more than the limit of liability under this policy that applies to the building:

         (a) the **actual cash value** of that part of the building damaged; or

         (b) that proportion of the cost to repair or replace, after application of deductible and without deduction for depreciation, that part of the building damaged, which the total amount of insurance in this policy on the damaged building bears to 80% of the **replacement cost** of the building.

      (3) To determine the amount of insurance required to equal 80% of the full **replacement cost** of the building immediately before the loss, do not include the value of:

         (a) excavations, foundations, piers or any supports which are below the undersurface of the lowest basement floor;

         (b) those supports in (a) above which are below the surface of the ground inside the foundation walls, if there is no basement; and

         (c) underground flues, pipes, wiring and drains.

      (4) We will pay no more than the **actual cash value** of the damage unless:

         (a) actual repair or replacement is complete; or

         (b) the cost to repair or replace the damage is both:

            (i) less than 5% of the amount of insurance in this policy on the building; and

            (ii) less than \$2500.

      (5) You may disregard the **replacement cost** loss settlement provisions and make claim under this policy for loss or damage to buildings on an **actual cash value** basis. You may then make claim within 180 days after loss for any additional liability on a **replacement cost** basis.

4. **Loss to a Pair or Set.** In case of loss to a pair or set we may elect to:

   a. repair or replace any part to restore the pair or set to its value before the loss; or

   b. pay the difference between **actual cash value** of the property before and after the loss.

5. **Glass Replacement.** Loss for damage to glass caused by a Peril Insured Against will be settled on the basis of replacement with safety glazing materials when required by ordinance or law.

Copyright, Washington Surveying and Rating Bureau,
includes copyrighted material of
Insurance Services Office, Inc. with its permission, 1990



6. **Appraisal.** If you and we fail to agree on the amount of loss, either may demand an appraisal of the loss. In this event, each party will choose a competent appraiser within 20 days after receiving a written request from the other. The two appraisers will choose an umpire. If they cannot agree upon an umpire within 15 days, you or we may request that the choice be made by a judge of a court of record in the state where the **residence premises** is located. The appraisers will separately set the amount of loss. If the appraisers submit a written report of an agreement to us, the amount agreed upon will be the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will set the amount of loss.

   Each party will:

   a. pay its own appraiser; and

   b. bear the other expenses of the appraisal and umpire equally.

7. **Other Insurance.** If a loss covered by this policy is also covered by other insurance, we will pay only the proportion of the loss that the limit of liability that applies under this policy bears to the total amount of insurance covering the loss.

8. **Suit Against Us.** No action can be brought unless the policy provisions have been complied with and the action is started within one year after the date of loss.

9. **Our Option.** If we give you written notice within 30 days after we receive your signed, sworn proof of loss, we may repair or replace any part of the damaged property with like property.

10. **Loss Payment.** We will adjust all losses with you. We will pay you unless some other person is named in the policy or is legally entitled to receive payment. Loss will be payable 30 days after we receive your proof of loss and:

    a. reach an agreement with you;

    b. there is an entry of a final judgment; or

    c. there is a filing of an appraisal award with us.

11. **Abandonment of Property.** We need not accept any property abandoned by an **insured**.

12. **Mortgage Clause.** Insurance Commissioner's Regulation No. 335/WAC-284-21-010 requires that Form 372 (Ed. 11 -50) or Form 438 BFU (Ed. 5-42) be endorsed on this policy, if applicable.

13. **No Benefit to Bailee.** We will not recognize any assignment or grant any coverage that benefits a person or organization holding, storing or moving property for a fee regardless of any other provision of this policy.

14. **Nuclear Hazard Clause.**

    a. "Nuclear Hazard" means any nuclear reaction, radiation, or radioactive contamination, all whether controlled or uncontrolled or however caused, or any consequence of any of these.

    b. Loss caused by the nuclear hazard will not be considered loss caused by fire, explosion, or smoke, whether these perils are specifically named in or otherwise included within the Perils Insured Against in Section I.

    c. This policy does not apply under Section I to loss caused directly or indirectly by nuclear hazard, except that direct loss by fire resulting from the nuclear hazard is covered.

15. **Recovered Property.** If you or we recover any property for which we have made payment under this policy, you or we will notify the other of the recovery. At your option, the property will be returned to or retained by you or it will become our property. If the recovered property is returned to or retained by you, the loss payment will be adjusted based on the amount you received for the recovered property.

## SECTION II - LIABILITY COVERAGES

### COVERAGE E - Personal Liability

If a claim is made or a suit is brought against an **insured** for damages because of **bodily injury** or **property damage** caused by an **occurrence** to which this coverage applies, we will:

1. pay up to our limit of liability for the damages for which the **insured** is legally liable. Damages include prejudgment interest awarded against the **insured**.

Copyright, Washington Surveying and Rating Bureau, includes copyrighted material of Insurance Services Office, Inc. with its permission, 1990



2. provide a defense at our expense by counsel of our choice, even if the suit is groundless, false or fraudulent. We may investigate and settle any claim or suit that we decide is appropriate. Our duty to settle or defend ends when the amount we pay for damages resulting from the **occurrence** equals our limit of liability.

## COVERAGE F - Medical Payments To Others

We will pay the necessary medical expenses that are incurred or medically ascertained within three years from the date of an accident causing **bodily injury**. Medical expenses means reasonable charges for medical, surgical, x-ray, dental, ambulance, hospital, professional nursing, prosthetic devices and funeral services. This coverage does not apply to you or regular residents of your household except **residence employees**. As to others, this coverage applies only:

1. to a person on the **insured location** with the permission of an **insured**; or
2. to a person off the **insured location**, if the **bodily injury**:
   a. arises out of a condition on the **insured location** or the ways immediately adjoining;
   b. is caused by the activities of an **insured**;
   c. is caused by a **residence employee** in the course of the **residence employee's** employment by an **insured**; or
   d. is caused by an animal owned by or in the care of an **insured**.

---

# SECTION II - EXCLUSIONS

1. **Coverage E - Personal Liability and Coverage F - Medical Payments to Others** do not apply to **bodily injury** or **property damage**:
   a. which is expected or intended by the **insured**;
   b. (1) arising out of or in connection with a **business** engaged in by an **insured**. This exclusion applies but is not limited to an act or omission, regardless of its nature or circumstance, involving a service or duty rendered, promised, owed, or implied to be provided because of the nature of the **business**;
      (2) arising out of the rental or holding for rental of any part of any premises by an **insured**. This exclusion does not apply to the rental or holding for rental of an **insured location**:
         (a) on an occasional basis if used only as residence;
         (b) in part for use only as a residence, unless a single family unit is intended for use by the occupying family to lodge more than two roomers or boarders; or
         (c) in part, as an office, school, studio or private garage;
   c. arising out of the rendering of or failure to render professional services;
   d. arising out of a premises:
      (1) owned by an **insured**;
      (2) rented to an **insured**; or
      (3) rented to others by an **insured**;
      that is not an **insured location**;
   e. arising out of:
      (1) the ownership, maintenance, use, loading or unloading of motor vehicles or all other motorized land conveyances, including trailers, owned or operated by or rented or loaned to an **insured**;
      (2) the entrustment by an **insured** of a motor vehicle or any other motorized land conveyance to any person; or
      (3) statutorily imposed vicarious parental liability for the actions of a child or minor using a conveyance excluded in paragraph (1) or (2) above.
      This exclusion does not apply to:
      (1) a trailer not towed by or carried on a motorized land conveyance;

Copyright, Washington Surveying and Rating Bureau, includes copyrighted material of Insurance Services Office, Inc. with its permission, 1990



    (2) a motorized land conveyance which is both designed and used exclusively for recreational purposes off public roads, not subject to licensing requirements and:

        (a) not owned by an **insured**; or

        (b) owned by an **insured** and on an **insured location**;

    (3) a motorized golf cart when used to play golf on a golf course;

    (4) a vehicle or conveyance not subject to licensing requirements which is:

        (a) used exclusively to service an **insured's** residence;

        (b) in dead storage on an **insured location**;

    (5) a vehicle or conveyance which is both designed and used exclusively for assisting the handicapped and has a maximum attainable speed of 10 miles per hour;

f.  arising out of:

    (1) the ownership, maintenance, use, loading or unloading of a watercraft described below;

    (2) the entrustment by an **insured** of a watercraft described below to any person; or

    (3) statutorily imposed vicarious parental liability for the actions of a child or minor using a watercraft described below.

    Watercraft:

    (1) with inboard or inboard-outdrive motor power owned by an **insured**;

    (2) with inboard or inboard-outdrive motor power of more than 50 horsepower rented to an **insured**;

    (3) that is a sailing vessel, with or without auxiliary power, 26 feet or more in length owned by or rented to an **insured**; or

    (4) powered by one or more outboard motors with more than 25 total horsepower if the outboard motor is owned by an **insured**.  But, outboard motors of more than 25 total horsepower are covered for the policy period if:

        (a) you acquire them prior to the policy period and:

            (i) you declare them at policy inception; or

            (ii) your intention to insure is reported to us in writing within 45 days after you acquire the out-board motors.

        (b) you acquire them during the policy period.

    This exclusion does not apply while the watercraft is stored;

g.  arising out of:

    (1) the ownership, maintenance, use, loading or unloading of an aircraft;

    (2) the entrustment by an **insured** of an aircraft to any person; or

    (3) statutorily imposed vicarious parental liability for the actions of a child or minor using an aircraft.

    An aircraft means any contrivance used or designed for flight, except model or hobby aircraft not used or designed to carry people or cargo;

h.  caused directly or indirectly by war, including undeclared war, civil war, insurrection, rebellion, revolution, warlike act by a military force or military personnel, destruction or seizure or use for a military purpose, and including any consequence of any of these.  Discharge of a nuclear weapon will be deemed a warlike act even if accidental.

Exclusions d., e., f., and g. do not apply to **bodily injury** to a **residence employee** arising out of and in the course of the **residence employee's** employment by an **insured**.

2.  **Coverage E - Personal Liability**, does not apply to:

a.  liability:

    (1) for any loss assessment charged against you as a member of an association, corporation or community of property owners;

    (2) under any contract or agreement.  However, this exclusion does not apply to written contracts:

        (a) that directly relate to the ownership, maintenance or use of an **insured location**; or

Copyright, Washington Surveying and Rating Bureau, includes copyrighted material of Insurance Services Office, Inc. with its permission, 1990



  (b)  where the liability of others is assumed by the **insured** prior to an occurrence; unless excluded in (1) above or elsewhere in this policy;

 b. **property damage** to property owned by the **insured**;

 c. **property damage** to property rented to, occupied or used by or in the care of the **insured**.  This exclusion does not apply to **property damage** caused by fire, smoke or explosion;

 d. **bodily injury** to any person eligible to receive any benefits:

  (1)  voluntarily provided; or

  (2)  required to be provided;

  by the **insured** under any:

  (1)  workers' compensation law;

  (2)  non-occupational disability law; or

  (3)  occupational disease law;

 e. **bodily injury** or **property damage** for which an **insured** under this policy:

  (1)  is also an insured under a nuclear energy liability policy; or

  (2)  would be an insured under that policy but for the exhaustion of its limit of liability.

  A nuclear energy liability policy is one issued by:

  (1)  American Nuclear Insurers;

  (2)  Mutual Atomic Energy Liability Underwriters;

  (3)  Nuclear Insurance Association of Canada;

  or any of their successors; or

 f. **bodily injury** to you or an **insured** within the meaning of part a. or b. of "**insured**" as defined.

3. **Coverage F - Medical Payments to Others**, does not apply to **bodily injury**:

 a. to a **residence employee** if the **bodily injury**:

  (1)  occurs off the **insured location**; and

  (2)  does not arise out of or in the course of the **residence employee's** employment by an **insured**;

 b. to any person eligible to receive benefits:

  (1)  voluntarily provided; or

  (2)  required to be provided;

  under any:

  (1)  workers' compensation law;

  (2)  non-occupational disability law; or

  (3)  occupational disease law;

 c. from any:

  (1)  nuclear reaction;

  (2)  nuclear radiation; or

  (3)  radioactive contamination;

  all whether controlled or uncontrolled or however caused; or

  (4)  any consequence of any of these.

 d. to any person, other than a **residence employee** of an **insured**, regularly residing on any part of the **insured location**.

Copyright, Washington Surveying and Rating Bureau,
includes copyrighted material of
Insurance Services Office, Inc. with its permission, 1990



## SECTION II - ADDITIONAL COVERAGES

We cover the following in addition to the limits of liability:

1. **Claim Expenses.** We pay:
   a. expenses we incur and costs taxed against an **insured** in any suit we defend;
   b. premiums on bonds required in a suit we defend, but not for bond amounts more than the limit of liability for Coverage E. We need not apply for or furnish any bond;
   c. reasonable expenses incurred by an **insured** at our request, including actual loss of earnings (but not loss of other income) up to $50 per day, for assisting us in the investigation or defense of a claim or suit;
   d. interest on the entire judgment which accrues after entry of the judgment and before we pay or tender, or deposit in court that part of the judgment which does not exceed the limit of liability that applies.

2. **First Aid Expenses.** We will pay expenses for first aid to others incurred by an **insured** for **bodily injury** covered under this policy. We will not pay for first aid to you or any other **insured**.

3. **Damage to Property of Others.** We will pay, at **replacement cost**, up to $500 per **occurrence** for **property damage** to property of others caused by an **insured**.
   We will not pay for **property damage**:
   a. to the extent of any amount recoverable under Section I of this policy;
   b. caused intentionally by an **insured** who is 13 years of age or older;
   c. to property owned by an **insured**;
   d. to property owned by or rented to a tenant of an **insured** or a resident in your household; or
   e. arising out of:
      (1) a **business** engaged in by an **insured**;
      (2) any act or omission in connection with a premises owned, rented or controlled by an **insured**, other than the **insured location**; or
      (3) the ownership, maintenance, or use of aircraft, watercraft or motor vehicles or all other motorized land conveyances.
      This exclusion does not apply to a motorized land conveyance which is both designed and used exclusively for recreational purposes off public roads, not subject to licensing requirements and not owned by an **insured**.

4. **Loss Assessment.** We will pay up to $1000 for your share of loss assessment charged during the policy period against you by a corporation or association of property owners, when the assessment is made as a result of:
   a. **bodily injury** or **property damage** not excluded under Section II of this policy; or
   b. liability for an act of a director, officer or trustee in the capacity as a director, officer or trustee, provided:
      (1) the director, officer or trustee is elected by the members of a corporation or association of property owners; and
      (2) the director, officer or trustee serves without deriving any income from the exercise of duties which are solely on behalf of a corporation or association of property owners.
   This coverage applies only to loss assessments charged against you as owner or tenant of the **residence premises**.
   We do not cover loss assessments charged against you or a corporation or association of property owners by any governmental body.
   Regardless of the number of assessments, the limit of $1000 is the most we will pay for loss arising out of:
   a. one accident, including continuous or repeated exposure to substantially the same general harmful conditions; or

Copyright, Washington Surveying and Rating Bureau,
includes copyrighted material of
Insurance Services Office, Inc. with its permission, 1990



b. a covered act of a director, officer or trustee. An act involving more than one director, officer or trustee is considered to be a single act.

The following do not apply to this coverage:

1. Section II - Coverage E - Personal Liability Exclusion 2.a.(1);
2. Condition 1. Policy Period, Under Sections I and II Conditions.

## SECTION II - CONDITIONS

1. **Limit of Liability.** Our total liability under Coverage E for all damages resulting from any one **occurrence** will not be more than the limit of liability for Coverage E as shown in the Declarations. This limit is the same regardless of the number of **insureds**, claims made or persons injured. All **bodily injury** and **property damage** resulting from any one accident or from continuous or repeated exposure to substantially the same general harmful conditions shall be considered to be the result of one **occurrence**.

   Our total liability under Coverage F for all medical expense payable for **bodily injury** to one person as the result of one accident will not be more than the limit of Liability for Coverage F as shown in the Declarations.

2. **Severability of Insurance.** This insurance applies separately to each **insured**. This condition will not increase our limit of liability for any one **occurrence**.

3. **Duties After Loss.** In case of an accident or **occurrence**, the **insured** will perform the following duties that apply. You will help us by seeing that these duties are performed.

   a. give written notice to us or our agent as soon as is practical, which sets forth:
      (1) the identity of the policy and **insured**;
      (2) reasonably available information on the time, place and circumstances of the accident or **occurrence**; and
      (3) names and addresses of any claimants and witnesses;

   b. promptly forward to us every notice, demand, summons or other process relating to the accident or **occurrence**;

   c. at our request, help us:
      (1) to make settlement;
      (2) to enforce any right of contribution or indemnity against any person or organization who may be liable to an **insured**;
      (3) with the conduct of suits and attend hearings and trials;
      (4) to secure and give evidence and obtain the attendance of witnesses;

   d. under the coverage - Damage to Property of Others - submit to us within 60 days after the loss, a sworn statement of loss and show the damaged property, if in the **insured's** control;

   e. the **insured** will not, except at the **insured's** own cost, voluntarily make payment, assume obligation or incur expense other than for first aid to others at the time of the **bodily injury**.

4. **Duties of an Injured Person - Coverage F - Medical Payments to Others.** The injured person or someone acting for the injured person will:

   a. give us written proof of claim, under oath if required, as soon as is practical; and

   b. authorize us to obtain copies of medical reports and records.

   The injured person will submit to a physical exam by a doctor of our choice when and as often as we reasonably require.

5. **Payment of Claim - Coverage F - Medical Payments to Others.** Payment under this coverage is not an admission of liability by an **insured** or us.

6. **Suit Against Us.** No action can be brought against us unless there has been compliance with the policy provisions.

Copyright, Washington Surveying and Rating Bureau, includes copyrighted material of Insurance Services Office, Inc. with its permission, 1990



No one will have the right to join us as a party to any action against an **insured**. Also, no action with respect to Coverage E can be brought against us until the obligation of the **insured** has been determined by final judgment or agreement signed by us.

7. **Bankruptcy of an Insured.**   Bankruptcy or insolvency of an **insured** will not relieve us of our obligations under this policy.

8. **Other Insurance - Coverage E - Personal Liability.**   This insurance is excess over other valid and collectible insurance except insurance written specifically to cover as excess over the limits of liability that apply in this policy.

## SECTION I AND II - CONDITIONS

1. **Policy Period.**   This policy applies only to loss in Section I or **bodily injury** or **property damage** in Section II, which occurs during the policy period.

2. **Concealment or Fraud.**   The entire policy will be void if, whether before or after a loss, an **insured** has:

   a. intentionally concealed or misrepresented any material fact or circumstance; or

   b. engaged in fraudulent conduct;

   relating to this insurance.

3. **Liberalization Clause.**   If we make a change which broadens coverage under this edition of our policy without additional premium charge, that change will automatically apply to your insurance as of the date we implement the change in your state, provided that this implementation date falls within 60 days prior to or during the policy period stated in the Declarations.

   This Liberalization Clause does not apply to changes implemented through introduction of a subsequent edition of our policy.

4. **Waiver or Change of Policy Provisions.**

   A waiver or change of a provision of this policy must be in writing by us to be valid.  Our request for an appraisal or examination will not waive any rights.

5. **Cancellation.**

   a. You may cancel this policy at any time by returning it to us or by letting us know in writing of the date cancellation is to take effect.

   b. We may cancel this policy only for the reasons stated below by letting you know in writing of the date cancellation takes effect.   This cancellation notice, together with our reason for cancellation, will be mailed to you and, if applicable, your agent or broker at the last addresses known to us or shown by our records.  Proof of mailing will be sufficient proof of notice.

      (1) When you have not paid the premium, we may cancel at any time by letting you know at least 10 days before the date cancellation takes effect.

      (2) When this policy has been in effect for less than 60 days and is not a renewal with us, we may cancel for any reason by letting you know at least 45 days before the date cancellation takes effect.

      (3) When this policy has been in effect for 60 days or more, or at any time if it is a renewal with us, we may cancel:

         (a) if there has been a material misrepresentation of fact which if known to us would have caused us not to issue the policy; or

         (b) if the risk has changed substantially since the policy was issued.

         This can be done by letting you know at least 45 days before the date cancellation takes effect.

      (4) When this policy is written for a period of more than one year, we may cancel for any reason at anniversary by letting you know at least 45 days before the date cancellation takes effect.

         However, with respect to paragraphs b. (2), (3) and (4) above, if two or more of the following conditions exist at any building that is covered under this policy, we may cancel this policy by letting you and, if applicable, your agent or broker know at least 5 days before the date cancellation takes effect.  We will also let any mortgagee or other person shown by the policy to have an interest in a covered loss know at least 20 days before the date cancellation takes effect.

Copyright, Washington Surveying and Rating Bureau,
includes copyrighted material of
Insurance Services Office, Inc. with its permission, 1990



(1) Without reasonable explanation, the building is unoccupied for more than 60 consecutive days, or at least 65% of the rental units are unoccupied for more than 120 consecutive days unless the building is maintained for seasonal occupancy or is under construction or repair;

(2) Without reasonable explanation, progress toward completion of permanent repairs to the building has not occurred within 60 days after receipt of funds following satisfactory adjustment or adjudication of loss resulting from a fire;

(3) Because of its physical condition, the building is in danger of collapse;

(4) Because of its physical condition, a vacation or demolition order has been issued for the building, or it has been declared unsafe in accordance with applicable law;

(5) Fixed and salvageable items have been removed from the building, indicating an intent to vacate the building;

(6) Without reasonable explanation, heat, water, sewer, and electricity are not furnished for the building for 60 consecutive days; or

(7) The building is not maintained in substantial compliance with fire, safety and building codes.

c. When this policy is cancelled, the premium for the period from the date of cancellation to the expiration date will be refunded pro rata.

d. If the return premium is not refunded with the notice of cancellation or when this policy is returned to us, we will refund it as soon as possible, but no later than:

(1) 45 days after we send a notice of cancellation to you; or

(2) 30 days after we receive the policy or a notice of cancellation from you.

e. Except as noted below, if the policy is cancelled by us, we will give the same advance notice of cancellation in writing to any mortgagee or other person shown by the policy to have an interest in a covered loss as we give to you. The cancellation notice may be delivered or mailed; if mailed, proof of mailing will be sufficient proof of notice.

6. **Nonrenewal.** We may elect not to renew this policy. We may do so by mailing to you and, if applicable, your agent or broker at the last addresses known to us or shown by our records, written notice, including our reason for refusing to renew, at least 45 days before the expiration date of this policy. Proof of mailing will be sufficient proof of notice.

If we have offered in writing, either directly or through our agent, at least 20 days before the expiration date of this policy, to renew this policy, and have included a statement of the renewal premium due, we may terminate this policy on its expiration date if you fail to pay the required premium when due.

For the purpose of determining the date when nonrenewal can be effected: A policy with a term of six months or less is considered as if written for a policy period of six months. A policy written for a term longer than one year or a policy with no fixed expiration date is considered as if written for a period of one year.

7. **Assignment.** Assignment of this policy will not be valid unless we give our written consent.

8. **Subrogation.** An **insured** may waive in writing before a loss all rights of recovery against any person. If not waived, we may require an assignment of rights of recovery for a loss to the extent that payment is made by us.

If an assignment is sought, an **insured** must sign and deliver all related papers and cooperate with us.

Subrogation does not apply under Section II to Medical Payments to Others or Damage to Property of Others.

9. **Death.** If any person named in the Declarations or the spouse, if a resident of the same household, dies:

a. we insure the legal representative of the deceased but only with respect to the premises and property of the deceased covered under the policy at the time of death;

b. **insured** includes:

(1) any member of your household who is an **insured** at the time of your death, but only while a resident of the **residence premises**; and

(2) with respect to your property, the person having proper temporary custody of the property until appointment and qualification of a legal representative.

Copyright, Washington Surveying and Rating Bureau,
includes copyrighted material of
Insurance Services Office, Inc. with its permission, 1990



## MUTUAL POLICY CONDITIONS

This policy is issued by a mutual company having special regulations lawfully applicable to its organization, membership, policies or contracts of insurance, of which the following shall apply to and form a part of this policy:

> This policy is non-assessable.  The policyholder is a member of the company and shall participate, to the extent and upon the conditions fixed and determined by the Board of Directors in accordance with the provisions of law, in the distribution of dividends so fixed and determined.

For dividend classification purposes, this policy is classified, except as to coverage afforded by any rider or endorsement providing otherwise, in Dividend Class II.

---

The named insured is hereby notified that by virtue of this policy he is a member of Liberty Mutual Group and is entitled to vote either in person or by proxy at any and all meetings of said company.

The annual meetings are held at its home office, Boston, Massachusetts on the second Wednesday of April in each year, at eleven o'clock in the morning.

IN WITNESS WHEREOF, the company has executed and attested these presents; but this policy shall not be valid unless countersigned on the Declarations Page.

**SECRETARY**

**PRESIDENT**



# HOMEPROTECTOR PLUS ENDORSEMENT                    FMHO 2171 R2

**A. INCREASED SPECIAL LIMIT OF LIABILITY - JEWELRY, WATCHES, FURS, PRECIOUS AND SEMI-PRECIOUS STONES**

Section I Coverage C - Personal Property.  Special Limits of Liability.  Paragraph 6 is replaced with:

6.  Jewelry, watches, furs, precious and semi-precious stones are insured for accidental direct physical loss or damage.  The following exclusions and limitations apply:

    a.  $2500 for loss by theft, subject to a maximum of $1000 for any one article.

    b.  The limit of liability stated in the declarations page for Coverage C, for loss caused by perils named under Coverage C of this policy, other than theft.

    c.  $2500 for loss caused by perils not named and not excluded in this policy, subject to a maximum of $1000 for any article.

    d.  We do not cover loss or damage caused by mechanical breakdown, wear and tear, gradual deterioration, insects, vermin or inherent vice.

**B. REPLACEMENT COST PROVISION - DWELLING AND PERSONAL PROPERTY**

You must meet the following additional condition for this provision to apply:

17.  Additions or Changes to Dwelling - Notice to Company.  You must inform us within 90 days of the start of any additions, alterations or improvements to the dwelling that will increase the replacement cost of the dwelling by $5000 or more.

If you meet Condition 17, then Section I, Conditions of the policy, Item 3. Loss Settlement, is replaced as follows:

3.  Loss Settlement.  Covered property losses are settled as follows:

    a.  The applicable limit of liability for Buildings under Coverage A or B is the replacement cost without deduction for depreciation, subject to the following:

        (1)  We will pay the cost of repair or replacement, but not exceeding:

            (a)  The replacement cost of that part of the building damaged using new materials of like kind and quality on the same premises and intended for the same occupancy and use;

            (b)  With respect to Coverage A, an amount not exceeding 20% greater than the limit of liability stated in the declarations, as modified by the Inflation Protection Provision of the policy;

            (c)  With respect to Coverage B, the limit of liability stated in the declarations, as modified by the Inflation Protection Provision of the policy;

            (d)  The amount actually and necessarily spent to repair or replace the damage.

        (2)  When the cost of repair or replacement is more than $2500 or more than 5% of the amount of insurance in this policy on the building, whichever is less, we will pay no more than the actual cash value of the damage until actual repair or replacement is complete.

        **(3)  If the policy includes optional Earthquake coverage, FMHO 2168, this Loss Settlement provision will not apply for direct physical loss to property caused by earthquake, including land shock waves or tremors before, during or after a volcanic eruption.**

    b.  Awnings, outdoor antennas and outdoor equipment, whether or not attached to buildings, and structures that are not buildings: at actual cash value at the time of loss but not exceeding the amount needed to repair or replace.

    c.  Personal property, carpeting and domestic appliances: at replacement cost but not exceeding the amount needed to repair or replace subject to the following:

        (1)  Our limit of liability for loss to Personal Property shall not exceed the smallest of the following:

            (a)  Replacement cost with a new item of like kind and quality at the time of loss;

             (b)  The full cost of repair;

            (c)  Any special limit of liability described in the policy or stated in this endorsement; or



(d) The Coverage C limit of liability stated in the declarations, as modified by the Inflation Protection Provision of the policy.

(2) This endorsement shall not apply to:

(a) Fine arts and items which, by their nature cannot be replaced with new items.

(b) Articles whose age or history contribute substantially to their value including souvenirs or collector's items.

(c) Property that is unusable for the purpose for which it was originally intended due to age or historic condition.

(3) We will not pay for any loss to personal property under this endorsement until actual repair or replacement is complete.

d. You may disregard the replacement cost provision and make a claim for loss of damage to property on an actual cash value basis and then make claim within 180 days after loss for additional liability under this endorsement.

## C. INCREASED LIMIT - COVERAGE D

We will pay the amount of loss covered by Coverage D which is actually sustained by you during the 12 consecutive months following the date of loss, subject to the periods of time under paragraphs 1, 2 and 3 of Coverage D - Loss of Use.

## D. ADDITIONAL COVERAGES

REFRIGERATORS AND FREEZERS CONTENTS COVERAGE

We cover the contents of deep freeze or refrigerated units on the residence premises from the perils of:

1. Fluctuation or total interruption of electric power, either on or off premises, resulting from conditions beyond the control of the Insured.

2. Mechanical breakdown of any refrigeration equipment on premises including the blowing of fuses or circuit breakers.

We do not cover loss caused by the following additional exclusions:

1. Disconnection or termination of power due to turning off any switch.

2. Inability of power source to provide sufficient power due to government order, lack of fuel or lack of generating capacity to meet demand.

SPECIAL LIMIT - We will not pay more than $500 of your loss of refrigerator or freezer contents resulting from the above perils.

All other provisions of this policy apply.

LOCK REPLACEMENT COVERAGE

We will pay up to $250 for replacing the locks or cylinders on the exterior doors of the residence premises when your keys have been stolen.  The theft of the keys must be reported to the police for this coverage to apply.

This coverage is additional insurance.  No deductible applies to this coverage.



## CREDIT CARD, FUND TRANSFER CARD, FORGERY
## AND COUNTERFEIT MONEY COVERAGE

**HO-53** (Ed. 4-84)

Increased Limit

For an additional premium, the limit of liability for Additional Coverage 6., Credit Card, Fund Transfer Card, Forgery and Counterfeit Money, is increased to $*

*Entries may be left blank if shown elsewhere in this policy for this coverage.

All other provisions of this policy apply.

HO-53 (Ed. 4-84)            Copyright, Insurance Services Office, Inc., 1984            Page 1 of 1



# AMENDATORY ENDORSEMENT

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

*THIS ENDORSEMENT SUPERSEDES ALL OTHER ENDORSEMENTS WHICH HAVE BEEN MADE PART OF YOUR POLICY AND REFERENCE THESE SAME PROVISIONS*

## SECTION I - PROPERTY COVERAGES

### COVERAGE A - Dwelling

Item **1.** is amended as follows:

We cover:

1. The dwelling on the "residence premises" shown in the Declarations, including structures attached to the dwelling, and attached wall-to-wall carpeting;

### COVERAGE C - Personal Property

The introductory paragraph of **Special Limits of Liability** is amended to read:

These do not increase the Coverage C limit of liability. The special limit for each numbered category below is the total limit for each loss for all property in that category. If personal property can reasonably be considered a part of two or more of the groups listed below, the lowest limit will apply.

The following limits are added:

11. $5000 on electronic data processing system equipment and the recording or storage media or accessories used with that equipment.
12. $5000 on any one article and $10000 in the aggregate for loss by theft of any rug, carpet (excluding attached wall-to-wall carpet), tapestry, wall-hanging or other similar article.
13. $2500 in the aggregate for loss of any of the following whether or not they are part of a collection: trading cards, comic books, figurines, stamps, advertising materials, stuffed animals, dolls, sports and entertainment memorabilia, toys, games, militaria, and books.
14. $1200 for any one electrical appliance for loss by sudden and accidental damage from artificially generated electrical currents. This special limit does not apply to electronic data processing equipment or storage media.

In the event Landlord Endorsement FMHO 3307 is part of this policy, the above coverage contained in Special Limits of Liability introductory paragraph and subparagraphs 11 through 14 are deleted.

**Property Not Covered** under **COVERAGE C - Personal Property**

The final two subparagraphs of Item **3.** (**a.** and **b.**) are replaced by the following:

We do cover vehicles or conveyances not subject to motor vehicle registration which are:

   a. Used solely to service an "insured's" residence; or
   b. Designed for assisting the handicapped;

In the event Landlord Endorsement FMHO 3307 is part of this policy, the above coverage contained in the final two subparagraphs of Item **3.** (**a.** and **b.**) is deleted.

Item **10.** is added as personal property items not covered.

**10.** Water or steam

**ADDITIONAL COVERAGES** is revised as follows:

Item **7. Loss Assessment** is deleted in its entirety.

The following is added to Item **8. Collapse:**

   With respect to this Additional Coverage:

   **(1)** Collapse means the sudden and entire falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied or used for its current intended purpose.

   **(2)** A building or any part of a building that is in danger of falling down or caving in is not considered to be in a state of collapse.

   **(3)** A part of a building that is standing is not considered to be in a state of collapse even if it has separated from another part of the building.

   **(4)** A building or any part of a building that is standing is not considered to be in a state of collapse even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.



## SECTION I - PERILS INSURED AGAINST

### COVERAGE A - DWELLING and COVERAGE B - OTHER STRUCTURES

The following is added to item **2.b.**

    **(4)** Footing(s)

The following are added to item **2.e.** Any of the following:

    **(8)** Growth of trees, shrubs, plants or lawns whether or not such growth is above or below the surface of the ground;

The final paragraph of item **2.** is further revised as follows:

If any of these cause sudden and accidental water damage not otherwise excluded, from a plumbing, heating, air conditioning or automatic fire protective sprinkler system or household appliance, we cover loss caused by the water including the cost of tearing out and replacing any part of a building necessary to repair the system or appliance. We do not cover loss to the system or appliance from which this water escaped.

## SECTION I - EXCLUSIONS

2. **Earth Movement** is deleted and replaced by the following:

2. **Earth Movement**, meaning movement of the earth, whether combined with water or not, in any direction, including but not limited to:

    **a.** Earthquake, including land shock waves or tremors before, during, or after a volcanic eruption;

    **b.** Landslide, mud slide, or mud flow;

    **c.** Subsidence or sinkhole; or

    **d.** Any other earth movement, including earth sinking, rising, shifting, expanding, contracting, or eroding;

caused by or resulting from manmade, animal, or natural actions, events, or conditions.

If direct loss by fire or explosion ensues, we will pay only for the ensuing loss.

This exclusion does not apply to loss by theft.

(This is Exclusion **1.b.** in Form **HO 00 03.**)

## SECTION II - EXCLUSIONS

Item **1.a.** under **Coverage E - Personal Liability and Coverage F - Medical Payments to Others** is amended as follows:

Which is expected or intended by the "insured", even if the resulting "bodily injury" or "property damage"

    **1)** is of a different kind, quality, or degree than initially expected or intended; or

    **2)** is sustained by a different person, entity, real or personal property, than initially expected or intended.

However, this exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

## SECTION II - ADDITIONAL COVERAGES

Item **1.c.** under **Claims Expenses** is amended as follows:

Reasonable expenses incurred by an "insured" at our request, including actual loss of earnings (but not loss of other income) up to $250 per day, for assisting us in the investigation or defense of a claim or suit.

Item **4. Loss Assessment** is deleted in its entirety.

All other policy terms and conditions apply.



# HOMEOWNER AMENDATORY ENDORSEMENT

## THIS ENDORSEMENT CHANGES YOUR POLICY - PLEASE READ IT CAREFULLY

*THIS ENDORSEMENT SUPERSEDES ALL OTHER ENDORSEMENTS WHICH HAVE BEEN MADE PART OF YOUR POLICY AND REFERENCE THESE SAME PROVISIONS*

### DEFINITIONS

The introductory paragraph of **Definitions** is amended to read:

In this policy, "you" and "your" refer to the "named insured" shown in the Declarations and

 (1) the spouse of the "named insured" shown on the Declarations, if a resident of the same household; or

 (2) the partner in a civil union, registered domestic partnership, or similar union or partnership, with the "named insured" shown on the Declarations, if a resident of the same household.

Section (2), above, only applies if the civil union, registered domestic partnership or other similar union or partnership is validly entered into under the law of any state, territory or possession of the United States of America, any territory or province of Canada, or the equivalent of a state or province in any other country.

"We," "us" and "our" refer to the Company providing this insurance.  In addition, certain words and phrases are defined as follows:

### SECTIONS I AND II - CONDITIONS

The introductory paragraph of **9. Death.** is amended to read:

If any person named in the Declarations or the spouse, if a resident of the same household; or the partner in a civil union, registered domestic partnership or similar union or partnership, if a resident of the same household, dies:



## NO SECTION II - LIABILITY COVERAGES FOR HOME DAY CARE BUSINESS LIMITED SECTION I - PROPERTY COVERAGES FOR HOME DAY CARE BUSINESS

**HO-322 WA** (Ed. 6-92)

If an **insured** regularly provides home day care services to a person or persons other than **insureds** and receives monetary or other compensation for such services, that enterprise is a **business**. Mutual exchange of home day care services, however, is not considered compensation. The rendering of home day care services by an **insured** to a relative of an **insured** is not considered a **business**.

Therefore, with respect to a home day care enterprise which is considered to be a **business**, this policy:

1.  does not provide Section II - Liability Coverages because a **business** of an **insured** is excluded under exclusion **1.b.(1)** of Section **II** - Exclusions;

2.  does not provide Section I - Coverage B coverage where other structures are used in whole or in part for **business**;

3.  limits coverage for property used on the **residence premises** for home day care enterprise to $2,500, because Coverage C - Special Limits of Liability - item 9 imposes that limit on **business** property on the **residence premises**. (Item 9 corresponds to item 6 in Form **HO-8**);

4.  limits coverage for property used off the **residence premises** for home day care enterprise to $250, because Coverage C - Special Limits of Liability - item 10 imposes that limit on **business** property off the **residence premises**. (Item 10 corresponds to item 7 in Form **HO-8**.)


THIS ENDORSEMENT DOES **NOT** CONSTITUTE A REDUCTION OF COVERAGE.

Copyright, Washington Surveying and Rating Bureau, includes copyrighted material
of Insurance Services Office, Inc. with its permission, 1992



# AMENDATORY MOLD, FUNGUS, WET ROT, DRY ROT, BACTERIA, OR VIRUS ENDORSEMENT

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**DEFINITIONS**

The following definition is added to the DEFINITIONS section:

12. **"Mold, Fungus, Wet Rot, Dry Rot, Bacteria, or Virus"** means any type or form of fungus, rot, virus or bacteria.  This includes mold, mildew and any mycotoxins (meaning a toxin produced by a fungus), other microbes, spores, scents or byproducts produced or released by mold, mildew, fungus, rot, bacteria, or viruses.

**SECTION I – PROPERTY COVERAGES**

**Additional Coverages**

The following Additional Coverage is added:

9. **Remediation of "Mold, Fungus, Wet Rot, Dry Rot, Bacteria, or Virus" Resulting Directly From Any Covered Loss**

We will pay, up to the Additional Coverage – Mold Limit of Liability shown below, for the **"Remediation"** of **"Mold, Fungus, Wet Rot, Dry Rot, Bacteria, or Virus"** resulting directly from any covered loss.

**"Remediation"** means the reasonable and necessary treatment, containment, decontamination, removal or disposal of **"Mold, Fungus, Wet Rot, Dry Rot, Bacteria, or Virus"** as required to complete the repair or replacement of property, covered under Section I of the policy, that is damaged by any covered peril insured against, and also consists of the following:

1. The reasonable costs or expense to remove, repair, restore, and replace that property including the costs to tear out and replace any part of the building as needed to gain access to the **"Mold, Fungus, Wet Rot, Dry Rot, Bacteria, or Virus"**; and

2. the reasonable costs or expense for the testing or investigation necessary to detect, evaluate or measure **"Mold, Fungus, Wet Rot, Dry Rot, Bacteria, or Virus"**; and

3. any loss of fair rental value, or reasonable increase in additional living expenses, that is necessary to maintain your normal standard of living, if **"Mold, Fungus, Wet Rot, Dry Rot, Bacteria, or Virus"** resulting directly from any covered loss makes your residence premises uninhabitable.

We will pay no more than the Additional Coverage - Mold Limit of Liability shown below for the **"Remediation"** of **"Mold, Fungus, Wet Rot, Dry Rot, Bacteria, or Virus"** resulting directly from any covered loss during the policy period, regardless of the number of locations under the policy to which this endorsement is attached, the number of persons whose property is damaged, the number of "insureds,"or the number of losses or claims made.

If there is a covered loss or damage to covered property, not caused, in whole or in part, by **"Mold, Fungus, Wet Rot, Dry Rot, Bacteria, or Virus,"** loss payment will not be limited by the terms of this Additional Coverage, except to the extent that **"Mold, Fungus, Wet Rot, Dry Rot, Bacteria, or Virus"** causes an increase in the loss. Any such increase in the loss will be subject to the terms of this Additional Coverage.

FMHO 3373 12 12                                                                                                Page 1 of 2



## *ADDITIONAL COVERAGE -- MOLD LIMIT OF LIABILITY*

| **Mold Limit of Liability:** | **SECTION I** | **Aggregate Limit** | **$5,000** |
|---|---|---|---|

This limitation does not apply to **"Mold, Fungus, Wet Rot, Dry Rot, Bacteria, or Virus"** ensuing from a covered fire or lightning loss.

This Additional Coverage does not increase the limits of liability under Section I of the policy as shown in the Declarations.

### SECTION I – EXCLUSIONS

Exclusion **12.** is added:

12. Except as provided by **Additional Coverage 9.**, loss consisting of or caused by **"Mold, Fungus, Wet Rot, Dry Rot, Bacteria, or Virus"** is excluded, even if resulting from a peril insured against under Section I. We do not cover **"Remediation"** of **"Mold, Fungus, Wet Rot, Dry Rot, Bacteria, or Virus,"** even if resulting from a peril insured against under Section I, except as provided by **Additional Coverage 9.**

This exclusion does not apply to **"Mold, Fungus, Wet Rot, Dry Rot, Bacteria, or Virus"** ensuing from a covered fire or lightning loss.

### SECTION II – EXCLUSIONS

**Coverage E - Personal Liability and Coverage F - Medical Payments to Others**
Exclusion **1.i.** is added:

i. Arising out of or aggravated by, in whole or in part by, **"Mold, Fungus, Wet Rot, Dry Rot, Bacteria, or Virus."**

**This endorsement takes precedence over all other endorsements attached to your policy.**



# SEEPAGE EXCLUSION ENDORSEMENT

**THIS ENDORSEMENT CHANGES THE POLICY.   PLEASE READ IT CAREFULLY.**

**SECTION I – PERILS INSURED AGAINST**

**Coverage A – Dwelling and Coverage B – Other Structures**

**Paragraph 2.e.** is added:

   **e.**   Seepage, meaning a gradual, continuous, or repeated seepage or leakage of water, steam or fuel over a period of 14 days or more, resulting in damage to the structure, whether hidden or not.

**This endorsement takes precedence over all other endorsements attached to your policy.**



## INFLATION PROTECTION ENDORSEMENT

It is agreed that the limits of  liability for:

Coverage A, Dwelling;

Coverage B, Structure;

Coverage C, Personal Property;

and Coverage D, Loss of Use,

shall be raised by the rate of increase in the Xactware Pricing Indices published by Xactware Inc.

## METHOD

To find the limits of liability on a given date, the Index Level the Company assigns to that date will be divided by the Index Level for the effective date of this Endorsement.  This Factor is then multiplied by the limit for Coverages A, B, C and D separately.

If during this policy's term the Coverage A limit is changed at the insured's request, the effective date of this Endorsement is amended to the effective date of such change.

This Endorsement shall not reduce the limits of liability to less than the amount shown on:

    a.  The policy; or
    b.  The most recent Homeowners Policy Renewal Declaration.

This Endorsement must be attached to Change Endorsement when issued after the policy is written.



## PREMISES ALARM OR FIRE PROTECTION SYSTEM

HO-216 (Ed. 4-84)

For a premium credit, we acknowledge the installation of an alarm system or automatic sprinkler system approved by us on the **residence premises**.  You agree to maintain this system in working order and to notify us promptly of any change made to the system or if it is removed.

HO-216 (Ed. 4-84)                 Copyright, Insurance Services Office, Inc., 1984                 Page 1 of 1



# LEAD POISONING EXCLUSION ENDORSEMENT - WASHINGTON

The following provisions are added to and made part of your Homeowners Policy:

Section I - Property Coverages do not apply to any costs or expenses incurred or loss arising out of:

1. the removal, testing for, monitoring, clean-up, abatement, treatment, or neutralization of lead; paint, putty or plaster containing lead; soil or earth containing lead; or any other substance or material containing lead; or

2. any governmental direction or other request that you test for, monitor, clean-up, remove, abate, contain, treat or neutralize lead; paint, putty or plaster containing lead; soil or earth containing lead; or any other substance or material containing lead.

Coverage E - Personal Liability and Coverage F - Medical Payments to Others do not apply to bodily injury or property damage:

1. arising out of absorption, ingestion or inhalation of lead from lead paint, plaster or putty containing lead; soil or earth containing lead or any other material or substance containing lead; or

2. any costs or expenses incurred or loss arising out of any claim, governmental direction, or request that you test for, monitor, cleanup, remove, abate, contain, treat or neutralize lead; paint, putty or plaster containing lead; or any other substance or material containing lead.

This exclusion applies to any obligation to share damages, costs or expenses with someone else or to repay someone else who must pay damages, costs or expenses.

FMHO 1082 (ED. 9-95)                                                                      Page 1 of 1



## ORDINANCE OR LAW COVERAGE - WASHINGTON

For the Premium charged, the percentage applied to the Coverage A limit of liability under Form HO 00 03 or Form HO 00 06, or the percentage applied to the building Additions and Alterations limit of liability under Form HO 00 04, is increased to 10%.  This applies to covered property or the building containing the covered property for loss resulting from a Peril Insured Against.  The loss will be settled on the basis of any ordinance or law that regulates the construction, repair or demolition of this property.

All other provisions of this policy apply.

FMHO 2055                                                                                                   Page 1 of 1



## UNDERGROUND FUEL STORAGE TANK EXCLUSION

**The following provision is added to and made part of your Homeowners Policy:**

**Section II - Exclusions**

**The Paragraph below is added:**

**Coverage E - Personal Liability and Coverage F - Medical Payments to Others do not apply to "bodily injury" or "property damage":**

arising out of the release of fuel or fuel products from an "underground storage tank system."

"Underground storage tank system" means the underground tank, the fill pipe, the vent pipes, and all associated fixtures, including pipe and tubing which contains or conveys fuel or fuel products from the underground storage tank to the point of combustion.

All other provisions of this policy apply.

FMHO 3209 10 09                                                                                    Page 1 of 1



## WAIVER OF SMALL PREMIUM ADJUSTMENT

Section I and II - Conditions, Item #4.  Waiver or Change of Policy Provisions is changed by adding this sentence:  If a change results in a premium adjustment of less than $3.00, the refund or additional premium will be waived unless the insured requests a refund.



## Notice of Membership in Liberty Mutual Holding Company Inc.

While this policy is in effect, the named insured first named in the Declarations is a member of Liberty Mutual Holding Company Inc. and is entitled to vote either in person or by proxy at any and all meetings of the members of said company.  The Annual Meeting of Liberty Mutual Holding Company Inc. is in Boston, Massachusetts, on the second Wednesday in April each year at ten o'clock in the morning.

The named insured first named in the Declarations shall participate in the distribution of any dividends declared by us for this Policy.  The amount of such Named Insured's participation is determined by the decision of our Board of Directors in compliance with any laws that apply.

Any provisions in the policy relating to:

1.  Membership in Liberty Mutual Insurance Company or Liberty Mutual Fire Insurance Company; or

2.  Entitlement to dividends as a member of Liberty Mutual Insurance Company or Liberty Mutual Fire Insurance Company

are deleted and replaced by the preceding paragraphs.

2340e

# EXHIBIT H

Pol: H3226803084640 | Ins: RANI THYKKUTTATHIL | DoL: 03/09/2014 | St: Open

| Create Date | Author | Topic | Related To | Subject | Text (2,500) |
|---|---|---|---|---|---|
| 04/16/2014 01:21 PM | NANCY SIMOENS | Claim Status | (1) 1st Party Dwelling - RANI THYKKUTT | | Original 04/16/2014 01:21 PM Took incoming call from ph Rani. She wanted to go over a few items: regarding ale - I gave the okay to stay through 5/5/14. She is on a waiting list hotel that ALE set her up at after that - 5/6 onward. Her pregnancy due date is 5/2. She has a note from her doctor stating that she should not be in home until damaged items are removed/ remediation complete and heavy construction complete. She wanted to ensure she had a place to go in case work is not done and she had newborn. I advised I understood. The security system panel sustained water damage. Her contractor will forward this documentation to PLS Oyugi. It is unclear at this time if electrical items were damaged. She is having her contractor take out damaged wall and do any remediation as she is unhappy with Rainbow and does not want them back in her home. She has attempted to call Mit Spec. Tim O'Brian yesterday and today and she stated that telephone system is not working. I advised that I would email him asking him to contact her. |
| 04/15/2014 03:01 PM | TIMOTHY O'BRIEN | Investigation | RAINBOW INTERNATI LLC | Mitigation | Original 04/15/2014 03:01 PM IBC from Mike @ RBW. 206-510-7182. Discussed the loss. Will get in touch with the PH to see if the issues can be resolved. Discussed with the PLS over IM regarding. |
| 04/15/2014 02:54 PM | TIMOTHY O'BRIEN | Investigation | RAINBOW INTERNATI LLC | Mitigation | Original 04/15/2014 02:54 PM OBC to Mike @ RBW 206-510-7182. LVM requesting a call back. ————— OBC to PH 206-225-9969. LVM regarding the contact attempts with RBW. Requested a call back. |
| 04/15/2014 12:00 PM | TIMOTHY O'BRIEN | Investigation | RAINBOW INTERNATI LLC | Mitigation | Original 04/15/2014 12:00 PM OBC to RBW 800-708-6787. Mike was not in. ———— OBC to Mike @ RBW 206-510-7182. LVM requesting a call back regrading the customer complaint |
| 04/14/2014 07:37 PM | JACKLINE OYUGI | Claim Status | none (Claim-level) | | Original 04/14/2014 07:37 PM called cabinet CTR to go over his proposal. No answer, sent an email and will follow up tomorrow during normal business hours. |
| 04/14/2014 06:05 PM | JACKLINE OYUGI | Policyholder | none (Claim-level) | | Original 04/14/2014 06:05 PM Insd called back stating that she needed hotel accomodation for her sister and her husband who live with her?? she stated that they are not renters. She also wanted them put in different hotels close to their work? informed insd that ALE will be for a hotel with 2 rooms and a kitchen as food will not be expensed. They will all stay in the same hotel and share a kitchen like they do at their residence. Insd added that they had 4 cats which were not present during inspection? informed ALE and they will find something reasonable with my terms. Insd on board. |



07/30/2015 02:26 PM

LM000144

# EXHIBIT I

Print  |  Close Window

Subject: Re: claim #032071457
   From: Rani Joseph <ranijt@gmail.com>
   Date: Wed, Nov 23, 2016 3:45 pm
     To: "Wolterman, James" <James.Wolterman@libertymutual.com>
     Cc: Ryan Barrett <Ryan@pacengtech.com>, "Eversole, Sarah" <Eversole@wscd.com>,
         "joel@joelhansonlaw.com" <joel@joelhansonlaw.com>, Ryan Wellman <ryan@ryanwellman.com>
 Attach: image001.png

Mr. Wolterman,


Five months ago, in my June 24, 2016 letter (to which you did not respond), I clearly
explained that we cannot afford to continue to wait for Liberty Mutual to reach an agreement
with Belfor on the cost of repairs, and would have to start working with our bank to obtain a
loan to rebuild the house. It has been an ongoing financial burden on us to pay for both for a
rental house and a mortgage on a completely unlivable property. Since you're not paying our
rental house bills and Liberty Mutual's repair process has not moved forward, we hired SIRCA
Architect to start the rebuild process by obtaining a project plan number and developing plans
to submit, and this is what Mr. Barrett saw in the City of Seattle system.


Since we already have a project plan number with the City of Seattle, Mr. Barrett is concerned
that the rebuild process will be further delayed if he attempts to submit plans to the City, if he
is even able to do so at all. Mr. Barrett cannot even attempt to submit plans without first
meeting with the City of Seattle to figure that out, and according to Mr. Barrett's November
21, 2016 email to us, he states that you, Mr. Wolterman, will not pay for him to meet with
City officials.  If you want him to take this course of action, then Liberty Mutual needs to pay
for it.


What course of action would you like us to take, Mr. Wolterman? What would you like to direct
Mr. Barrett to do now?


Best Regards,


Rani

On Mon, Nov 21, 2016 at 7:38 AM, Wolterman, James <James.Wolterman@libertymutual.com> wrote:

   Mrs. Thykkuttathil et al,


   I spoke with Ryan Barrett on Friday (11/18) and he stated that when he went to submit the plans, there were already
   documents submitted from another architect for your property's address dealing with, he believes, a garage.


   Would you please offer an understanding of what has been completed and by whom in relation to submitting plans to
   the city unrelated to the fire damage. This may be hindering Pace in the process of completing an approved set of
   plans and any additional cost beyond the normal submittal time would be borne at your expense.

Thank you,


**Track your claim, anytime, anywhere with your online account at**
**LibertyMutual.com**

View claims status and policy details  |  Upload documents and photos  |  Update your contact information


### Jimmy Wolterman

Sr. Field Claims Resolution Specialist III

Liberty Mutual Insurance

P.O. Box 8415

Westminster, CA  92684

Direct Dial: 480.290.1234

My Manager: Brian Cahill

Brian.Cahill@libertymutual.com



AUTO  |  HOME  |  LIFE

Copyright © 2003-2017. All rights reserved.

# EXHIBIT J

June 24, 2016

To: James Wolterman, Liberty Mutual
Regarding Liberty Mutual's June 16, 2016 Letter
Claim Number 032071457

Dear Mr. Wolterman,

I found your letter dated June 16, 2016 alarming as it makes false statements about me and contradicts Liberty Mutual's prior statements and actions. You are trying to blame me, your insured, with a fabricated scenario in order to deflect from your unexplainable delays and bad faith in dealing with our claim.

I never told Ryan Barrett of Pacific Engineering to stop work. Mr. Barrett has been working with you and Ted Sitterley of Belfor to collaborate on the cost of repairs. I have always encouraged Pacific Engineering and Belfor to work closely with Liberty Mutual and, per your policies, only proceed with work that you have explicitly pre-authorized with approved estimates.

Before I respond to the accusations in your letter, let's first review Liberty Mutual's clear pattern of unexplainable delays and bad faith:

Ted Sitterley of Belfor has consistently attempted to get your authorization for any estimated costs before proceeding with repairs, only to be unnecessarily delayed by Liberty Mutual at every turn. After Liberty Mutual agreed to cover the May 19, 2016 house fire in October 2016 (5 months after the incident), it took another month for Liberty Mutual to authorize Mr. Sitterley to even do any mitigation, claiming - without any factual basis - that the house magically dried itself out after being hosed down by fire fighters! Mr. Sitterley worked very hard to appease Liberty Mutual and, after a long and drawn out approval process, Belfor did the mitigation. But, when you got the invoice, Liberty Mutual still refused to pay for all of Belfor's work because someone in Florida, who had never even been to our property, just did not feel like paying the entire amount. Cheating contractors creates an atmosphere where professionals are hesitant to work on our home if they may not get paid - even after they get the go ahead from Liberty Mutual - because you don't feel like writing a check.

When Belfor requested that Liberty Mutual authorize hiring a structural engineer to evaluate the damage, you did not respond and only authorized the cost of a structural engineer on January 22, 2016 (about two months later). You knew that Ryan Barrett, the structural engineer from Pacific Engineering, could not do any evaluation until the house was gutted to reveal all the damages, and yet Liberty Mutual did not authorize Belfor's estimate for the cost of the interior demolition until March 3, 2016. Based on Pacific Engineering's initial report, Belfor provided you on May 10, 2016 with an initial minimum estimate (which he made clear would be more once the City of Seattle got involved), but you never evaluated or approved this estimate.

Now, let's deal with the blatant fabrications in your June 16, 2016 letter. Just to review, you wrote:

*"I recently spoke with Ryan Barrett at Pacific Engineering. Mr. Barrett stated that shortly after he finished his draft report (in April), Mrs. Thykkuttathil directed him not to continue or complete his report.*

*A final engineers report (with review by Seattle's building department) is necessary to determine the actual cope of work for hidden damage and code upgrades. It is unclear why Mrs. Thykkuttathil directed Mr. Barrett to stop his work. We were not aware that the engineering work was suspended until I spoke with Mr. Barrett on June 10th, 2016. . . .*

*At this time, because Mrs. Thykkuttathil has asked Pacific Engineering not to finish their engineering work, Liberty Mutual will move forward with the hiring of another engineer who can determine the actual work necessary to obtain the necessary permits and complete the repairs."*

Now, let's review the facts.

You claim you just found out that the engineering work was "suspended" by talking to Ryan Barrett on June 10th, but you have had Mr. Sitterley's estimate based on the structural engineer's report since May, and you knew that the engineering work could not move forward until you approved the funds for Belfor's initial estimate and the funds for additional engineering work. On June 10, 2016, you wrote:

*"The estimate send by Mr. Sitterley on May 10th states, in the estimate (capitalization in estimate), that "THIS ESTIMATE IS PRELIMINARY This proposal is the isolated code items. It is still subject to final engineering and permitting." . . .Until a finalized report is produced, a true scope of work cannot be determined."*

Ted Sitterley immediately responded to you on June 10, 2016:

*"The engineer, Ryan Barrett, gave specific direction on site, which was the basis of my proposal. The DRAFT letter was generated by Mr. Barrett and then I told the engineer to stop until there was some corroboration, lest he continue spending engineering money that would be the responsibility of Liberty Mutual to pay. I was trying to have economy with the expenditure.*

*My proposal has that limiting language on the title page because the City of Seattle is a complete wild card these days in what codes they require. Lately, they have been putting engineers through the ringer on additional scopes after the engineer has completed their primary code review. So, until the final permit is issued, my proposal would be subject to ADDITIONAL work above that which is described resulting from said process."*

Liberty Mutual's policies state: "Before repairs begin, please show our estimate to your contractor.  If your contractor's estimate exceeds the amounts in our estimate, please contact us prior to beginning the work," as well as "It is important to call us with questions prior to beginning repairs, as any changes in the scope of damages or pricing must be pre-approved by Liberty Mutual Insurance." Working within your polices, Belfor was waiting for Liberty Mutual to approve their initial <u>minimum</u> estimate provided May 10, 2016. In his email, Ted Sitterley clearly stated to you that the work was not "suspended" but as final as it could be without the Liberty Mutual giving the go ahead on the initial estimate so that Belfor and Pacific Engineering could move forward to work with the City of Seattle with the full knowledge that the cost would likely be <u>more</u> (not less) than Belfor's initial estimate. Mr. Sitterley explicitly wrote that "The DRAFT letter was generated by Mr. Barrett and then I (Mr. Sitterley) told the engineer to stop until there was some corroboration, lest he continue spending engineering money that would be the responsibility of Liberty Mutual to pay." Let me make it clear: this means it was Liberty Mutual's job to move things forward by approving the estimate.

You knew that Ryan Barrett's report was as final as it could be without you approving Belfor's estimate and, according to Ryan Barrett, you also knew you had to approve significant additional cost for them to work with the City of Seattle and create structural engineering plans. It was your job to move the project forward, and yet you claimed on June 16th that I was the one who told the engineer not to write the report when you knew on June 10th that I had absolutely nothing to do with this entire process. Clearly, I never told Pacific Engineering not to complete their structural engineering work.

After reviewing your letter, I arranged for a call with Ryan Barrett of Pacific Engineering to discuss the issues you raised. We spoke in the afternoon on June 20th after he had a chance to review your letter.  He told me that what you wrote was completely inconsistent with your conversation and a gross distortion of the facts. According to Mr. Barrett, he never said anything about me directing their company not to comply with Liberty Mutual's requirements. He informed me that my name only came up in the conversation as the one from whom Liberty Mutual needed to get the invoice for the engineering work to date as my husband and I were Pacific Engineering's contractual clients. In light of these facts, it is extremely bizarre that Liberty Mutual is claiming that I directed Pacific Engineering not to complete the structural engineering report, and because of that, Liberty Mutual has decided to hire another engineer to "determine the actual work necessary to obtain the necessary permits and complete the repairs." Ryan Barrett set the record straight as far as your conversation in his June 21, 2016 email that states:

*"We have reviewed the letter prepared by Mr. James Wolterman with Liberty Mutual dated June 16, 2016, and are providing this response email in order to provide additional clarification as to our involvement with the Thykkuttathil/Wellman fire damage repair project.*

*Our initial report, dated April 13, 2016 was issued as a DRAFT to expedite our Client's contractor (Belfor Property Restoration) prepare a cost estimate for the code upgrades that we determined would be required to obtain a building permit based upon the current edition of the Seattle Existing Building Code policies.  The report remained in DRAFT format as there was consideration of having a pre-construction meeting with the City to determine if additional upgrades would be required.  To clarify, a pre-construction meeting is typically not required and our report will be made final as is.*

*Following the site visit to the home on April 4th, 2016 after finishes had been removed; it was evident that additional engineering analysis and code upgrades would be required beyond what had already been approved.  While on site Mr. Sitterley (with Belfor Property Restoration) requested that we prepare the code upgrade report so he could develop a revised cost estimate based upon the code upgrades.  It was my understanding that the new cost estimate for the updated scope of work and additional engineering would require Liberty Mutual's approval before I could proceed with the additional analysis and repair drawing updates."*

Liberty Mutual has clearly fabricated a scenario where I hindered the repair process. Moreover, you are using this strange lie as the basis to bring in another engineer. Ryan Barrett's email clarified that his "draft" report was only a draft in the sense that often more code upgrades may be required once they start working with the Seattle's building department. Thus, this report should be sufficient to evaluate the Belfor estimate. Pacific Engineering is the engineering firm on this job, and you need to negotiate the fees with them to work with the City of Seattle, obtain permits, and draw up the structural engineering plans. As you know, the repair process cannot move forward until Liberty Mutual authorizes the costs in Ted Sitterley's initial estimate as well as the additional structural engineering costs.

Your job, as our insurance company, is to assist us in the repair process, move the process along in a timely manner, and write the checks to cover the costs. However, Liberty Mutual has consistently delayed the repair process, refused to evaluate estimates, and even cheated contractors after agreeing to estimates and telling them to move forward with the work. Now, you want to cut off our additional living expenses after July 19, 2016, knowing that there is absolutely no way that the repairs could be completed by July. Liberty Mutual's bad faith has made it impossible for us to repair our home and created incredible stress on our family. The sad fact of the matter is that Liberty Mutual's behavior has been so bad and so seriously hindered the repair process for the past two years that we have no choice but to move forward with the reconstruction by borrowing money from our bank because we do not have Liberty Mutual's help. Our bank has told us it will not lend us money unless we demolish the house and rebuild.

Best Regards,

Rani Thykkuttathil

# EXHIBIT K

 Pol: H3226803084640 | Ins: RANI THYKKUTTATHIL | DoL: 03/09/2014 | St: Open

| Create Date | Author | Topic | Related To | Subject | Text (2,500) |
|---|---|---|---|---|---|
| | | | | | on the current water claim, then they should file a new claim. If this is the case, please let me know if you will be representing them on the new claim and send in a representation letter once the claim number is assigned. The adjuster will then call the customer for additional information. Thanks |
| 05/19/2015 02:01 PM | CHARLES BLACKBUR | Claim Status | none (Claim-level) | Attorney correspondenc | Original 05/19/2015 02:01 PM Received letter from Joel Hanson, attorney for the customer, advising Rainbow of the MDE report. Joel does not specifically state a demand contingent on estimates that are currently to be submitted but states that he and his clients believe both Rainbow and Liberty Mutual are responsible for the damage. Requested support to upload. Advised TM re. this letter and request for additional 3 months for the suit deadline to Sept. 9. |
| 05/18/2015 03:54 PM | CHARLES BLACKBUR | Claim Status | none (Claim-level) | PLAN FOR RESOLUTION BLDG | Original 05/18/2015 03:54 PM Received e-mail from Joel Hanson, attorney for the customer responding to my request for status indicating that Belfor is writing an estimate based on the mold report from MDE and more time is needed. Because of this, Joel is requesting a 90 day extension of the suit deadline which was originally extended to June 9. This would extend the suit deadline to Sept. 9. |
| 05/15/2015 09:53 AM | CHARLES BLACKBUR | Claim Status | none (Claim-level) | PLAN FOR RESOLUTION BLDG | Original 05/15/2015 09:53 AM Bldg: waiting on further damage information from attorney. Wrote letter to the attorney requesting a status on repairs and any additional information associated with the strucure. LOU: ALE limit was reached on 3/9 and all known costs have been paid. No known completion date for repairs. Forward diary 30 days for follow up. Reserves are adequate. |
| 05/08/2015 06:37 PM | BRIAN CAHILL | Claim Status | none (Claim-level) | | Original 05/08/2015 06:37 PM Spoke to Marshall Krotenberg at Rimkus. He is reviewing report from MDE and provide a written review based on what facts he can. |
| 05/04/2015 06:35 PM | ALYCIA PRICE | Exposure Evaluation | (3) 1st Party Content - RANI THYKKUTT | PPUN Storage - Payments | Original 05/04/2015 06:35 PM Rcvd auth to issue payments to both FRSTeam and Servpro for storage of PH's PPUN. Contacted atty Joel Hanson and he requested not to be named on payments. Issued storage invoice payments at this time. PPUN PAYMENT $41,658.96 Servpro contents storage inv $2,411.06 FRSTeam textiles storage inv Contacted atty re payments being issued. |
| 05/04/2015 03:41 PM | ALYCIA PRICE | Claim Status | (3) 1st Party | Storage | Original 05/04/2015 03:41 PM Rcvd auth to issue payment to Servpro and FRSTeam for storage of contents. PH is now being rep'd by atty. Called |



07/30/2015 02:26 PM

LM000034

 Pol: H3226803084640 | Ins: RANI THYKKUTTATHIL | DoL: 03/09/2014 | St: Open

| Create Date | Author | Topic | Related To | Subject | Text (2,500) |
|---|---|---|---|---|---|
| | | | | | protocol includes removal and remediation of additional areas in the house, appliance inspection and certification, duct cleaning and replacement of flex ducting (with additional demolition if necessary to access flex ducting), replacement of wiring and electrical devices on the lower level per Washington statute for any wiring or devices that were subjected to water exposure, and final cleaning and clearance. Since the mold limit has been exceeded. There would be no additional coverage for mold. Electrical wiring was included in the Mooney estimate which is the estimate on which LM based payment. It is unclear if there are any other devices or wiring in the laundry that have not been considered and were exposed to water. At this point a letter of response to this report should be sent to the attorney. It appears from the e-mail string that estimates for the work as described will also be sent. Sent notice to TM to advise on further handling. |
| 03/30/2015 06:48 PM | ALYCIA PRICE | Claim Status | (3) 1st Party Content - RANI THYKKUTT | Re-assignment - PPUN | Original 03/30/2015 06:48 PM Rcvd re-assigned claim from PPS Goffinet. I reviewed the claim in its entirety. The claim is atty rep'd - Joel Hanson. I contacted Joel to introduce myself and explain I have taken over the handling of the Personal Property portion of this claim. I reviewed the pending personal property information as I know it to date. He asked that I send an email outlining the items/issues, which I sent following our phone conversation. Joel stated the PH's didn't have any idea what Servpro had at their facility regarding their PPUN. I explained, that Servpro had completed a thourough inventory of all contents at their facility and had hand delivered that to Rani. Explained I will get a copy of that inventory from Servpro and send it to him for the records. I also explained that storage of the contents is concluded when LOU coverage is done. Explained last day of LOU was 3/9. Explained I am working to get some additional information from LL Blackburn and would let him know as soon as I knew last day we will pay for contents storage. Listed the outstanding issues of replacement receipts for some bedding, a computer and software. Explained PH had listed discrepancies with the pricing on these and Jon was waiting on her to submit the replacement receipts. Joel will look into these and get back to me. |
| 03/23/2015 03:23 PM | CHARLES BLACKBUR | Claim Status | none (Claim-level) | PLAN FOR RESOLUTION BLDG/LOU | Original 03/23/2015 03:23 PM ALE limit has expired. First party claims have been paid and no further claims have been made. Customer has hired an attorney who has stated that additional opinions would be sought |



LM000044

 Pol: H3226803084640 | Ins: RANI THYKKUTTATHIL | DoL: 03/09/2014 | St: Open

| Create Date | Author | Topic | Related To | Subject | Text (2,500) |
|---|---|---|---|---|---|
| | | | | | regarding mold and building damages but nothing submitted. Hold file open for additional 30 days. |
| 03/23/2015 01:32 PM | DEBORAH TAEGEL | Claim Status | none (Claim-level) | | Original 03/23/2015 01:32 PM Reassigning contents to PPS Price for handling. |
| 03/17/2015 11:56 AM | RICKY SUMMERLI | Examining | none (Claim-level) | Claim Review | Original 03/17/2015 11:56 AM Reviewed recent activity. |
| 03/16/2015 05:42 PM | MICHAEL TURNER | Subrogation | none (Claim-level) | | Original 03/16/2015 05:42 PM Fut rev...no reply to my questions regarding pursuit of the vendor. Without it, I am unable to proceed as it is not the normal subro claim. Obviously any offer that is made can be considered by the claims office if acceptable. I do not have sufficient knowledge of the matter to advise if offer noted is acceptable or even if offer should be considered given the current status of the file. |
| 03/06/2015 12:24 AM | BRIAN CAHILL | Claim Status | none (Claim-level) | | Original 03/06/2015 12:24 AM Insd atty rep'd. Suit Notice extension agreed to for 90 days post one year or 6-8-15. One year ALE coverage paid. Insd has not submitted any addl ALE misc ALE receipts during one year of coverage. Mold limit paid. Covered water damages paid and repair of kitchen area. Insd's atty has stated they are getting opinions from other contrs and IH. |
| 03/05/2015 03:51 PM | DEBORAH TAEGEL | Claim Status | none (Claim-level) | | Original 03/05/2015 03:51 PM Noted status of contents. |
| 02/26/2015 01:33 PM | JON GOFFINET | Claim Status | (3) 1st Party Content - RANI THYKKUTT | Response to Insured's attorney- Inventory- PPUN cleaning | Original 02/26/2015 01:33 PM I responded to the insured's attorney's email regarding his questions about the insured receiving a list of salvagable items from Servpro and his inquiry about why Servpro had not yet completed the PPUN cleaning. I responded to Mrs. Insured's Attorney (Joel) and advised him Emily stated the the insured was hand delievered a listing of the items that were packed out on two separate occassions. I also informed him Servpro has completed the cleaning of the PPUN items in October of 2014 and is awaiting the completion of the insured's building repairs, or the expiration of the LOU coverage as PPUN storage costs will follow LOU. |
| 02/26/2015 01:02 PM | JON GOFFINET | Claim Status | (3) 1st Party | Servpro Discussion- | Original 02/26/2015 01:02 PM In order to address the insured's attorney's two questions/concerns, I called and spoke with Emily from Servpro at |

LM000045

# EXHIBIT L

Print | Close Window

**Subject:** RE: Thykkuttathil 32071457 - GOOD FAITH SURVEY for asbestos and lead content
**From:** joel@joelhansonlaw.com
**Date:** Wed, Jun 17, 2015 5:00 pm
**To:** "Ted Sitterley" <Ted.Sitterley@us.belfor.com>, "Blackburn, Charles" <CHARLES.BLACKBURN@LibertyMutual.com>
**Cc:** "ryan@ryanwellman.com" <ryan@ryanwellman.com>, "ranijt@gmail.com" <ranijt@gmail.com>

Ted and Charles:

Please update us on the status of the mitigation and repair efforts. Are they proceeding? Is there anything we can do to move it forward faster?

It has been 29 days since the fire and 29 days since Liberty Mutual was notified of the fire. I am worried about mold growth and the financial pressure on Rani and Ryan, who are currently paying for a rental house out of their own pocket.

Regards,

Joel

Joel B. Hanson, Attorney at Law, PLLC
6100 - 219th St. SW, Suite 480
Mountlake Terrace, WA 98043
Office: 425-582-5636
Cell:206-412-8765
Fax: 425-368-7442
joel@joelhansonlaw.com

The information contained in this email message is intended only for the personal and confidential use of the recipient(s) named above. This message may be privileged and confidential. If you are not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify me immediately by email, and delete the original message. Thank you.

-------- Original Message --------
Subject: RE: Thykkuttathil 32071457 - GOOD FAITH SURVEY for asbestos and lead content
From: Ted Sitterley <Ted.Sitterley@us.belfor.com>
Date: Thu, June 11, 2015 9:20 am
To: "Blackburn, Charles" <CHARLES.BLACKBURN@LibertyMutual.com>
Cc: "joel@joelhansonlaw.com" <joel@joelhansonlaw.com>, "ryan@ryanwellman.com" <ryan@ryanwellman.com>, "ranijt@gmail.com" <ranijt@gmail.com>

Oops. Here you go.

Ted

**From:** Blackburn, Charles [mailto:CHARLES.BLACKBURN@LibertyMutual.com]
**Sent:** Thursday, June 11, 2015 9:17 AM
**To:** Ted Sitterley
**Subject:** RE: Thykkuttathil 32071457 - GOOD FAITH SURVEY for asbestos and lead content

Hi, Ted.  This appears to be the King Co. tax assessment webpage for the home, not a survey.

The lead portion is not covered under the policy (specifically excluded).  I understand you have to test but the cost is not covered.

Please provide the abatement estimate and survey.  Please remember that our coverage investigation is ongoing and no commitments to paying for these items can be made at this time.  Thanks.

**Charles Blackburn, AIC**
Liberty Mutual Insurance
PO Box 8415
Westminster, CA 92684-8415

Cell Phone: 425-754-0317
Office Fax: 800-510-8005
charles.blackburn@libertymutual.com

> **From:** Ted Sitterley [mailto:Ted.Sitterley@us.belfor.com]
> **Sent:** Thursday, June 11, 2015 9:06 AM
> **To:** joel@joelhansonlaw.com; ryan@ryanwellman.com; ranijt@gmail.com; Blackburn, Charles
> **Subject:** RE: Thykkuttathil 32071457 - GOOD FAITH SURVEY for asbestos and lead content
>
> Good morning all,
>
> We just received the good faith survey moments ago, but I wanted to forward it to you so that we all had it as we review for scope requirements
>
> It looks like there are a couple of locations that have Asbestos in the vinyl mastic and some lead based paint.
>
> Asbestos requires an asbestos abatement contractor, who we will engage for pricing.
>
> Lead requires certified lead restoration technicians, which we have.
>
> I'll begin to prepare a mitigation plan and pricing and get it over to you as soon as possible.
>
> Charles, I think I got a message from you but it was all garbled.  Was that you?

Thanks,

## Ted Sitterley
**BELFOR**
**PropertyRestoration**
4320 South 131st Place, Suite 100
Seattle, Wa 98168
Ph: 206.632.0800, Fx: 206.547.0800

Copyright © 2003-2016. All rights reserved.

# EXHIBIT M



Liberty Mutual Fire
Insurance Co.
P.O. 8415
Westminster, CA
92684-8415 (800)
565-5505
Fax (800) 510-8005

June 25, 2015

Joel Hanson, Attorney at Law
6100 219th St. SW Ste. 480
Mount Lake Terrace, WA 98043

Re:   Insured: Rani Thykkuttathil
      Claim Number: 032071457-01
      Date of Loss: 5/19/15

Dear Mr. Hanson:

I am offering to pay for Additional Living Expenses for our insured during the investigation of their fire claim.

Our customer would be entitled to the payment of rent based on their current rental or payment for Fair Rental Value coverage consisting of the cost of rent for their unfurnished home.

Rental payments would begin on the date of loss and our latest information shows they are paying 3,495.00 per month at 2606 130th Ave NE Bellevue, WA 98005.

If this amount has changed or their lease modified, please advise me and send the latest lease with the rental amount and terms.

The payment of Additional Living Expenses or Fair Rental Value would be issued under a reservation of rights as follows:

Until our investigation is complete, we expressly, completely, and fully reserve all of our rights under the policy and applicable law. The purpose of this reservation of rights is to permit us to investigate your claim and any coverage issues without waiving or being estopped to assert any of our legal rights.

This reservation includes, but is not limited to, a reservation of our right to disclaim and deny any obligation or liability under the policy, if further investigation of the circumstances surrounding this loss and claim would so warrant, and to avail us of any other rights which we may have or which may arise under this policy or applicable law. We do not intend to waive, but rather expressly reserve, our rights to assert any policy conditions or exclusions that we learn may be applicable to this loss.

Please let me know if you have any questions regarding the above information and let me know of the customer's decision regarding Additional Living Expense coverage or Fair Rental Value coverage.

Sincerely,

**LIBERTY MUTUAL FIRE INSURANCE COMPANY**

Charles Blackburn AIC
Senior Property Loss Specialist III
Personal Market Claims
P.O. Box 8415
Westminster, CA 92684-8415
charles.blackburn@libertymutual.com
425-754-0317
Fax: (800) 510-8005

**Helping People Live Safer, More Secure Lives**

# EXHIBIT N

**Print** | **Close Window**

Subject: Re: ALE Issues & Site 2/4/2016 Site Visit
   From: Ryan Wellman <maddgrinner@gmail.com>
   Date: Thu, Feb 04, 2016 2:27 pm
     To: Rani Joseph <ranijt@gmail.com>
     Cc: James.Wolterman@libertymutual.com, "<joel@joelhansonlaw.com>" <joel@joelhansonlaw.com>, Ryan Wellman <ryan@ryanwellman.com>

Hello Mr Wolterman,

It was a pleasure meeting with you this morning.  It was clear from the conversation that Liberty Mutual will not be extending the ALE past the 1 year date in May, despite Liberty Mutual's delays in getting the house completed.  Also, it was unclear if you would be providing assistance with us in locating and moving to a new temporary residence.  The owner of the current residence wants us to be out no later than the end of May, but earlier is fine as well, so they can begin a remodeling project.  We will need to be out & resettled sooner than that however (March-April time frame) as my wife is expecting our second child in mid to late May and it will not be feasible for our family to deal with both at the same time.



We really need your assistance in locating and moving to a new location.  It took your venders a long time last time to find a house that would hold our family, so it would be wise to start looking now for any suitable options.

Thank you,
Ryan

On Thu, Feb 4, 2016 at 12:18 AM, Rani Joseph <ranijt@gmail.com> wrote:

Mr. Wolterman,

As your Liberty Mutual policyholder, I wanted to personally reach out to you as the new adjuster on our case (32071457) regarding some important issues.

The first issue is ALE payment. I believe that your predecessor Charles Blackburn had issued ALE for December 2015 and January 2016, but my husband was not sure from his reading of the LM claim portal if this was the case. Moreover, the last time my husband checked, you have not issued payment for February 2016 and we are not sure as to why. We would appreciate it if you could check on these issues and offer some clear answers.

The second issue is ALE housing. We were just informed by the property management company for our rental that the owner is taking back possession of the property for renovations and we need to relocate within the next few months. Since it is your responsibility to handle our housing, please have your ALE vendors start searching for appropriate accommodations for our family. As a family that includes people with disabilities and very small children, we will also need your help to arrange a packing and moving service for us to make the transition as smooth as possible.

The third issue is the ALE time frame. On January 7, 2016, Joel Hanson reached out to you to inquire about this and summed up the situation:

"Mitigation is not completed, repairs have not started, and an engineer has not yet evaluated the damage (which is necessary before a full estimate of the cost of repairs

can be determined). Further, Liberty Mutual has not yet reached an agreement with any contractor on the cost of repairs. Under these circumstances, I think you will agree that it will not be possible to repairs to be completed by May 2016. Ryan and Rani will need to stay in their rental home beyond that date. Is Liberty Mutual willing to extend payment for their rental home beyond May 2016?

My understanding is that the entire purpose of ALE is to have smooth and seamless transition for your insured between repairs being completed and moving back into one's own home so that your insured's life is as little disrupted as possible. In our case, Liberty Mutual has created massive delays that have hindered us from moving forward or even figuring out what the scope and cost of the repairs should be, let alone actually having the time to complete the repairs. I do agree with Mr. Hanson that it is reasonable under these circumstances for Liberty Mutual to continue the ALE as the project moves forward beyond May 2016, and I would appreciate your thoughts.

The fourth issue is that we really need you to keep us in the loop in our own claim. I know you are communicating with Mr. Hanson and the contractors, but we are the insured and should also be copied on all your communications with them. We were surprised to only have just heard about a site visit being planned. Ted Sitterly of Belfor and the structural engineer had wanted the homeowners to be on site as the biggest stakeholder in creating a plan to move forward. Liberty Mutual has created many problems in this claim, and although it seems that Charles Blackburn could not put our interests on par with Liberty Mutual, we hope that you will be different and move this claim forward in a positive way. As such, my husband Ryan looks forward to meeting you at 9AM.

Best Regards,

Rani

Copyright © 2003-2016. All rights reserved.

# EXHIBIT O

<u>Print</u>  |  <u>Close Window</u>

**Subject:** RE: ALE Issues & Site 2/4/2016 Site Visit
**From:** joel@joelhansonlaw.com
**Date:** Fri, Feb 12, 2016 12:02 pm
**To:** "Eversole, Sarah" <Eversole@wscd.com>, "James Wolterman" <James.Wolterman@LibertyMutual.com>
**Cc:** "John Silk" <silk@wscd.com>
**Attach:** image001.jpg

Sarah:

I have not heard back from in response to my email below. <u>It appears that Liberty Mutual will not reconsider its decision to end the rental and ALE payments after 12 months. Accordingly, my clients have no choice but to ask the Court to rule on this issue.</u>

Regards,

Joel

Joel B. Hanson, Attorney at Law, PLLC
6100 - 219th St. SW, Suite 480
Mountlake Terrace, WA 98043
Office: 425-582-5636
Cell: 206-412-8765
Fax: 425-368-7442
joel@joelhansonlaw.com

The information contained in this email message is intended only for the personal and confidential use of the recipient(s) named above. This message may be privileged and confidential. If you are not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify me immediately by email, and delete the original message. Thank you.

-------- Original Message --------
Subject: RE: ALE Issues & Site 2/4/2016 Site Visit
From: <joel@joelhansonlaw.com>
Date: Wed, February 10, 2016 11:36 am
To: "Eversole, Sarah" <Eversole@wscd.com>, "James Wolterman" <James.Wolterman@LibertyMutual.com>
Cc: "John Silk" <silk@wscd.com>

Sarah:

Thank you for the response. Here, the "shortest time required to repair or replace the damage" is more than 12 months. So it is our position that Liberty Mutual should not stop payment at 12 months. Do you disagree with that interpretation?
The original contract (without the endorsement/amendment) allowed the repair time to exceed 12 months. If you are correct, and coverage was increased by the

"increased limit", then the original benefit should not be affected or reduced in any way.

Regards,

Joel


Joel B. Hanson, Attorney at Law, PLLC
6100 - 219th St. SW, Suite 480
Mountlake Terrace, WA 98043
Office: 425-582-5636
Cell:206-412-8765
Fax: 425-368-7442
joel@joelhansonlaw.com

The information contained in this email message is intended only for the personal and confidential use of the recipient(s) named above. This message may be privileged and confidential. If you are not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify me immediately by email, and delete the original message. Thank you.


-------- Original Message --------
Subject: RE: ALE Issues & Site 2/4/2016 Site Visit
From: "Eversole, Sarah" <Eversole@wscd.com>
Date: Tue, February 09, 2016 4:50 pm
To: "'joel@joelhansonlaw.com'" <joel@joelhansonlaw.com>

Joel:

I'll talk to Mr. Wolterman about this issue, but at first glance, it does appear you are misreading the policy.

The Policy coverage form does provide for Loss of Use that does not have a dollar limit, but is limited instead by "Actual Loss Sustained" which will be paid for the "shortest time required to repair or replace the damage…" (See Coverage D).

There is an amendment that does in fact extend this coverage. The amendment provides:

**C. INCREASED LIMIT - COVERAGE D**
We will pay the amount of loss covered by Coverage D which is actually sustained by you during
the 12 consecutive months following the date of loss, subject to the periods of time under
paragraphs 1, 2 and 3 of Coverage D - Loss of Use.

This is an extension of coverage, as the time period no longer limited by the "shortest time required to repair or replace the damage." Instead, the policy appears to be

paying "actual loss sustained" up to 12 months, with no reference to the reasonable repair period.

Would you like another copy of the policy?

Was there some other argument you were making that I might be missing?

**Sarah L. Eversole**



Attorney
901 Fifth Ave, Suite 1700
Seattle, WA 98164
Main:   206 623 4100
Fax:      206 623 9273
Email:  eversole@wscd.com

CONFIDENTIALITY NOTICE: The information contained in this ELECTRONIC MAIL transmission is confidential.  It may also be subject to the attorney-client privilege or be privileged work product or proprietary information. This information is intended for the exclusive use of the addressee(s).  If you are not the intended recipient, you are hereby notified that any use, disclosure, dissemination, distribution (other than to the addressee (s)), copying or taking of any action because of this information is strictly prohibited.

**From:** joel@joelhansonlaw.com [mailto:joel@joelhansonlaw.com]
**Sent:** Tuesday, February 09, 2016 4:05 PM
**To:** Silk, John; Eversole, Sarah
**Cc:** James.Wolterman@libertymutual.com
**Subject:** RE: ALE Issues & Site 2/4/2016 Site Visit

Mr. Silk, Ms. Eversole, and Mr. Wolterman:

Please see the emails below. It is my understanding that Liberty Mutual is unwilling to extend Rani and Ryan's rental house payments (the "ALE") past the 12 month anniversary of the fire. Liberty Mutual only recently approved the cost of an engineer, and the 12 month anniversary will be in May of 2016. I do not think there is any dispute that it will not be possible for Ryan and Rani to complete repairs by May. They need to have a place to stay until the repairs are complete.
The insurance contract Declarations page states that the only limit on the ALE/Loss of Use is the "Actual Loss Sustained" with no limitation on the number of months available.  My understanding is that the decision to not extend the ALE past 12 months is based on amendment that provides an "Increased Limit" under the Homeprotector Plus Endorsement. Rani and Ryan paid an additional $163 for that "increased" benefit. As you can see, this "Increased Limit" of 12 months actually seems to reduce the benefit. It is unfair for Liberty Mutual to charge Rani and Ryan for a reduction of their benefits. I hope that Liberty Mutual will reconsider this decision.

I am preparing to file a motion with the Court to determine whether it is fair to limit Rani and Ryan's ALE to 12 months. Please let me know right away if you feel it is unnecessary for me to file a motion on that issue. Please also let me know if you feel there is something I am misunderstanding about the insurance contract.

Regards,

Joel

Joel B. Hanson, Attorney at Law, PLLC
6100 - 219th St. SW, Suite 480
Mountlake Terrace, WA 98043
Office: 425-582-5636
Cell:206-412-8765
Fax: 425-368-7442
joel@joelhansonlaw.com

The information contained in this email message is intended only for the personal and confidential use of the recipient(s) named above. This message may be privileged and confidential. If you are not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify me immediately by email, and delete the original message. Thank you.

-------- Original Message --------
Subject: Re: ALE Issues & Site 2/4/2016 Site Visit
From: Ryan Wellman <maddgrinner@gmail.com>
Date: Thu, February 04, 2016 2:27 pm
To: Rani Joseph <ranijt@gmail.com>
Cc: James.Wolterman@libertymutual.com,
"<joel@joelhansonlaw.com>"
<joel@joelhansonlaw.com>, Ryan Wellman
<ryan@ryanwellman.com>

Hello Mr Wolterman,

It was a pleasure meeting with you this morning.  It was clear from the conversation that Liberty Mutual will not be extending the ALE past the 1 year date in May, despite Liberty Mutual's delays in getting the house completed.  Also, it was unclear if you would be providing assistance with us in locating and moving to a new temporary residence.  The owner of the current residence wants us to be out no later than the end of May, but earlier is fine as well, so they can begin a remodeling project.  We will need to be out & resettled sooner than that however (March-April time frame) as my wife is expecting our second child in mid to late May and it will not be feasible for our family to deal with both at the same time.

We really need your assistance in locating and moving to a new location.  It took your venders a long time last time to find a house that would hold our family, so it would be wise to start looking now for any suitable options.

Thank you,
Ryan

On Thu, Feb 4, 2016 at 12:18 AM, Rani Joseph <ranijt@gmail.com>
wrote:
Mr. Wolterman,

As your Liberty Mutual policyholder, I wanted to personally reach
out to you as the new adjuster on our case (32071457) regarding
some important issues.

The first issue is ALE payment. I believe that your predecessor
Charles Blackburn had issued ALE for December 2015 and
January 2016, but my husband was not sure from his reading of
the LM claim portal if this was the case. Moreover, the last time
my husband checked, you have not issued payment for February
2016 and we are not sure as to why. We would appreciate it if you
could check on these issues and offer some clear answers.

The second issue is ALE housing. We were just informed by the
property management company for our rental that the owner is
taking back possession of the property for renovations and we
need to relocate within the next few months. Since it is your
responsibility to handle our housing, please have your ALE
vendors start searching for appropriate accommodations for our
family. As a family that includes people with disabilities and very
small children, we will also need your help to arrange a packing
and moving service for us to make the transition as smooth as
possible.

The third issue is the ALE time frame. On January 7, 2016, Joel
Hanson reached out to you to inquire about this and summed up
the situation:

"Mitigation is not completed, repairs have not started, and an
engineer has not yet evaluated the damage (which is
necessary before a full estimate of the cost of repairs can be
determined). Further, Liberty Mutual has not yet reached an
agreement with any contractor on the cost of repairs. Under these
circumstances, I think you will agree that it will not be possible to
repairs to be completed by May 2016. Ryan and Rani will need to
stay in their rental home beyond that date. Is Liberty Mutual
willing to extend payment for their rental home beyond May
2016?

My understanding is that the entire purpose of ALE is to have
smooth and seamless transition for your insured between repairs
being completed and moving back into one's own home so that
your insured's life is as little disrupted as possible. In our case,
Liberty Mutual has created massive delays that have hindered us

from moving forward or even figuring out what the scope and cost of the repairs should be, let alone actually having the time to complete the repairs. I do agree with Mr. Hanson that it is reasonable under these circumstances for Liberty Mutual to continue the ALE as the project moves forward beyond May 2016, and I would appreciate your thoughts.

The fourth issue is that we really need you to keep us in the loop in our own claim. I know you are communicating with Mr. Hanson and the contractors, but we are the insured and should also be copied on all your communications with them. We were surprised to only have just heard about a site visit being planned. Ted Sitterly of Belfor and the structural engineer had wanted the homeowners to be on site as the biggest stakeholder in creating a plan to move forward. Liberty Mutual has created many problems in this claim, and although it seems that Charles Blackburn could not put our interests on par with Liberty Mutual, we hope that you will be different and move this claim forward in a positive way. As such, my husband Ryan looks forward to meeting you at 9AM.

Best Regards,

Rani

Copyright © 2003-2016. All rights reserved.

# EXHIBIT P

**Print** | **Close Window**

**Subject:** **Assisted living expenses**
**From:** "Wolterman, James" <James.Wolterman@LibertyMutual.com>
**Date:** Tue, Mar 29, 2016 8:18 am
**To:** "joel@joelhansonlaw.com" <joel@joelhansonlaw.com>, "ryan@ryanwellman.com" <ryan@ryanwellman.com>
**Cc:** Rani Joseph <ranijt@gmail.com>, "Eversole, Sarah" <Eversole@wscd.com>
**Attach:** image002.png
FRFRM - 032071457, THYKKUTTATHIL.pdf

Mrs. Thykkuttatthil et al,

The attached letter states there has been an approval of two (2) additional months for the assisted living expenses. Assisted living expenses will be extended until July 19th, 2016. The monthly amount will remain the same at $3495.00 a month.

A payment has also been issued for the assisted living expenses from 4/1/16 through 5/31/16 and should be received within 7-10 business days.

If you have any questions or concerns, please let me know.

Thank you,


**Jimmy Wolterman**
Sr. Field Claims Resolution Specialist III
Liberty Mutual Insurance
P.O. Box 8415
Westminster, CA 92684-8415
Direct Dial: 480.290.1234
Fax: 800.510.8005



**Track your claim, anytime, anywhere with eService at** www.libertymutual.com
- View claim status and details on any device, 24/7
- Upload claim-related documents and photos
- Update your contact information in just a few taps

Copyright © 2003-2016. All rights reserved.

# EXHIBIT Q

Atkinson-Baker Court Reporters
www.depo.com

1            UNITED STATES DISTRICT COURT WESTERN DISTRICT OF

2                    WASHINGTON AT SEATTLE

3

4    R.W. and R.J.T., husband and        )
     wife, and the marital community     )
     composed thereof,                   )
5                                        )
                    Plaintiffs,          )
6                                        )
     v.                                  )   No. CV 16-465 RAJ
7                                        )
     LIBERTY MUTUAL FIRE INSURANCE       )
8    COMPANY, dba Liberty Mutual,        )
                                         )
9                    Defendant.          )
                                         )

10

11

12              DEPOSITION OF JAMES WOLTERMAN

13

14                    Phoenix, Arizona

15                   November 4, 2016

16

17

18

19

20

21   ATKINSON-BAKER, INC.
22   COURT REPORTERS
     (800) 288-3376
23   www.depo.com

24   REPORTED BY:   CHARLOTTE LACEY, RPR, CR NO. 50859

25   FILE NO.:      AA0BC15

1

```
 1    necessary to expose code requirements and hidden damage?
 2         A.   It was necessary to open it up to see what truly
 3    needed to be done for repairs.
 4         Q.   Okay.  So that's a yes?
 5         A.   Yes.
 6         Q.   Can you tell me what additional living expenses
 7    stand for?
 8         A.   Additional living expenses?
 9         Q.   Sorry.  Sorry.  I answered my own question.
10              Can you tell me what ALE stands for?
11         A.   Additional Living Expenses.
12         Q.   Okay.  And does that include the cost of renting
13    a house during the repair process?
14         A.   What's available under the policy.
15         Q.   Does the policy allow Ryan and Rani to rent an
16    equivalent house during the repair process?
17         A.   With certain limitations, yes.
18         Q.   Did Liberty Mutual help relocate Ryan and Rani to
19    a temporary house after the fire?
20         A.   I don't know if they did or not.
21         Q.   Did you decide to end the ALE payments before the
22    repairs were finished?
23         A.   They were ended initially -- they were -- I
24    believe it was 14 months from the date of the loss.  Your
25    policy limits give you one year from the date of the loss.
```

James Wolterman
November 4, 2016

1     Q.   And can you say why you decided to -- to end the

2   ALE before the repairs were finished?

3     A.   It's in your policy.  You have one year from the

4   date of loss for additional living benefits, additional

5   living expenses.

6              THE WITNESS:  If it's okay, Joel, I need to

7   use the restroom.

8              MR. HANSON:  Okay.  Sure.  Let's go off the

9   record.

10              (A recess ensued from 2:06 p.m. to

11         2:09 p.m.)

12   BY MR. HANSON:

13     Q.   Can you look at Exhibit Number 16, which is a

14   June 16th, 2016, letter from you to Rani?  Do you see

15   that?

16     A.   Yes.

17     Q.   This letter noted that your understanding was

18   that Rani had told Pacific Engineering not to finish their

19   engineering work, correct?

20     A.   Correct.

21     Q.   And was that a factor in the decision to end Ryan

22   and Rani's additional living expenses?

23     A.   The additional living expenses were expiring

24   because it was the one year per the policy.

25     Q.   Okay.  And Liberty Mutual allowed an extension of

146

1    an additional two months beyond the 12 months in the

2    policy; is that correct?

3        A.    I believe it was two months, yes.

4        Q.    Okay.  Do you know why Liberty Mutual allowed an

5    additional two months?

6        A.    I personally do not.  It's not a decision made by

7    myself.

8        Q.    Okay.  So somebody else made that decision?

9        A.    Yes.

10       Q.    Okay.  Do you know who made that decision?

11       A.    Top of my head, I don't know who.

12       Q.    Okay.  Do you have any discretion in allowing

13   additional living expenses beyond 12 months if

14   circumstances make it impossible for a homeowner to do

15   repairs in that time?

16       A.    I do not, no.

17       Q.    Does anybody that you know at Liberty Mutual have

18   that discretion?

19       A.    I would assume, yes.

20       Q.    Did you ask anybody for that authority to go

21   beyond the 12 or 14 months limit on additional living

22   expenses?

23       A.    I would never be in a position to offer or ask

24   for that authority.  It would come from somebody above me.

25       Q.    Did you talk to Mr. Cahill about seeking

147

1   mean, if you're trying to protect something right away, if

2   a house is about to fall over, you tell them, no, frame up

3   whatever you need to do quickly.

4        Q.   Okay.

5        A.   But, in general, you try to get an agreed cost

6   beforehand for any additional work.

7             (Deposition Exhibit 24 was marked for

8             identification.)

9   BY MR. HANSON:

10       Q.   You've been handed an exhibit.  Can you tell me

11  what number it is?

12       A.   24.

13       Q.   Number 24 is an e-mail chain, and it's dated

14  the -- the last e-mail is dated March 16th, 2016.  And the

15  e-mail before it is on the second page, is an e-mail from

16  you to Ryan and Rani and other people as well, dated

17  March 16, 2016.  Do you see that?

18       A.   Yes.

19       Q.   Do you see where this is a discussion of whether

20  additional living expenses will be extended beyond the

21  period set by the policy?

22       A.   I see we're talking about ALE, yes.

23       Q.   Okay.  And do you see in the third paragraph of

24  your e-mail, it says, "Payments for undisputed

25  reconstruction costs were issued on October 6th, 2015, for

Atkinson-Baker Court Reporters
www.depo.com

```
 1    $160,000; and then on November 16th, 2015, an additional
 2    $29,000 was issued."  Do you see that?
 3         A.   Yes.
 4         Q.   And then you see where you said, "When I visited
 5    in February, it appeared that no work had been completed
 6    yet and there were several months between the payments and
 7    my visit."  Do you see that?
 8         A.   Yes.
 9         Q.   Do you have any criticism of the -- of the speed
10    at which the repairs process has gone here?
11         A.   I don't understand.
12         Q.   Okay.  Are you critical of Ryan and Rani not
13    starting repairs around the date of those October 6th and
14    November 17th payments in 2015?
15         A.   My e-mail is just stating, basically, what
16    happened and what I saw from those times.  It's not
17    a -- it's not an opinion on anything.
18         Q.   Okay.  So this e-mail is not intended to be a
19    criticism of them for not starting the repairs sooner?
20         A.   It's to give a chronological account of what I
21    know is going on with the claim at the time.
22         Q.   Okay.  Is it to give an explanation for why
23    additional living expenses are not going to be paid beyond
24    the 12-month limit?
25         A.   Well, it doesn't appear to be concerning that,
```

181

1    because the 12-year [sic] limit is your policy limits.

2        Q.   Okay.  So you don't think these e-mails are about

3    the question of whether Liberty Mutual should extend the

4    additional living expenses beyond the 12-month limit?

5        A.   Well, if you go back, it appears Ryan is asking

6    about one-year limit.

7             But, again, what I'm explaining is, this is

8    what has happened chronological from what I've been

9    involved and what I know based on the claim and when

10   payments have been paid.  So I'm not speaking to whether

11   or not there's extensions or anything related to

12   additional living expenses.

13       Q.   Okay.  And you're not being critical -- in this

14   March 16th e-mail, you're not being critical of the -- the

15   speed at which they have undertaken repairs?

16       A.   No.  Again, I -- explaining chronologically what

17   I know to have happened up to this point.

18       Q.   Okay.  Do you feel that there were any problems

19   with this claim after you became involved in it?

20       A.   I would say it seemed to have taken inordinately

21   long to get a set of plans completed.

22       Q.   Completed and then submitted to the City,

23   correct?

24       A.   Well, even just completed at this point.

25       Q.   Okay.  Okay.  Aside from the delay in getting the

182

James Wolterman
November 4, 2016

1   plans, the engineering plans completed, do you see

2   any -- any other problems with this claim?

3       A.    To my knowledge, no.

4       Q.    Okay.  Aside from the -- getting the plans

5   completed by the engineer, do you wish this claim had gone

6   differently in any way?

7               MS. EVERSOLE:  Objection.  Calls for

8   speculation.

9               THE WITNESS:  I would say at this point, I

10  mean, all I'm doing is waiting for plans to be done to

11  move forward.  That's where I stand.  I don't want to

12  offer an opinion one way or the other.

13  BY MR. HANSON:

14      Q.    Do you feel that you or anyone else at Liberty

15  Mutual made any mistakes during the claim?

16      A.    I believe everyone's done the best they can to

17  move the claim forward.

18      Q.    Do you feel that you or anyone at Liberty Mutual

19  did anything wrong during the claim?

20      A.    To my knowledge, I don't believe so.

21      Q.    Do you feel that Ryan or Rani or any of the

22  professionals that they hired caused any problems in this

23  claim, aside from the delay with the engineer --

24  engineering plans that you mentioned?

25      A.    Aside from engineering, I mean, that's all I've

183

Atkinson-Baker Court Reporters
www.depo.com

1    Q.   Do you think that Ryan or Rani caused any delays

2  in the repair process?

3    A.   To my knowledge, no.

4    Q.   So is it fair to say that the only thing that you

5  feel was done wrong in this claim was the delay in getting

6  an engineer's plans submitted to the City for approval?

7    A.   From when I've gotten involved, the only thing

8  that has been delaying this claim is getting an approved

9  set of plans.

10    Q.   Can you go to LM 5760?  Do you see that on 5760

11  there's a February 4th, 2016, note from you that's at

12  1:25 p.m.?

13    A.   Yes.

14    Q.   Okay.  Do you see that on -- looks like on the

15  third sentence it says, "Upon arrival, Ted, Ryan, the

16  engineer and I went inside and heard water running."  Do

17  you see that?

18    A.   Yes.

19    Q.   And then it says, "We moved to the basement and

20  the main supply line was opened and the angle stop supply

21  for the downstairs commode was on and there was also what

22  appeared to be human excrement on the ground."  Do you see

23  that?

24    A.   Yes.

25    Q.   So was the basement -- was there a lot of water

Atkinson-Baker Court Reporters
www.depo.com

1    repairs?

2                    MS. EVERSOLE:  Objection to form.

3                    THE WITNESS:  I don't -- what -- what cost

4    of repairs?

5    BY MR. HANSON:

6        Q.    The -- the BELFOR estimate for $291,000?

7        A.    I don't remember how often or/if when I had a

8    conversation with him.

9        Q.    Who would typically be responsible for kind of

10   moving things forward with the engineer?  Or making sure

11   that the engineer was moving forward with submitting plans

12   or doing what they -- they needed to be doing?

13       A.    Usually the engineer takes it upon themselves, if

14   they're a professional.

15       Q.    Okay.  And then, so typically just the engineer

16   goes forward and does the -- submits the plans without

17   direction from the contractor?

18       A.    Sometimes, yes.  Again, every claim is different.

19   At this point, I wouldn't say "submit," because now that

20   you pointed out they were just to produce a set of plans,

21   because they had that $9,000 limit.  So at this point, as

22   of January, they had the $9,000 to produce a set of plans.

23   And that's what we were waiting for, from that point

24   forward.

25       Q.    So if they had spent that full $9,000 and

James Wolterman
November 4, 2016

# EXHIBIT R

Print  |  Close Window

Subject: **RE: Urgent Relocation Issues**
   From: "Wolterman, James" <James.Wolterman@LibertyMutual.com>
   Date: Wed, Mar 16, 2016 9:49 am
      To: "ryan@ryanwellman.com" <ryan@ryanwellman.com>
      Cc: "'joel@joelhansonlaw.com'" <joel@joelhansonlaw.com>, Rani Joseph <ranijt@gmail.com>, "Eversole, Sarah" <Eversole@wscd.com>
  Attach: image001.png
          image002.png
          image004.png

Mr. Wellman et al,

I attached photos of the actual policy language below.  Liberty Mutual offers, only as a courtesy and not due to an obligation per the policy language, the resources of a third party vendor to help facilitate finding a comparable home while repairs are being completed.  Liberty Mutual has no control nor authority over these vendors but again, offers the service as a courtesy only.  The policy states that there are two options (1a and 1b) which are additional living expenses and fair rental value.  You have chosen the Additional Living Expenses and the definition is listed below.  It does not state Liberty will find the property, but it states Liberty will pay any necessary increase in living expenses.

I do not know when the decision on the extension will be decided but once I have said decision, I will inform you.

Payments for undisputed reconstruction costs were issued on 10/6/15 for $160,918.35 and on 11/17/15, an additional $29,238.65 was issued .  When I visited in February, it appeared that no work had been completed yet there were several months between the payments and my visit.  Liberty Mutual does work with contractors to expedite the reconstruction process and one way this is done is to pay undisputed costs so reconstruction can begin and if/when hidden damage is found, they can be addressed as a supplement.  I hope this gives you a better understanding of how the process works.

If you have any other questions or concerns, please let me know.

Thank you,

**Jimmy Wolterman**
Sr. Field Claims Resolution Specialist III
Liberty Mutual Insurance
P.O. Box 8415
Westminster, CA 92684-8415
Direct Dial: 480.290.1234
Fax: 800.510.8005



**Track your claim, anytime, anywhere with eService at** www.libertymutual.com
- View claim status and details on any device, 24/7
- Upload claim-related documents and photos
- Update your contact information in just a few taps

**COVERAGE D - Loss of Use**
The limit of liability for Coverage D is the total limit for all the coverages that follow.
1. If a loss covered under this Section makes that part of the residence premises where you reside not fit to live in, we cover, at your choice, either of the following. However, if the residence premises is not your principal place of residence, we will not provide the option under paragraph b. below.
   a. **Additional Living Expense**, meaning any necessary increase in living expenses incurred by you so that your household can maintain its normal standard of living; or
   b. **Fair Rental Value**, meaning the fair rental value of that part of the residence premises where you reside less any expenses that do not continue while the premises is not fit to live in.
   Payment under a. or b. will be for the shortest time required to repair or replace the damage or, if you permanently relocate, the shortest time required for your household to settle elsewhere.
2. If a loss covered under this Section makes that part of the residence premises rented to others or held for rental by you not fit to live in, we cover the:
   **Fair Rental Value**, meaning the fair rental value of that part of the residence premises rented to others or held for rental by you less any expenses that do not continue while the premises is not fit to live in.
   Payment will be for the shortest time required to repair or replace that part of the premises rented or held for rental.
3. If a civil authority prohibits you from use of the residence premises as a result of direct damage to neighboring premises by a Peril Insured Against in this policy, we cover the Additional Living Expense or Fair Rental Value loss as provided under 1 and 2 above for no more than two weeks.
The periods of time under 1, 2 and 3 above are not limited by expiration of this policy.
We do not cover loss or expense due to cancellation of a lease or agreement.

**C. INCREASED LIMIT - COVERAGE D**
We will pay the amount of loss covered by Coverage D which is actually sustained by you during the 12 consecutive months following the date of loss, subject to the periods of time under paragraphs 1, 2 and 3 of Coverage D - Loss of Use.

-----Original Message-----
From: ryan@ryanwellman.com [mailto:ryan@ryanwellman.com]
Sent: Monday, March 14, 2016 3:31 PM
To: Wolterman, James <James.Wolterman@LibertyMutual.com>
Cc: 'joel@joelhansonlaw.com' <joel@joelhansonlaw.com>; Rani Joseph <ranijt@gmail.com>; Eversole, Sarah <Eversole@wscd.com>
Subject: RE: Urgent Relocation Issues

Hello Mr. Wolterman,

I am very concerned and confused about Liberty Mutual's lack of serious action to find us someplace to live. From the e-mails we've been seeing, it sounds like it is merely a courtesy that you find us a place to live. I am asking you, as our adjuster, is this Liberty Mutual's official position?  We were under the impression that under the contract you were obligated to provide us with a place to live comparable to our

home, at least for the duration of the ALE.   As it stands now, it
sounds that if we are unable to find a place to live by April 15th we are on our own (the 15th is when we
estimate that we have to start moving in order be out of the house and clean it in time for the owner to reclaim
it at the end of April)?  Do you have some other plan for keeping us housed for the remainder of the ALE if we
are unable to find a place or are you suggesting that perhaps we live out of our cars until such a time as we do
manage to find a place?

I am however glad to hear that we will be receiving a resolution about the ALE extension inquiry.  Is there some
date we might expect this response?

It is still very confusing to us that somehow the "increased limit" you sold us actually reduces the ALE from the
time it takes to actually repair our house down to a 12-month maximum.  It seems to us that the original terms,
without this "increased limit" would provide an incentive for you to work efficiently with our contractors.  This
limit has been especially frustrating since progress has been delayed by you taking weeks and months to
approve seemingly simple requests.

If it isn't painfully clear already.  This entire situation, both the slow progress on our house and even more not
knowing where we're going to be living in a month, is very stressful on our family.  My wife's doctors have said
that this stress is bad for her health, our son's health and that of our unborn child.

Please contact us back promptly about what, if any, plan you have to help our family.

Thank you,
- Ryan


On 2016-03-14 10:42, Eversole, Sarah wrote:
> Joel:
>
> What is it that your clients would like Liberty to do at this point?
>
> The request for an extension of ALE is under review.  You will likely
> receive a response soon.
>
> The coverage is what it is.  There is nothing Liberty can do about the
> choice of housing that ALE solutions has offered.  My understanding is
> that the housing service is not actually a service that is provided
> for under the insurance policy, it is just assistance offered as a
> courtesy.   Certainly your clients are free to find a rental house on
> their own.   Whether they choose to enter into a lease that may be
> longer than the policy benefits available to them, would appear to be
> a decision that is entirely theirs, right?  Are you asking whether
> Liberty will pay for another year in rent past what is provided for in
> the policy? That can't be what you are asking, right?
>
> Mr. Wolterman states below regarding the moving company "I do not know
> of any moving companies in the area that I can recommend nor does

> Liberty partner with moving companies."
>
> SARAH L. EVERSOLE
>
> Attorney
>
> 901 Fifth Ave, Suite 1700
>
> Seattle, WA 98164
>
> Main:   206 623 4100
>
> Fax:      206 623 9273
>
> Email:   eversole@wscd.com
>
> CONFIDENTIALITY NOTICE: The information contained in this ELECTRONIC
> MAIL transmission is confidential.  It may also be subject to the
> attorney-client privilege or be privileged work product or proprietary
> information. This information is intended for the exclusive use of the
> addressee(s).  If you are not the intended recipient, you are hereby
> notified that any use, disclosure, dissemination, distribution (other
> than to the addressee(s)), copying or taking of any action because of
> this information is strictly prohibited.
>
> FROM: joel@joelhansonlaw.com [mailto:joel@joelhansonlaw.com]
> SENT: Monday, March 14, 2016 10:34 AM
> TO: Eversole, Sarah
> CC: Rani Joseph; Wolterman, James; ryan@ryanwellman.com
> SUBJECT: RE: Urgent Relocation Issues
>
> Sarah:
>
> I do not agree that Mr. Wolterman answered all the questions. To
> respond directly to each of your numbered statements:
>
> 1. If you read the emails below, you will see that ALE Solutions has
> only suggested one property. And it fails to meet Liberty Mutual's
> contractual requirements because it is too small. Remember, the house
> needs to be big enough for both families.
>
> 2. My clients have asked permission to find a rental house on their
> own. This would likely require a standard lease agreement. Neither you
> nor Mr. Wolterman has responded to that request. This is a separate
> request from the ALE "extension" that you have said is under review.
>
> 3. Mr. Wolterman did not respond to the inquiry about a moving

> company. Thank you for answering that question for him.
>
> Regards,
>
> Joel
>
> Joel B. Hanson, Attorney at Law, PLLC
> 6100 - 219th St. SW, Suite 480
> Mountlake Terrace, WA 98043
> Office: 425-582-5636
>
> Cell:206-412-8765
>
> Fax: 425-368-7442
> joel@joelhansonlaw.com
>
> The information contained in this email message is intended only for
> the personal and confidential use of the recipient(s) named above.
> This message may be privileged and confidential. If you are not the
> intended recipient or an agent responsible for delivering it to the
> intended recipient, you are hereby notified that you have received
> this document in error and that any review, dissemination,
> distribution, or copying of this message is strictly prohibited. If
> you have received this communication in error, please notify me
> immediately by email, and delete the original message. Thank you.
>
>> -------- Original Message --------
>> Subject: RE: Urgent Relocation Issues
>> From: "Eversole, Sarah" <Eversole@wscd.com>
>> Date: Fri, March 11, 2016 5:21 pm
>> To: "'joel@joelhansonlaw.com'" <joel@joelhansonlaw.com>
>> Cc: Rani Joseph <ranijt@gmail.com>, "Wolterman, James"
>> <James.Wolterman@LibertyMutual.com>, "ryan@ryanwellman.com"
>> <ryan@ryanwellman.com>
>>
>> Joel:
>>
>> I am confused as it appears Mr. Wolterman answered your question
>> already.
>>
>> 1.  ALE solutions, the relocation company, appears to already be
>> working with your clients.
>>
>> 2.  An extension is under review
>>
>> 3.  Liberty Mutual does not have a moving company that it
>> employs/works with or that it can recommend.

>>
>> Is there something specific that you do not understand?
>>
>> SARAH L. EVERSOLE
>>
>> Attorney
>>
>> 901 Fifth Ave, Suite 1700
>>
>> Seattle, WA 98164
>>
>> Main:   206 623 4100
>>
>> Fax:     206 623 9273
>>
>> Email:  eversole@wscd.com
>>
>> CONFIDENTIALITY NOTICE: The information contained in this ELECTRONIC
>> MAIL transmission is confidential.  It may also be subject to the
>> attorney-client privilege or be privileged work product or
>> proprietary information. This information is intended for the
>> exclusive use of the addressee(s).  If you are not the intended
>> recipient, you are hereby notified that any use, disclosure,
>> dissemination, distribution (other than to the addressee(s)), copying
>> or taking of any action because of this information is strictly
>> prohibited.
>>
>> FROM: joel@joelhansonlaw.com [mailto:joel@joelhansonlaw.com]
>> SENT: Friday, March 11, 2016 4:30 PM
>> TO: Wolterman, James; ryan@ryanwellman.com; Eversole, Sarah
>> CC: Rani Joseph
>> SUBJECT: RE: Urgent Relocation Issues
>>
>> Mr. Wolterman:
>>
>> As Rani and Ryan have repeatedly explained, they are being forced to
>> move to a new house PRIOR to the one year anniversary of the fire.
>> They need help finding a house during the period of time that Liberty
>> Mutual has already agreed they are covered.
>>
>> Please respond and confirm you understand this.
>>
>> Regards,
>>
>> Joel
>>
>> Joel B. Hanson, Attorney at Law, PLLC

>> 6100 - 219th St. SW, Suite 480
>> Mountlake Terrace, WA 98043
>> Office: 425-582-5636
>>
>> Cell:206-412-8765
>>
>> Fax: 425-368-7442
>> joel@joelhansonlaw.com
>>
>> The information contained in this email message is intended only for
>> the personal and confidential use of the recipient(s) named above.
>> This message may be privileged and confidential. If you are not the
>> intended recipient or an agent responsible for delivering it to the
>> intended recipient, you are hereby notified that you have received
>> this document in error and that any review, dissemination,
>> distribution, or copying of this message is strictly prohibited. If
>> you have received this communication in error, please notify me
>> immediately by email, and delete the original message. Thank you.
>>
>>> -------- Original Message --------
>>> Subject: RE: Urgent Relocation Issues
>>> From: "Wolterman, James" <James.Wolterman@LibertyMutual.com>
>>> Date: Fri, March 11, 2016 4:22 pm
>>> To: "ryan@ryanwellman.com" <ryan@ryanwellman.com>, "Eversole, Sarah"
>>> <Eversole@wscd.com>
>>> Cc: Joel Hanson <joel@joelhansonlaw.com>, Rani Joseph
>>> <ranijt@gmail.com>
>>>
>>> Mr. Wellman et al.,
>>>
>>> I can't approve an additional year at this time. The policy limits
>>> are for one year of the date of loss which would end on 5/19/16.
>>> An extension is under review. I do not know of any moving companies
>>> in the area that I can recommend nor does Liberty partner with
>>> moving companies.
>>>
>>> Once I know more on the review of the extension, I will let you
>>> know.
>>>
>>> Thank you,
>>>
>>> Jimmy Wolterman
>>> Sr. Field Claims Resolution Specialist III Liberty Mutual Insurance
>>> P.O. Box 8415 Westminster, CA 92684-8415 Direct Dial: 480.290.1234
>>> Fax: 800.510.8005
>>>
>>> Track your claim, anytime, anywhere with eService at

>>> www.libertymutual.com [1]
>>> - View claim status and details on any device, 24/7
>>> - Upload claim-related documents and photos
>>> - Update your contact information in just a few taps
>>>
>>> -----Original Message-----
>>> From: ryan@ryanwellman.com [mailto:ryan@ryanwellman.com]
>>> Sent: Thursday, March 10, 2016 12:45 AM
>>> To: Wolterman, James <James.Wolterman@LibertyMutual.com>; Cahill,
>>> Brian <BRIAN.CAHILL@LibertyMutual.com>
>>> Cc: Joel Hanson <joel@joelhansonlaw.com>; Rani Joseph
>>> <ranijt@gmail.com>
>>> Subject: Urgent Relocation Issues
>>>
>>> Hi James,
>>>
>>> We just found out a few days ago that the owner of the house has
>>> moved up the timeframe for when we have to be out. We now have to be
>>> completely out of the house by April 30th (which means we have to
>>> start moving by early to mid April in order to be out and clean the
>>> house).
>>> So far the relocation company, ALE Solutions, has only found us one
>>> potential property, it's not only smaller than our home (not to
>>> mention the current rental) but they haven't even verified yet that
>>> they will allow our cats.
>>>
>>> We've been forced to start looking on our own. We've been told that
>>> it is currently a very hot rental market that makes renting any
>>> house very expensive and difficult because of all the demand.
>>> It's exceptionally rare to find any house without a 1 year lease.
>>> Do we have permission to sign a one year lease if we find a home
>>> that will take us, including our cats? This is a huge burden on us
>>> and extremely stressful, please help us find a new property.
>>>
>>> Also we will need assistance in moving, do you have a moving company
>>> that is one of your preferred venders or should we find one on our
>>> own and provide the receipts for reimbursement?
>>>
>>> Thank you,
>>> - Ryan
>
>
> Links:
> ------
> [1] http://www.libertymutual.com/

The Honorable Richard A. Jones

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| R.W. and R.J.T., husband and wife, and the marital community composed thereof,<br><br>Plaintiffs,<br><br>v.<br><br>LIBERTY MUTUAL FIRE INSURANCE COMPANY, dba Liberty Mutual<br><br>Defendant. | NO.  C16-465 RAJ<br><br><br>(proposed) ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT RE COVERAGES |

This matter came before the Court on Plaintiffs' Motion for Partial Summary Judgment re Coverages. Having reviewed all the briefing and materials submitted for and against Plaintiffs' Motion,

**IT IS HEREBY ORDERED** that Plaintiffs' Motion for Partial Summary Judgment re Coverages is GRANTED. As a matter of law, the Court finds that:

1. The damage caused by the March 2014 water leak, and the mitigation of that damage, was covered.

2. There is no evidence that Plaintiffs intentionally caused the May 2015 fire.

3. The damage resulting from the May 2015 fire, and the mitigation of that damage, was covered.

(proposed) ORDER — 1

NO.  C16-465 RAJ

JOEL B. HANSON
ATTORNEY AT LAW, PLLC
6100 219 STREET SW
SUITE 480
SEATTLE, WA 98043
425.582.5636

4. Plaintiffs' mortgage company was also covered for the May 2015 fire damage, and the mitigation of that damage, even if Liberty Mutual had determined that Plaintiffs had intentionally caused the fire.

5. The insurance contracts in effect for the March 2014 water loss and for the May 2015 fire were not limited to a maximum of 12 months of Additional Living Expenses (ALE).


DATED this _____ day of _____, 2017.



_____
Richard A. Jones
United States District Court Judge

PRESENTED BY:

JOEL HANSON, ATTORNEY AT LAW, PLLC


/s/ Joel Hanson_____
Joel B. Hanson, WSBA #40814
Attorney for Plaintiff

(proposed) ORDER — 2

NO. C16-465 RAJ

JOEL B. HANSON
ATTORNEY AT LAW, PLLC
6100 219 STREET SW
SUITE 480
SEATTLE, WA 98043
425.582.5636

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| R.W. and R.J.T., husband and wife, and the marital community composed thereof,<br><br>Plaintiffs,<br><br>v.<br><br>LIBERTY MUTUAL FIRE INSURANCE COMPANY, dba Liberty Mutual<br><br>Defendant. | **NO. CV 16-465 RAJ**<br><br><br>**CERTIFICATE OF SERVICE** |

Under penalty of perjury under the laws of the State of Washington, I declare that on this 10th day of January, 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system with which will send notification of such filing to the following:

John M. Silk, WSBA #15035
Sarah L. Eversole, #36335
Wilson Smith Cochran Dickerson
901 5th Ave., Ste 1700
Seattle, WA 98164
206/623-4100

Sonia Chakalo

CERTIFICATE OF SERVICE — 1